83,797-01



**LEE HARRIS, JUDGE**
66TH JUDICIAL DISTRICT COURT
HILL COUNTY COURTHOUSE
P.O. BOX 284
HILLSBORO, TX 76645
(254) 582-4045
(254) 582-4010 fax
lharris@co.hill.tx.us

JANET McCONATHY
COURT REPORTER
jmcconathy@co.hill.tx.us

JANE HALL
COURT COORDINATOR
jhall@co.hill.tx.us

IDA ALCALA
ASST. COURT COORDINATOR
ialcala@co.hill.tx.us

October 7, 2015

RECEIVED IN
COURT OF CRIMINAL APPEALS

NOV 16 2015

Abel Acosta, Clerk

Sharon Keller, Chief Justice
Court of Criminal Appeals
P. O. Box 12308
Austin, TX 78711-2308

Re:    No. WR. 83,797-01
       In re: Darrell Curlee

Dear Judge Keller:

I am new to the process of responding personally to an Application for Writ of Mandamus. One of the briefing attorneys that I spoke with at the Court of Criminal Appeals said that I could do so in letter form.

I am a little confused over the filing of the Writ with your Court as the applicant entered into a plea agreement and was sentenced on July 31, 2015. I am attaching certified copies of each filing from Mr. Curlee's trial court file collectively as Exhibit A. I have also included a letter that I received from Mr. Curlee complaining about his trial counsel just before I appointed Mr. Lyle Gripp as additional and lead counsel. That letter is attached as Exhibit B. I have included a copy of the Order Appointing Mr. Gripp as Exhibit C. As you can see, the appointment does not remove Mr. Russell, it merely adds additional counsel.

This was done for two reasons. First, Mr. Curlee complained. Second, at about the same time as the appointment of Mr. Gripp, I learned of a troubling series of events that led me to question Mr. Russell's fitness to practice law.

When I served as the Judge of the County Court at Law of Hill County, I was, from time to time, assigned to sit as the Judge of the 66th District Court. One of those assignments was in Cause No. 37228, State of Texas v. James Ryder. Terence Russell had been appointed to represent Mr. Ryder by the Honorable F. B. McGregor, Jr., prior to my assignment to the case. I set the case for a jury trial on August 27, 2014; however, I fell ill and the Honorable Alan Mayfield, Retired Judge of the 74th District Court of McLennan County, was assigned to preside over the jury trial.

Mr. Ryder faced three felony counts. The first count had a range of punishment from 25 years to life, the second count was from two years to 20 years, and the third count was from two years to 10 years. Ultimately, the jury found Mr. Ryder guilty and sentenced Mr. Ryder to 99 years, 20 years, and 10 years, respectively. Although Mr. Ryder had been deemed indigent and had counsel appointed to him, no Ake v. Oklahoma or similar motions were filed with the court seeking funds for expert witnesses, investigators, or any other assistance.

Mr. Ryder has now hired the Honorable Kristin R. Brown of Dallas to represent him on appeal. Ms. Brown filed a Motion for New Trial wherein she alleges that Mr. Russell required Mr. Ryder to provide $1,500 so that an expert could be hired. That expert, Dr. Trent Terrell, required a fee of only $1,000 for his testimony. Unfortunately, because of an alleged miscommunication, Dr. Terrell never appeared at the trial. Dr. Terrell did return an uncashed $1,000 check written from Mr. Russell's personal checking account. A $1,000 check was subsequently written to Mr. Ryder or his fiancé as a refund. That check was not written on an IOLTA trust account but instead seems to come from Mr. Russell's and his wife's personal bank account. To this day, Mr. Russell has failed to account for or return the other $500 that he required the indigent defendant to tender to him.

I have attached as Exhibit D a copy of the Motion for New Trial, together with the Affidavits of Dr. Terrell and Larenda Nichole Watkins (the fiancé of Mr. Ryder who paid Mr. Russell the $1,500), along with a copy of the check that refunded the money to Mr. Ryder, and the receipt from Mr. Ryder when the money was deposited with Mr. Russell.

I have attached as Exhibit E the transcript of the hearing on the Motion to Rescind and Second Motion for New Trial filed by Mr. Ryder wherein Mr. Russell testified that he did not maintain a trust account, and that he used his personal account for his client trust account. Also attached is the attorney fee voucher and proof of payment by Hill County to Mr. Russell for representing Mr. Ryder.

Further, there is presently a case before your court styled In re Thomas Eric Lee, WR. 81,722-01. Mr. Russell represented Mr. Lee at the trial court and Mr. Lee has now alleged that Mr. Russell coerced him into pleading no contest. Mr. Lee alleged that Mr. Russell told him "that he was going to be elected district judge and Mr. Lee better hurry and plead to the charges because counsel would throw the book at him once counsel took the bench."

Attached as Exhibit F is a copy of the transcript from the hearing conducted as a part of the Order issued by the Court of Criminal Appeals. Mr. Russell testifies, but never unequivocally denies telling Mr. Lee what he was alleged to have said.

I believe Mr. Lee's assertion to be true because in a previous case, another defendant, Curtis Fields, made an allegation that "Russell emphasizes that he is utilizing political strategies to win votes for the up-coming judge's position." Attached as Exhibit G is a copy of Mr. Fields' complaint. The above referenced allegation is made at the top of page 4.

Because my understanding is that I have a fiduciary duty to appoint competent counsel for indigent defendants, and because of my growing concerns regarding Mr. Russell, I appointed additional counsel to an indigent defendant. I have also complied with my duty to report misconduct to the State Bar of Texas as a result of the trust account issues referenced above.

Sincerely,

Lee Harris, Judge

Cc:     Terence Russell (w/o attachments)
        Mark Pratt (w/o attachments)
        Lyle Gripp (w/o attachments)

# EXHIBIT A

# INDICTMENT

CAUSE NO. 37458

BOND $ *45,000 @ Count*

JUDGE *[signature]*

*[stamp: 12 AUG 24 P 1:48 DISTRICT COUNTY, TX]*

## THE STATE OF TEXAS VS. DARREL ALLEN CURLEE

## CHARGE: AGGRAVATED ASSAULT WITH A DEADLY WEAPON
## AGGRAVATED ASSAULT THREAT-WITH A DEADLY WEAPON

**IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:**

THE GRAND JURY, for the County of Hill, State of Texas, duly selected, empaneled, sworn, charged and organized as such at the **JULY/DECEMBER term, A.D., 2012** of the 66th Judicial District Court for said County, upon their oaths present in and to said court at said term that **DARREL ALLEN CURLEE** hereinafter styled Defendant, on or about the **15TH DAY OF JUNE 2012** and before the presentment of this indictment, in the County of Hill and State aforesaid, did then and there unlawfully, intentionally or knowingly or recklessly cause bodily injury to Christopher Jordan Wally by cutting him with a knife, and the defendant did use or exhibit a deadly weapon during the commission of the assault, to-wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury.

And it is further presented that prior to the commission of the primary offense by the said Darrel Allen Curlee, to-wit: on the 25th day of February 1983, in the District Court of San Miguel County, New Mexico in Cause No. 81-73-CR on the docket of said Court, the said Darrel Allen Curlee, under the name of Darrerll Allen Curlee, was duly and legally convicted in said last named Court of a felony, to-wit: Second Degree Murder upon an indictment then legally pending in said last named Court and of which said Court had jurisdiction; and said conviction was a final conviction and was a conviction for an offense committed by him, the said Darrel Allen Curlee, prior to the commission of the primary offense.

A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY [signature]

And it is further presented that before the commission of the primary offense and after the conviction in Cause No. 81-73-CR was final, the defendant, Darrel Allen Curlee, committed the felony of Burglary and was convicted on the 9th day of May 1989 in the Seventh Judicial District Court of San Juan County, Utah, in Cause No. 767.

And it is further presented that on or about the **15TH DAY OF JUNE 2012** in the County of Hill and State of Texas, the defendant, **DARREL ALLEN CURLEE** , did then and there intentionally or knowingly threaten Jerry Wayne Vessells with imminent bodily injury by attempting to cut and/or stab him with a knife and the defendant did use or exhibit a deadly weapon during the commission of the assault, to-wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury.

And it is further presented that prior to the commission of the primary offense by the said Darrel Allen Curlee, to-wit: on the 25th day of February 1983, in the District Court of San Miguel County, New Mexico in Cause No. 81-73-CR on the docket of said Court, the said Darrel Allen Curlee, under the name of Darrell Allen Curlee, was duly and legally convicted in said last named Court of a felony, to-wit: Second Degree Murder upon an indictment then legally pending in said last named Court and of which said Court had jurisdiction; and said conviction was a final conviction and was a conviction for an offense committed by him, the said Darrel Allen Curlee, prior to the commission of the primary offense.

And it is further presented that before the commission of the primary offense and after the conviction in Cause No. 81-73-CR was final, the defendant, Darrel Allen Curlee, committed the felony of Burglary and was convicted on the 9th day of May 1989 in the Seventh Judicial District Court of San Juan County, Utah, in Cause No. 767.

Foreman of the Grand Jury

NO. 37,458

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 66th JUDICIAL DISTRICT |
| | § | |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |

## WAIVER OF ARRAIGNMENT

The undersigned Defendant, Darrell Allen Curlee, by counsel, waives formal pre-trial arraignment and preparation time between arraignment and trial, and agrees to be arraigned at time of trial, and enters a plea of not guilty.

The undersigned attorney hereby enters appearance as attorney of record for Darrell Allen Curlee and agrees that the cause be set for trial in the courtroom of the 66th Judicial District Court of Hill County, Texas.

**SIGNED** on September 6, 2012.

Respectfully submitted,

Terence A. (Tiger) Russell
Attorney & Counselor at Law
PO Box 306
Hillsboro, TX 76645
245-396-3219
254-582-5593 (facsimle)

By: _Terence A. Russell_
Terence A. Russell
State Bar No. 17437070
Attorney for Darrell Allen Curlee

Approved by the Court:

Signed on _Sept 14, 2012_.

JUDGE PRESIDING

A CERTIFIED COPY
ATTEST 8-31-
ANGELIA ORR 20/5
DISTRICT CLERK
HILL COUNTY, TEXAS
BY

COPY

## NO. 37,458

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 66th JUDICIAL DISTRICT |
| | § | |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |

## WAIVER OF ARRAIGNMENT

The undersigned Defendant, Darrell Allen Curlee, by counsel, waives formal pre-trial arraignment and preparation time between arraignment and trial, and agrees to be arraigned at time of trial, and enters a plea of not guilty.

The undersigned attorney hereby enters appearance as attorney of record for Darrell Allen Curlee and agrees that the cause be set for trial in the courtroom of the 66th Judicial District Court of Hill County, Texas.

**SIGNED** on September 6, 2012.

Respectfully submitted,

Terence A. (Tiger) Russell
Attorney & Counselor at Law
PO Box 306
Hillsboro, TX 76645
245-396-3219
254-582-5593 (facsimle)

By: _Terence A. Russell_
Terence A. Russell
State Bar No. 17437070
Attorney for Darrell Allen Curlee

ORIGINAL

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY, TX
2012 SEP -7 P 1:44

Def. to HCT ex cond.

Approved by the Court: _____

Signed on _____

_____
JUDGE PRESIDING

A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _Mary Mullen_

# Send Result Report
MFP



TASKalfa 420i

Firmware Version 2KS_2F00.005.004 2010.04.13



09/25/2012 08:14

[2KS_1000.005.001] [2KS_1100.001.002] [2KS_7000.005.001]

Job No.: 033502          Total Time: 0°00'17"          Page: 002

# Complete

Document:          doc03350220120925081330

CAUSE NO. 37,458

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |

**SETTING ORDERS**
**THIS CASE IS ORDERED SET FOR**

1. _XX_ PRE-TRIAL MOTIONS HEARING
UNDER ARTICLE 28.01 CCP SET ON —OCTOBER 18, 2012 9:00 A.M.

2. _XX_FINAL PRE-TRIAL CONFERENCE—NOVEMBER 13, 2012 9:00 A.M.

3. _XX_ JURY TRIAL IS SET FOR ——— JANUARY 14, 2013 9:00 A.M.

4. _____PLEA IS SET FOR _____

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |

## ORDER APPOINTING A DISINTERESTED EXPERT
## TO EXAMINE DEFENDANT

It is ORDERED that Dr. Verl O. Childers, Jr. is hereby appointed to examine DARRELL ALLEN CURLEE, Defendant in the above entitled and numbered cause, for the purposes of determining whether Defendant is competent to stand trial and whether Defendant is or was a person with mental illness at the time of the alleged offense or offenses.

The Defendant, DARRELL ALLEN CURLEE is in the Hill County Jail on charges of Aggravated Assault with a Deadly Weapon and Aggravated Assault-Threat-with a Deadly Weapon, felony indictments.

The meaning of competency to stand trial is whether the Defendant has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding and whether the Defendant has a rational as well as factual understanding of the proceedings against him.

For the purpose of competency you should determine whether if at the time of the conduct charged, Defendant, as a result of mental disease or defect, did not know that his

ORDER APPOINTING A DISINTERESTED
EXPERT TO EXAMINE DEFENDANT

1

A CERTIFIED COPY
ATTEST _____ 8-31 _____ 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _____

conduct was wrong. The term "mental disease or defect" does not include abnormality manifested only by repeated criminal or otherwise antisocial conduct. IT IS FURTHER ORDERED that the examiner appointed herein submit a written report of the examination to the Court within thirty (30) days of the date of this ORDER, including a description of the procedures used in the examination, the examiner's observations and findings pertaining to the Defendant's competency to stand trial, and the recommended treatment. If the examiner concludes that the Defendant is incompetent to stand trial, the report must also state the examiner's observations and findings and whether there is a substantial probability that the Defendant will attain the competency to stand trial within the foreseeable future.

IT IS FURTHER ORDERED that a separate report be submitted to the Court setting forth the examiner's observations and findings concerning:

1.     Whether the Defendant is a person with mentally illness (and meets the criteria for court-ordered inpatient mental health services under Subtitle C, Title 7, Health and Safety Code.

2.     Whether the Defendant is a person with mental retardation and meets the criteria for commitment to a residential care facility under Subtitle D, Title 7, Health and Safety Code.

3.     Whether the Defendant was sane at the time of the alleged offenses.

IT IS FURTHER ORDERED if the examiner is a physician and concludes that the defendant is a person with mental illness, the examiner shall complete and submit to the court a Certificate of Medical Examination for Mental Illness. If the examiner is a physician or a licensed psychologist and determines that the defendant is a person with mental retardation and if the determination has been made in accordance with the standards established by

Section 593.005, Health and Safety Code, the examiner shall submit to the court an affidavit setting forth the conclusions reached as a result of the examination.

SIGNED this the 26 day of Sept _____, 2012.

_____
F. B. (Bob) McGregor, Jr., Judge
66th Judicial District Court
Hill County, Texas

NO. 37,458

| STATE OF TEXAS | : | IN THE 66TH JUDICIAL |
| VS. | : | DISTRICT COURT OF |
| DARRELL ALLEN CURLEE<br>230 S. Waco St. #108<br>Hillsboro, Tx 76645 | :<br><br>ORDER | HILL COUNTY, TEXAS |

TO:  DARRELL ALLEN CURLEE


You are hereby **ORDERED** to report to the Hill County Community Supervision and Corrections Department at 126 South Covington Street, on the North end of the Hill County Courthouse Annex, Hillsboro, Texas, at 8:00 A.M., TUESDAY, DECEMBER 11, 2012.  You are further **ORDERED** to provide the interviewing officer with true answers to questions concerning your criminal history, social history, work history, educational history and medical history.

All information obtained is for the purpose of a PRE-SENTENCE INVESTIGATION required by Section 9, Article 42.12, Texas Code of Criminal Procedure, and the report will be handled in accord with said Section.


SIGNED this 3rd day of October, 2012.

F.  B.  (Bob) McGREGOR, JR.
PRESIDING DISTRICT JUDGE

ALLEGED OFFENSE:   AGG ASSLT W/DEADLY WEAPON
                   AGG ASSLT W/DEADLY WEAPON
ccm/frms



A CERTIFIED COPY
ATTEST___8-31___, 20_15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY_____

**Verl O. Childers, Jr., Ph. D.**
192 HCR 4319
Milford TX 76670
(817) 707-6010

2012 OCT 16 P 3:05
FILED
ANGELIA ORR DISTRICT CLERK HILL COUNTY, TX

**Defendant:** Curlee, Darrell A.
**County:** Hill
**Cause #:** 37,458
**Date of Evaluation:** 10/10/2012
**Date of Report:** 10/16/2012

**Specific Issues for Evaluation:** Mr. Darrell A. Curlee is referred by the Honorable F. B. McGregor, Jr., Judge of the 66th District Court for evaluation of his competency to stand trial. The Court requests information in regard to two questions: (1) does the defendant have a rational and factual understanding of the nature of the proceedings against him; and (2) does the defendant have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding. The Court also seeks information as to his sanity at the time of the alleged offense and at present.

**Disclosures:** Prior to any evaluation procedures, Mr. Curlee was provided with the following information and disclosure about the nature and purpose of this evaluation.

*The Court has ordered an evaluation of your mental status and characteristics with respect to the upcoming legal proceedings that you face. The information obtained during the evaluation process will be used in legal hearings about the charges pending against you, and I will be evaluating your competency to stand trial as well as your sanity. As part of this evaluation, I will be asking you a number of questions about your personal history as well as using standard procedures and instruments to gather information. What we say and do during the course of this evaluation is not privileged, private, or confidential. I am not treating you in a doctor-patient relationship. Regardless of how you participate or cooperate, I will write a report. The report will go to the Court, the prosecutor, and your attorney. As a result of the evaluation, I may be called upon by one of the attorneys to testify in the proceedings. Do you have any questions?*

**Procedures, Techniques, and Information Reviewed:**
Clinical interview and history
Mental status examination
Review of indictment and record of prior offenses
Telephone interview with defense attorney Terrence Russell
Interview with Mr. Freddie Bassinger, LMSW
Review of letters and notes written by Mr. Curlee
Competency interview
Carlson Psychological Inventory
Interview with Mr. Cory Cole and Ms. Stacy Beam of Citizens State Bank-Itasca



A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY

**Clinical Observations and Findings:**

Behavioral observations. Mr. Curlee was seen at the Hill County Jail. He arrived promptly when summoned by jail staff and was appropriately and neatly attired in jumpsuit. His motor activity was smooth and coordinated, with no sign of any spasticity, tic, or other anomaly. His fine motor activity was good as indicated by his writing ability, grip, and gait. His facial expressions and social behaviour were appropriate. He showed no signs of any type of agitation and was cooperative and agreeable during the evaluation process. Rapport was deemed as being satisfactory.

Relevant background history. Mr. Curlee is presently in jail with charges of aggravated assault with a deadly weapon and aggravated assault-threat, with a deadly weapon. He was arrested and detained in the jail in June 2012. His previous record includes the following items.

- 1964: conviction in Michigan for misdemeanour assault; fine of $11
- 1975: conviction in Michigan for assault with deadly weapon, 1-4 years confinement
- 1986: conviction in New Mexico for homicide; 6 years confinement, paroled to Hill County Texas
- 1989: conviction in Utah for burglary; 5 years confinement
- 2010: conviction for criminal trespass in McLennan County, TX

Mr. Curlee reported dropping out of school in the 10th grade; he has no GED certificate or further formal education. By trade, he has been a production machine operator. Presently he is unemployed and receives monthly disability compensation. He reported being divorced once pbefore and presently is in an informal marriage with a local woman. He said that together they have two children and that he has several other children in the Michigan area. His mother is alive and living in a local nursing home; his father died in 2006 from complications related to Alzeheimer's disease. He has a sister living in Itasca, TX.

Mr. Curlee's health history has several significant items. He denied any difficulties with alcohol, illicit drugs, seizures, or other physical difficulty. He reported a previous motorcycle accident (date unknown) that resulted in a concussion; he recovered with no ill effects. He admitted to being a patient at the local community mental health center since 1972, receiving services for schizophrenia. In the past, he has taken antipsychotic medications (Prolixin, Zyprexa, Abilify), but at present he is not on any antipsychotic medication. Interview with Mr. Freddie Bassinger, the director of the Hillsboro office of the Heart of Texas Region MHMR Center, revealed that Mr. Curlee was diagnosed in 1992 with schizophrenia, paranoid type, and that he was treated regularly until April 2011, when his case was transferred to the Johnson County MHMR Center because Mr. Curlee moved out of the Hillsboro area. Mr. Curlee was reliable and compliant with his treatment regimen and was considered well-controlled. During his time in treatment with Mr. Bassinger, Mr. Curlee posed no major problem due to his mental condition. Mr. Curlee reported—and Mr. Bassinbger verified—a history of auditory hallucinations described as voices of unknown others, always behind or around him, talking about him. He had no identification for the voices, simply referring to "them." The voices do not provide any directions or commands for him. The only other health concern for Mr. Curlee is a non-insulin dependency diabetic condition, for which he is treated with Metformin and diet management. Hill County Jail medical staff report that he is compliant with his treatment regimen and that the condition is under control.

Mental status at time of evaluation. The mental status examination revealed a generally cooperative and forthcoming demeanor on Mr. Curlee's part. His mood is best described as

being even and appropriate. His emotional expression was normal, with no indications of any problematic communication style or behaviour. Perceptually, he admitted to hearing voices (described above) but said that they were not very problematic for him. He exhibited no overt behaviours that commonly accompany serious mental thought problems, and jail staff did not report any such behaviours either. He denied any thought of suicide/homicide. His thinking processes during the interview and evaluation process were logical, focused, and relevant. He denied any problems with thought blocking, phobias, compulsions or obsessions. He was alert and oriented to his current situation, his personal status, and his current location, but he was not accurate in the date, thinking that it was November. His memory was intact for remote things such as previous charges and convictions and his previous mental health treatment regimen, and for recent things such as his current medication, date of arrest, and current charge pending. He concentrated and attended to interview questions as well as instructions for questionnaires without difficulty. His insight into his current situation was good. Cognitively, he used a vocabulary that was good for his educational level. While no formal assessment of his intelligence level was made, based upon his responses and former occupational level, he functions within the broad limits of the average range of intelligence, above the range of mental retardation.

Mr. Curlee stated the charge pending against him as aggravated assault and said that he allegedly stabbed somebody with a knife, trying to kill the other person. He correctly identified his attorney as Mr. Terrence Russell and said that they had not yet discussed the possible penalty if he is convicted. This is consistent with the indictment returned against him and information provided by Mr. Russell. When asked about the actors and participants in a criminal proceeding, he gave the following information as to their roles.

- Defense attorney: to see that your rights are upheld and that I'm handled fairly by the judge
- Prosecutor: looking up evidence to use against you on the charge
- Trial judge: know the whole case, see the problem fairly, and deal with both parties fairly
- Jury: judge the case fairly. If they say you're guilty, you pay the penalty. The judge, jury, and district attorney decide who is guilty

When questioned about essential things that are part of the criminal trial process, Mr. Curlee gave the following answers.

- Right to remain silent: to protect yourself, say as little as possible. *(Q: If the judge asks you a question, do you have to answer it?)* you don't have to, you can plead the 5th but it makes you look guilty. I think it's best to answer questions.
- Concept of *Not Guilty*: I go back to normal living in my RV in Grandview. I owe back rent of over $3000.
- Concept of *Guilty*: admitting to doing what they allege
- Probation: a period of observation, if you do as expected you get off on time; it keeps you from going to jail or prison; you go to jail or prison if you violate
- Consequences if found to be incompetent or insane: I don't know

The results of psychological testing provided the following information. Intellectually, test results show that is functioning within the broad limits of the average range of intelligence, above the range of mental retardation. Based upon interview information provided by Mr. Bassinger, Mr. Cole, and Ms. Beam, Mr. Curlee's everyday adaptive behavior skills are adequate enough to allow him to take care of his personal needs in the community.

likely testify in his own behalf if that were to be a part of his legal strategy.

- Capacity to consult with counsel. In spite of the ideas of reference that he harbors, Mr. Curlee's answers to questions and his engagement in the evaluation process, both in interview and testing, all suggest that he is able to consult with his attorney in a rational and factual manner.
- Capacity to understand rationally the charges and potential consequences of the pending proceedings. Based upon his answers to questions during interview, Mr. Curlee has an accurate understanding of the charges pending against him and what they mean, but he is in need of a formal discussion with his attorney regarding possible consequences if convicted.

The Carlson Psychological Survey is a personality screening instrument specifically designed for use with offenders. On it, Mr. Curlee generated a valid profile. Of the four clinical scales, Mr. Curlee's scores on the ones measuring chemical abuse, antisocial tendencies, and self-degradation are all low, indicating no difficulties in those areas. On the one scale that measures thought disturbance, his score surpasses 77% of those in the norm group, suggesting the presence of perceptual distortion and hallucinations. This score is consistent with his long-standing diagnosis of schizophrenia.

**Diagnoses:** The most likely DSM-IV diagnostic classification for Mr. Curlee is as follows.
- Axis I: schizophrenia, paranoid type (295.30)
- Axis II: none
- Axis III: diabetes, by history
- Axis IV: current stressors include problems related to arrest and detention, economic difficulties (due to loss of disability income while incarcerated), housing stress related to back rent, and removal of parent to nursing home care
- Axis V: current GAF = 55

**Areas of Competency:**
- Capacity to understand charges and potential consequences. Based upon his answers to questions about the charges pending, Mr. Curlee has an accurate understanding of the charges pending. He does not know possible consequences if convicted and needs to visit with his attorney on that matter.
- Capacity to disclose pertinent material. Based upon his answers to questions during interview and his recounting of personal history, Mr. Curlee has no difficulty in relating relevant history concerning his background and current case. His statements were corroborated by outside information and were accurate.
- Capacity to engage in legal strategies. Mr. Curlee's previous experiences in the legal system along with his current understanding of his situation, his way of thought patterns, and his record of compliance in treatment, all suggest that he is able to work with his attorney in developing a reasonable legal strategy
- Capacity to understand the adversarial nature of the proceedings. Based upon answers to specific questions about the nature of a trial and the roles of the various participants, Mr. Curlee has an accurate understanding of the adversarial nature of a criminal trial and the risks involved.
- Capacity to testify. Based upon his interpretation of his rights as a defendant and his understanding of the nature of a trial, along with his former experiences, Mr. Curlee could likely testify in his own behalf if that were to be a part of his legal strategy.
- Capacity to consult with counsel. In spite of the ideas of reference that he harbors, Mr. Curlee's answers to questions and his engagement in the evaluation process, both in interview and testing, all suggest that he is able to consult with his attorney in a rational and factual manner.
- Capacity to understand rationally the charges and potential consequences of the pending proceedings. Based upon his answers to questions during interview, Mr. Curlee has an accurate understanding of the charges pending against him and what they mean, but he is in need of a formal discussion with his attorney regarding possible consequences if convicted.

**Opinion on Competence to Stand Trial:** Although Mr. Curlee has a long-standing diagnosis of a psychiatric disorder, based upon available historical information, current test and interview data, and interviews with collateral sources, he has sufficient present ability at this time to consult with his attorney with a reasonable degree of rational understanding. Further, he has a rational and factual understanding of the proceedings pending against him. It is my opinion that he is competent to stand trial on the charges pending.

**Treatment Recommendations:** With his long-term, known history of schizophrenia, paranoid type, Mr. Curlee is in need of psychiatric evaluation to determine his present need for antipsychotic medication. This can be done on an outpatient basis without need for inpatient hospitalization. According to mental health practitioners that have treated him in the past, he needs a maintenance dose of an antipsychotic medication to manage his mental disorder adequately. He has now been off of his prescribed medication for over a year. The antipsychotic medication is likely necessary for Mr. Curlee to maintain a functional mental status and to care for himself adequately outside of a hospital setting as well as for the management of his symptoms of hallucinations and delusions. In addition, he will need to maintain a stable status with respect to his diabetes in order to preclude mental difficulties resulting from fluctuations in his blood sugar level. This includes compliance with both his medication for diabetes and his dietary treatment recommendations as well as routine medical oversight and monitoring of his blood sugar level.

Verl O. Childers, Jr., Ph. D.
Psychologist #22103

**Verl O. Childers, Jr., Ph. D.**
192 HCR 4319
Milford TX 76670
(817) 707-6010

16 October 2012

Honorable F. B. McGregor, Jr., Judge
66th District Court
PO Box 284
Hillsboro TX 76645

RE: Curlee, Darrell A., Cause #37,458

Dear Judge McGregor:

Pursuant to order of the Court, I have seen and evaluated Mr. Darrell A. Curlee with respect to his sanity for the upcoming activities in the above cause. As part of my evaluation, I interviewed Mr. Curlee and, with his permission, Mr. Freddie Bassinger (Director of the Hill County Office of Heart of Texas Region MHMR Center and Mr. Curlee's former psychotherapist), Mr. Cory Cole, and Ms. Stacy Beam, staff members of the Citizens State Bank of Itasca. Mr. Cole and Ms. Beam had pertinent knowledge regarding an allegation made by Mr. Curlee with respect to his personal checking account, which needed verification and assessment. I administered a mental status examination, collected a personal history, and administered a personality test to Mr. Curlee as part of the evaluation process.

Mr. Curlee has a long-standing mental health diagnosis of schizophrenia, paranoid type, that has been treated successfully in the past with medication, allowing him to live in the community and to care for his own needs. He has been off his medication since April of 2011, when his case was closed at the local community mental health center and transferred to the community mental health center in Johnson County, TX. He related an accurate history, verified by outside information obtained from the Hill County Sheriff's Office and from interviews with the individuals named above. Mr. Curlee's statements included accurate information about his past criminal activity as well as an allegation he made of recent fraudulent activity in his personal checking account. Review of his criminal history verified his statements about that aspect of his life. Interviews with Mr. Cole and Ms. Beam revealed that there has been activity on his checking account after the date of Mr. Curlee's incarceration resulting from checks he had written prior to his arrest. There is no indication to bank personnel of any fraudulent activity, only activity that as of the date of my interview with Mr. Curlee had not been clarified for him.

Results of the testing suggested that Mr. Curlee has odd ideas that include hearing nondescript and nearby voices talking about him. This thought pattern occurs without respect to any particular location in which Mr. Curlee might be. When I asked him further about this, he related that he hears the voices but that he does not give any great concern to them or that they cause him any distress. The voices do not provide any commands or instructions to him, and he does not act according to what he hears from them. He related only that "they talk about me."

These symptoms of thought difficulty have been treated successfully since 1992 with prescribed medications.

During interview, Mr. Curlee accurately outlined the charges pending against him, including a history of his alleged actions that led to the charges. He did dispute the allegation that he stabbed anyone, saying that allegation was incorrect. When asked about the allegations, he gave the following answers.

- *What are you charged with?* Assault with a deadly weapon, a knife
- *What does that mean?* They say I stabbed him, attempted to murder him, drew blood
- *If someone does that, why is it wrong?* You're not supposed to abuse someone. You can protect yourself. I used a paring knife to scare him; he was a pro boxer.

Without any knowledge about the identity of the putative victim in this incident, I can neither verify nor dispute Mr. Curlee's interpretation of the level of his personal risk, however he does appear to have a clear and accurate understanding of his action and the resulting charges.

Given Mr. Curlee's expressed view about not abusing others yet being able to protect himself, along with his statement of the lack of a sense of command or urgency he perceives from the voices he hears, it is my opinion that his current mental disorder does not prevent him from understanding that his conduct was wrong. Accordingly, it is my opinion that he is sane with respect to the proceedings he now faces. While he may dispute with authorities the level of personal risk that he perceived, his understanding of his alleged actions is not significantly impaired as a result of his hallucinations and delusions. He does need to be evaluated by a qualified psychiatrist to determine the need for re-instatement of antipsychotic medication and regular psychotherapy. In my opinion, this can be accomplished on an outpatient basis and does not require inpatient hospitalization.

Respectfully,

Verl O. Childers, Jr., Ph. D.
Psychologist #22103

Verl O. Childers, Jr., Ph. D.
192 HCR 4319
Milford TX 76670

# Statement



| Bill To |
|---|
| Hill County |
| Hill County Treasurer |
| PO Box 671 |
| Hillsboro TX 76645 |

| Date | Amount Due | Enclosed |
|---|---|---|
| 10/16/12 | $1,095.00 | . |

| Date | Description | Amount | Balance |
|---|---|---|---|
| 09/16/12 | Balance forward | | 0.00 |
| | Curlee eval- | | |
| 10/10/12 | | 645.00 | 645.00 |
| | Interviews--Curlee, Bassinger, Cole/Beam; testing | | |
| | --- Interview, 4.3 @ $150.00 = 645.00 | | |
| 10/16/12 | | 450.00 | 1,095.00 |
| | Written competency report Darrell Curlee, Cause #37,458 | | |
| | --- Report, 3 @ $150.00 = 450.00 | | |

| Current | 1-30 Days Past Due | 31-60 Days Past Due | 61-90 Days Past Due | OVER 90 Days Past Due | Amount Due |
|---|---|---|---|---|---|
| $1,095.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,095.00 |

**Verl O. Childers, Jr., Ph. D.**
192 HCR 4319
Milford TX 76670
(817) 707-6010

**RECEIVED**

OCT 1 6 2012

DISTRICT JUDGE

16 October 2012

Honorable F. B. McGregor, Jr., Judge
66th District Court
PO Box 284
Hillsboro TX 76645

RE: Curlee, Darrell A., Cause #37,458

Dear Judge McGregor:

Enclosed are my reports on Mr. Darrell A. Curlee in the above-mentioned cause pending in the District Court. Should you or any of the attorneys in the matter have any questions or need clarification on any point, please contact me at your convenience.

Thank you for this referral and the opportunity to serve the Court in this matter.

Sincerely,

*Verl Childers Jr*

Verl O. Childers, Jr., Ph. D.
Psychologist #22103

Enclosures (3)

# Send Result Report

MFP

TASKalfa 420i

Firmware Version 2KS_2F00.005.004 2010.04.13



10/16/2012 15:57
[2KS_1000.005.001] [2KS_1100.001.002] [2KS_7000.005.001]

Job No.: 034837          Total Time: 0°02'41"          Page: 009

# Complete

Document:          doc0348372012101615S322

**Verl O. Childers, Jr., Ph. D.**
192 HCR 4319
Milford TX 76670
(817) 707-6010

Defendant: Curlee, Darrell A.
County: Hill
Cause #: 37,458
Date of Evaluation: 10/10/2012
Date of Report: 10/16/2012

Specific Issues for Evaluation: Mr. Darrell A. Curlee is referred by the Honorable F. B. McGregor, Jr., Judge of the 66th District Court for evaluation of his competency to stand trial. The Court requests information in regard to two questions: (1) does the defendant have a rational and factual understanding of the nature of the proceedings against him; and (2) does the defendant have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding. The Court also seeks information as to his sanity at the time of the alleged offense and at present

| No. | Date and Time | Destination | Times | Type | Result | Resolution/ECM |
|-----|---------------|-------------|-------|------|--------|----------------|
| 001 | 10/16/12 15:53 | **District Attorney** | 0°01'18" | FAX | OK | 200x100 Normal/On |
| 002 | 10/16/12 15:56 | **Terence Russell** | 0°01'23" | FAX | OK | 200x100 Normal/On |

1

[ QWGOX08415 ]

CAUSE NO JAIL ID 55832

§ 37,458

| STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS | § | HILL COUNTY, TEXAS |
| DARRELL ALLEN CURLEE | § | 66TH JUDICIAL DISTRICT |

## ORDER APPOINTING AN ATTORNEY

On the 13TH day of AUGUST, 2012, it was made known to the Court that the defendant Darrell Allen Curlee was in need of an attorney, and it appearing to the Court that the said Defendant should have an attorney, it is ORDERED by the Court that Terrance Russell a practicing attorney of this Court, be and is hereby appointed to represent the Defendant in the above cause.

This defendant has been charged with:     AGG ASSAULT W/ DEADLY
                                          WEAPON (2 COUNTS)

**NEXT HEARING DATE:   NO DATE AT THIS TIME**

Signed this 13TH day of AUGUST, 2012.

_____
Presiding Judge

☒Defendant is in the Hill County Jail

☐ Defendant is not in the Hill County Jail and can be reached as follows:

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY
2012 AUG 13 P 2:52



A CERTIFIED COPY
ATTEST_____8-31_____20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY_____

## HP LaserJet *3055*

# Fax Call Report

Hill County
2545825933
Aug-13-2012    1:47PM

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|-----|------|------|------|----------------|----------|-------|--------|
| 4399 | 8/13/2012 | 1:46:57PM | Send | 5825593 | 0:47 | 2 | OK |



Ida Alcala
Indigent Defense Coordinator
P. O. BOX 526
Hillsboro, TX 76645
254-582-4077
254-582-5933 FAX

## FAX

TO:

Terrance Russell
254-582-5593

RE:        DARRELL ALLEN CURLEE
IN JAIL:   ☒YES   ☐NO

CHARGE:    JAIL ID 55832

PAGES:     INCLUDING COVER    2

DATE:      8/13/12

CC:

COMMENTS:

THIS FAX CONTAINS CONFIDENTIAL INFORMATION. IF YOU ARE NOT THE INTENDED
RECIPIENT OF THIS FAX, PLEASE CONTACT INDIGENT DEFENSE OFFICE.

STATE OF TEXAS                    §        IN THE DISTRICT COURT OF
VS                               §        HILL COUNTY, TEXAS
                                          66TH JUDICIAL DISTRICT

DARRELL ALLEN CURLEE

---

Dear Mr. Curlee,                              August 13, 202012

After reviewing your application for Court-Appointed Attorney, the appointing
authority hereby appoints you MARK MORRIS, as your attorney, who can be
reached as follows:

2121 W. WACO DR
WACO, TX 76707
254-752-1254

**NEXT COURT DATE**:    NO DATE AT THIS TIME

THANK YOU,


IDA ALCALA
INDIGENT DEFENSE
COORDINATOR

## NO. 37458

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 66th JUDICIAL DISTRICT |
| | § | |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |

## MOTION FOR CONTINUANCE

### TO THE HONORABLE JUDGE OF SAID COURT:

Now comes Darrell Allen Curlee, Defendant, and files this Motion for Continuance of this cause from its present setting of February 25, 2013 and shows the following:

1. This motion is filed in accordance with Article 29.03 of the Texas Code of Criminal Procedure.

2. Counsel for Defendant is involved in a DWI with Child Passenger trial on February 25, 2013, State vs. Vicki Sanchez, cause number CR11916 in the 355th Judicial District Court of Hood County, Texas. This is the 4th trial setting of this case.

3. This motion is not made for purposes of delay but that justice may be done.

**WHEREFORE, PREMISES CONSIDERED,** Defendant prays that the Court enter its order continuing this cause until some future date, or, in the alternative, sets this motion for hearing.

Respectfully submitted,

Terence A. (Tiger) Russell
Attorney & Counselor at Law
PO Box 306
Hillsboro, TX 76645
245-396-3219
254-582-5593 (facsimle)

A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY Mary Muller

By: <u>Terence A Russell</u>
Terence A. Russell
State Bar No. 17437070
Attorney for Darrell Allen Curlee

## VERIFICATION

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HILL** | § |

ON THIS DAY personally appeared Terence A. Russell, who, after being placed under oath, stated the following:

"My name is Terence A. Russell and I am the attorney of record for Darrell Allen Curlee and have been so at all material times relevant to this proceeding.

"I have read the Motion for Continuance and every statement is within my personal knowledge and is true and correct."

<u>Terence A Russell</u>
Terence A. Russell

Sworn to and subscribed before me on <u>February 14, 2013</u>.

<u>Susan M Russell</u>
NOTARY PUBLIC


SUSAN M. RUSSELL
MY COMMISSION EXPIRES
January 21, 2015

## CERTIFICATE OF SERVICE

This is to certify that on February 14 2013, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Hill County, 3rd Floor, Hill County Courthouse, by hand delivery.

<u>Terence A Russell</u>
Terence A. Russell

NO. 37458

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 66th JUDICIAL DISTRICT |
| | § | |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |

**NOTICE TO CLERK OF COURT:**

This motion is to be considered EX PARTE and is filed for purposes of the record. This motion is required to be SEALED, by law, and disclosure shall be made ONLY to the TRIAL COURT and COUNSEL FOR DEFENDANT.

## MOTION TO PROCEED *EX PARTE* AND MOTION FOR APPOINTMENT OF EXPERT ASSISTANCE

**THE FOLLOWING IS WORK PRODUCT OF THE UNDERSIGNED ATTORNEY AND IS INTENDED FOR DISCLOSURE TO THE TRIAL COURT ONLY.**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes Darrell Allen Curlee, Defendant in the above entitled and numbered case, by and through the undersigned counsel, and to proceed *ex parte*, in camera, and on a sealed record with regard to applications for expert fees, and moves this Court pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 3, 3a, 10, 13 and 19 of the Texas Constitution, and Article 26.05(d) of the Texas Code of Criminal Procedure, to appoint an expert in police procedures to assist in the evaluation, preparation, and presentation of a defense, and for good cause shows the following:

**Factual Matters which establish Need for Expert Assistance**

The charged offense of aggravated assault with a deadly weapon occurred at a time when Defendant is believed to be insane. Defendant has been a MHMR patient since 1993, diagnosed with schizophrenia. Defendant's recollection of events relevant to this charge contain hallucinations regarding the character of the actors and his involvement in the event.

**Need for Expert Assistance**

Defendant has timely filed his intent to assert his insanity defense. Without expert assistance,

MOTION TO PROCEED *EX PARTE* AND MOTION FOR APPOINTMENT OF EXPERT ASSISTANCE          Page 1



A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY

evidence which will be the subject of expert opinion is critical to a determination of Darrell Lee Curlee's sanity at the time of the offense.

3.    If Darrell Lee Curlee is not provided with expert assistance, Darrell Lee Curlee will be deprived of due process, due course, and equal protection of the laws, the effective assistance of counsel, the right to confront witnesses, the right to a fair and impartial trial, the right to present evidence on behalf of the defense, and the right to explain or deny evidence presented against the defense in the punishment phase, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 3, 3a, 10, 13 and 19 of the Texas Constitution.

**WHEREFORE, PREMISES CONSIDERED,** Darrell Lee Curlee requests that this Court consider this motion and order that sufficient funds be provided to the Defense to have a competent psychiatric or psychological expert assist in the investigation, evaluation, preparation and presentation of the defense.

Respectfully submitted,

Terence A. (Tiger) Russell
Attorney & Counselor at Law
PO Box 306
Hillsboro, Texas 76645
Tel: (254) 396-3219
Fax: (254) 582-5593

By: _Terence A. Russell_

Terence A. Russell
State Bar No. 17437070
Attorney for Darrell Lee Curlee

**BEFORE ME,** the undersigned authority, on this day personally appeared Terence A. Russell, who, after being duly sworn, stated upon oath that the foregoing was true and correct.

Sworn to and subscribed before me on _February 13, 2013_.

SUSAN M. RUSSELL
MY COMMISSION EXPIRES
January 21, 2015

_Susan M. Russell_
NOTARY PUBLIC

MOTION TO PROCEED *EX PARTE* AND MOTION FOR APPOINTMENT OF EXPERT ASSISTANCE          Page 3

## NO. 37458

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 66th JUDICIAL DISTRICT |
| | § | |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |

**NOTICE TO CLERK OF COURT:**

**This motion is to be considered EX PARTE and is filed for purposes of the record. This motion is required to be SEALED, by law, and disclosure shall be made ONLY to the TRIAL COURT and COUNSEL FOR DEFENDANT.**

## MOTION TO PROCEED *EX PARTE* AND
## MOTION FOR APPOINTMENT OF EXPERT ASSISTANCE

**THE FOLLOWING IS WORK PRODUCT OF THE UNDERSIGNED ATTORNEY AND IS INTENDED FOR DISCLOSURE TO THE TRIAL COURT ONLY.**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Now comes Darrell Allen Curlee, Defendant in the above entitled and numbered case, by and through the undersigned counsel, and to proceed *ex parte*, in camera, and on a sealed record with regard to applications for expert fees, and moves this Court pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 3, 3a, 10, 13 and 19 of the Texas Constitution, and Article 26.05(d) of the Texas Code of Criminal Procedure, to appoint an expert in police procedures to assist in the evaluation, preparation, and presentation of a defense, and for good cause shows the following:

**Factual Matters which establish Need for Expert Assistance**

The charged offense of aggravated assault with a deadly weapon occurred at a time when Defendant is believed to be insane. Defendant has been a MHMR patient since 1993, diagnosed with schizophrenia. Defendant's recollection of events relevant to this charge contain hallucinations regarding the character of the actors and his involvement in the event.

**Need for Expert Assistance**

Defendant has timely filed his intent to assert his insanity defense. Without expert assistance,

MOTION TO PROCEED *EX PARTE* AND MOTION FOR APPOINTMENT OF EXPERT ASSISTANCE          **Page 1**



A CERTIFIED COPY
ATTEST ___8 - 3 1___ . 20_15_
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY TEXAS
BY _____

counsel cannot effectively present this defense to the jury and additionally is without the necessary knowledge to understand the nature of Defendants mental condition as far as mitigation evidence in the punishment phase of this case, provided he is found guilty.

**Legal Basis for Expert Assistance**

The United States Supreme Court held that an indigent defendant has a constitutional right to the assistance of a competent, independent expert. *See* Ake v. Oklahoma, 470 U.S. 68 (1985). The purpose of this holding is to ensure that indigent defendants are given the same due process as wealthier defendants, including, and perhaps especially, the right to the effective assistance of counsel. *Id.*

Appointing an expert whose purpose is to assist the court and whose findings are made public necessarily renders such an expert incapable of an undivided loyalty to the Defendant. Appointing any expert other than one whose findings are privileged and whose efforts and advice are rendered exclusively in the Defendant's best interests, is *not* an expert rendering assistance to Defendant or the defense, and therefore the due process requirements of Ake are not met. *See* Rey v. State, 897 S.W.2d 333 (Tex.Crim.App.1995).

When an indigent accused makes a clear showing to the trial judge that an expert's assistance is essential to assist in his defense, the judge has a clear duty upon request to appoint an expert to assist.

**Application for Fees**

1. In the past, Counsel has spoken with Dr. Steve Karten, a competent and qualified specialist in the field of forensic psychology or psychiatry. At the time, this expert charged $2,000.00 to review mental health records; conduct an interview; and perform a psychological and social history examination and evaluation, including but not limited to a determination whether the Defendant was insane at the time of the alleged offense; and possibly testify at trial.

2. The services of a psychologist are necessary to enable Darrell Lee Curlee to prepare effectively for trial, present favorable evidence and to cross-examine the state's witnesses. The

evidence which will be the subject of expert opinion is critical to a determination of Darrell Lee Curlee's sanity at the time of the offense.

3. If Darrell Lee Curlee is not provided with expert assistance, Darrell Lee Curlee will be deprived of due process, due course, and equal protection of the laws, the effective assistance of counsel, the right to confront witnesses, the right to a fair and impartial trial, the right to present evidence on behalf of the defense, and the right to explain or deny evidence presented against the defense in the punishment phase, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 3, 3a, 10, 13 and 19 of the Texas Constitution.

**WHEREFORE, PREMISES CONSIDERED**, Darrell Lee Curlee requests that this Court consider this motion and order that sufficient funds be provided to the Defense to have a competent psychiatric or psychological expert assist in the investigation, evaluation, preparation and presentation of the defense.

Respectfully submitted,

Terence A. (Tiger) Russell
Attorney & Counselor at Law
PO Box 306
Hillsboro, Texas 76645
Tel: (254) 396-3219
Fax: (254) 582-5593

By: _Terence A. Russell_

Terence A. Russell
State Bar No. 17437070
Attorney for Darrell Lee Curlee

**BEFORE ME**, the undersigned authority, on this day personally appeared Terence A. Russell, who, after being duly sworn, stated upon oath that the foregoing was true and correct.

Sworn to and subscribed before me on _February 13, 2013_ .

_Susan M. Russell_
NOTARY PUBLIC

SUSAN M. RUSSELL
MY COMMISSION EXPIRES
January 21, 2015

MOTION TO PROCEED *EX PARTE* AND MOTION FOR APPOINTMENT OF EXPERT ASSISTANCE                Page 3

NO. 37458

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
|---|---|---|
| vs. | §<br>§<br>§ | 66th JUDICIAL DISTRICT |
| DARRELL ALLEN CURLEE | §<br>§ | HILL COUNTY, TEXAS |

## ORDER

On _____, 2011, came on to be considered Darrell Lee Curlee's Motion

to Proceed Ex Parte and Motion for Appointment of Expert Assistance, and said motion is hereby

(Granted)   (Denied)

_____
JUDGE PRESIDING

Jail Id: 55832                           37,458
Name: CURLEE, DARRELL ALLEN                         Race: W  Sex: M   DOB: 10/30/1946
SO #: 23860        DL#: TX-04173584      SS#: 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   Date Booked: 06/16/2012

Date...... Time... Location..................... Reported By................
03/06/2013 10:11am F-8                            CAPT.CASTRO
Type: JI (JAIL INCIDENT)
Victim:      MEDICAL
Witnesses:
Rpt Officer: 240 (CASTRO, A (SGT))
Supervisor:  1000 (MICHAEL COX, SHERIFF)
Narrative:   ON 6/15/2012 SUBJECT CURLEE.DARRELL ALLEN WAS BOOKED INTO THE HILL
             COUNTY JAIL. SUBJECT WAS PLACED IN HOLDING AFTER HE WAS BOOKED
             INTO THE JAIL. AFTER SUBJECT WAS ARRAIGNED HE WAS ALOWED TO MAKE
             HIS PHONE CALLS AND WAS CLASSIFIED TO SEPERATION FOR MEDICAL
             REASON. SUBJECT HAD SEVERAL INJURIES TO HIS FACE FROM AN INCIDENT
             PRIOR TO HIS ARREST. ON 8-09-2012 AFTER SUBJECT HAD BEEN RELEASE
             FROM MEDICAL SUBJECT WAS RECLASSIFIED TO POPULATION IN B-1 DORM.
             ON 08-16-2012 INMATES IN B-1 ASK TO SPEAK WITH ME ABOUT INMATE
             CURLEE. INMATES STATED CURLEE WAS JUMPING UP OUT OF HIS SLEEP AND
             WOULD YELL OUT THAT SOMEONE WAS IN THE CELL TRYING TO GET TO HIM
             AND HURT HIM. INMATES STATED SUBJECT WOULD YELL IN THE DIRECTION
             OF THE SHOWER IN THE CELL AND MADE THE STATEMENT THERE WERE
             PERSONS COMING THRUOGH THE SHOW AND COMING FOR HIM. I ASKED CURLEE
             TO STEP OUT OF THE CELL AND SPEAK WITH ME ABOUT THIS MATTER.
             SUBJECT MADE THE STATEMENT HE COULDN'T BE IN THE CELL BECAUSE
             THERE WERE PEOPLE TRYIBG TO GET TO HIM. WHEN I ASKED CURLEE IF HE
             WAS TALKING ABOUT THE INMATE IN THE CELL WITH HIM CURLEE STATED
             NO. ITS THE ONES COMING OUT OF THE SHOWER I KNOW THEY ARE TRYING
             TO GET TO ME AND HURT ME. SUBJECT WAS THEN REMOVED FROM THE CELL
             AND PLACE IN SEPERATION FOR HIS SAFETY AND THE SAFETY OF THE OTHER
             INMATES. WHILE MAKING ROUNDS IN SEPERATION I CAPT.CASTRO AND OTHER
             FLOOR OFFICERS HAVE WITNESS CURLEE TALKING TO THE WALL IN HIS CELL
             OR IN THE DIRECTION OF HIS SHOWER. WHEN ASKED IF HE WAS DOING OK?
             CURLEE HAS MADE THE STATEMENT THESE PEOPLE ARE STILL AFTER ME AND
             BEGAN TO CURSE AT THE WALL OR IN THE DIRECTION OF THE SHOWER.END
             OF REPORT.

A CERTIFIED COPY
ATTEST 8-31        20 15
       ANGELIA ORR
    DISTRICT CLERK
  HILL COUNTY, TEXAS
BY Mary Mullen

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY.TX
2013 MAR -6 P 1:36

Def H1

# Send Result Report

MFP

TASKalfa 420i

Firmware Version 2KS_2F00.005.004 2010.04.13

03/06/2013 16:30

[2KS_1000.005.001] [2KS_1100.001.002] [2KS_1000.005.001]

Job No.: 044342          Total Time: 0°01'55"          Page: 012

# Complete

Document:          doc0443422013030306162730

Cause No. 37,458

| THE STATE OF TEXAS | ) ( | IN THE 66TH DISTRICT |
| VS | ) ( | COURT OF |
| DARRELL ALLEN CURLEE | ) ( | HILL COUNTY, TEXAS |

### JUDGMENT OF COMMITMENT: MENTAL INCOMPETENCE

Date of Hearing:          MARCH 6, 2013

Attorney for State:          Nicole Crain, Assistant District Attorney

Attorney for Defendant:          Terence A. Russell

Date of Birth: 10-30-46          Race: White

TRN NO: 914316336X A001 and

| No. | Date and Time | Destination | Times | Type | Result | Resolution/ECM |
|-----|---------------|-------------|-------|------|--------|----------------|
| 001 | 03/06/13 16:28 | Jail | 0°01'55" | FAX | OK | 200x100 Normal/On |

*Per FB.*
*Hand delivered cert copy*
*of order to bailiff and*
*faxed order to SO.*
*3-6-13*
*an*

1

[ QWG0X08415 ]

Cause No. 37,458

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) ( | IN THE 66TH DISTRICT |
| VS | ) ( | COURT OF |
| DARRELL ALLEN CURLEE | ) ( | HILL COUNTY, TEXAS |

## JUDGMENT OF COMMITMENT: MENTAL INCOMPETENCE

**Date of Hearing:**                    **MARCH 6, 2013**

**Attorney for State:**               **Nicole Crain, Assistant District Attorney**

**Attorney for Defendant:**        **Terence A. Russell**

**Date of Birth: 10-30-46**          **Race: White**

**TRN NO: 914316336X A001 and**

**TRN NO: 914316336X A002**        **Alien Reg. No: N/A**

**Cause No: 37,458**                    **Offense: Count One (1) Agg. Assault W/A Deadly
Weapon and Count Two (2) Agg. Assault Threat
W/A Deadly Weapon With prior felonies alleged
following each count.**

The Defendant was charged by indictment for the offenses shown above in the above numbered and entitled cause. The Court called the cause for trial on the issue of competency. The State appeared by her Assistant District Attorney. As charged above, Defendant was presented by counsel. In advance of the trial on the merits, it came to the attention of the Court that a suggestion had been raised by the Defendant's attorney that the Defendant is incompetent to stand trial.

After an inquiry, the Court found there is some evidence that the Defendant may be incompetent to stand trial, and the Court is not required to hold a jury hearing to determine Defendant's incompetent to stand trial because 1) neither party requests a jury on the issue of competence: 2) neither party opposes a finding of incompetency; and 3) the Court does not find that a jury hearing is necessary to determine incompetency.

A CERTIFIED COPY
ATTEST___8-31___, 20_15_
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY___Mary Mullin___

The Court heard the evidence submitted by the parties with Defendant and Defendant's counsel present. The Court then rendered its verdict and enters same upon the minutes of the Court as follows:

The Court FINDS the Defendant is <u>INCOMPETENT</u> to stand trial on this date. The Court finds defendant unable to effectively communicate with counsel at present, per representation of defense counsel, as an officer of the Court.

The Court FINDS the Defendant is a person with MENTAL ILLNESS and requires observation and/or treatment in a mental health facility, for his own welfare and protection or for the protection of others.

The Court FINDS the Defendant's conduct does involve an act, attempt, or threat of a violent offense as defined in TEX.CODE CRIM.PROC. Art.17.032(a) , and the indictment does allege a deadly weapon under Section 3g(a)(2), Article 42.12.

Accordingly, pursuant to Chapter 46B of the Texas Code of Criminal procedure, the Court ORDERS Defendant committed to and confined at the appropriate catchment facility within the state mental health system or the North Texas State hospital, Vernon, Texas, or other Mental Facility operated by the State of Texas as appropriate. The Court further ORDERS the Sheriff of Hill County, Texas to take the Defendant to North Texas State hospital, Vernon, Texas or other facility , as appropriate.

The Court ORDERS that the Defendant is to be held for a period not to exceed one hundred twenty (120) days.

The Court ORDERS the Clerk of this Court to send a certified copy of this judgment and any of the following documents available to the Court during the competency hearing:

1. The report of each expert;
2. Psychiatric, psychological, or social work reports that relate to the mental condition of the Defendant, including Court's Exhibit "A";
3. Documents provided by the attorney representing the State or the attorney representing the Defendant that relate to the Defendant's current or past mental condition;
4. Copies of the indictment or information and any supporting documents used to establish probable cause in the case;
5. The Defendant's criminal history record; and
6. The addresses of the attorney representing the State and the attorney representing the Defendant; and
7. The Court reporter's record herein.

A copy of this order is to be delivered to the Sheriff of Hill County, Texas and that such documents above referenced accompany the Defendant to the North Texas State Hospital Vernon, Texas, or other facility as appropriate.

IT IS ORDERED that DARRELL ALLEN CURLEE be remanded into the custody of the Sheriff of Hill County, Texas for lawful execution of this judgment of commitment.

Signed this the 6th day of March, 2013.

F.B. (Bob) McGregor, Jr., Judge Presiding

FILED
ANGELIA ORR DISTRICT
CLERK

2014 OCT 22 AM 11: 12

## FINAL PRE-TRIAL CONFERENCE SUMMARY
## AND CASE STATUS READINESS REPRESENTATION TO THE COURT

CAUSE NO. 37,458

| STATE OF TEXAS | § | IN THE 66TH DISTRICT |
| VS. | § | COURT OF |
| _Darrell Curlee_ | § | HILL COUNTY, TEXAS |

### DEFENSE REJECTION OF FINAL SETTLEMENT OFFER
The Prosecutor's Final Settlement Offer of:

_Agg Asslt DW X 2_　　　_25 yes I.D + CC_
　　Charge　　　　　　　　Sentence　　　　　Other (Specify)

is available until the Final Pre-Trial Conference is concluded. I understand that no settlement offers will be made after this date. The only disposition after the Final Pre-Trial Conference will be by plea of guilty as charged or trial.

_10-21-14_　　　　　　　　　　_Jeremy A Russell_
　　Date　　　　　　　　　　　　　Defense Counsel

### PROSECUTORS CERTIFICATION OF TRIAL READINESS
The merits of the case have been thoroughly reviewed. Pretrial settlement negotiations have been unsuccessful and the case is ready for trial.

_10/21/2014_　　　　　　　　　　_Prosecuting Attorney_
　　Date　　　　　　　　　　　　　Prosecuting Attorney

### STIPULATIONS
The Prosecutor and Defense Counsel hereby agree to the following stipulations:

### TRIAL LENGTH AND DATE
The Prosecutor and Defense Counsel represent that all pretrial motions and discovery have been completed and that all required witnesses are available for trial.
Number of Witnesses: Prosecution: _7-8_　　　Defense: _2 to 3_
Type of Trial: _Jury_　　　　　　　　Estimated Length: _3-4 days_

### TRIAL DATE AND TIME
Trial will commence on _Jan. 12, 2015_ at _9:00_ _A_.m.

### ACCEPTANCE OF NOTICE AND FIRM TRIAL DATE CONTRACT
Counsel for all parties accept notice of the trial date and waive all matters preliminary to trial except as entered on the record at the Final Conference. Defense Counsel and the Prosecutor confirm their availability on the trial date. All parties are to sign below.

_Jeremy A Russell_　　　　　　　_Prosecuting Attorney_
　Counsel for Defense　　　　　　　Prosecuting Attorney

_Darrell A. Curlee_　　　　　　　_Judge_
　　Defendant　　　　　　　　　　　Judge

A CERTIFIED COPY
ATTEST _8-31_ , 20 _15_
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _Mary Mullen_

 *37458*



ANGELIA ORR
CLERK HILL DISTRICT
CLERK HILL COUNTY, TX
2015 MAY 22 AM 9: 34

# The Supreme Court of Texas

CHIEF JUSTICE
  NATHAN L. HECHT

JUSTICES
  PAUL W. GREEN
  PHIL JOHNSON
  DON R. WILLETT
  EVA M. GUZMAN
  DEBRA H. LEHRMANN
  JEFFREY S. BOYD
  JOHN P. DEVINE
  JEFFREY V. BROWN

201 West 14th Street  Post Office Box 12248  Austin TX 78711
Telephone: 512/463-1312    Facsimile: 512/463-1365

May 14, 2015

CLERK
  BLAKE A. HAWTHORNE

GENERAL COUNSEL
  NINA HESS HSU

ADMINISTRATIVE ASSISTANT
  NADINE SCHNEIDER

PUBLIC INFORMATION OFFICER
  OSLER McCARTHY

Hon. Ralph T. Strother
19ᵗʰ District Court
McLennan County Courthouse
501 Washington Ave., Suite 303
Waco, Texas 76701

*via regular and electronic mail*

```
RECEIVED

MAY 1 4 2015

COURT OF APPEALS
WACO, TEXAS
```

RE:   Case No. *10-15-00157-CR; In re Darrell Curlee*

Dear Judge Strother:

Pursuant to the request of the Honorable Tom Gray, Chief Justice of the Tenth Court of Appeals District, and to the authority vested in me by Texas Government Code § 74.003(h), you are hereby assigned to service as a Justice of the Tenth Court of Appeals, Waco, Texas, for adjudication of the above-referenced case.

This assignment will continue for such period of time as may be necessary to complete consideration of this cause and to pass on any motions for rehearing.

Sincerely,

Nathan L. Hecht
Chief Justice

cc:   Hon. Tom Gray, Chief Justice, Tenth Court of Appeals       *via electronic mail*
      Hon. Sharri Roessler, Clerk, Tenth Court of Appeals        *via electronic mail*
      Ms. Nita Whitener, Deputy Clerk, Tenth Court of Appeals   *via electronic mail*
      Comptroller's Office, Judiciary Section                    *via electronic mail*

A CERTIFIED COPY
ATTEST  8-31         20 15
         ANGELIA ORR
        DISTRICT CLERK
      HILL COUNTY, TEXAS
BY

FILE COPY





ANGELIA ORR
CLERK HILL COUNTY, TX
2015 MAY 22 AM 9: 34

# TENTH COURT OF APPEALS

**Chief Justice**
*Tom Gray*

**Justices**
*Rex D. Davis*
*Al Scoggins*

McLennan County Courthouse
501 Washington Avenue, Rm. 415
Waco, Texas 76701-1373
Phone: (254) 757-5200     Fax: (254) 757-2822

**Clerk**
*Sharri Roessler*

May 15, 2015

Mark F. Pratt
Hill County District Attorney
P.O. Box 400
Hillsboro, TX 76645
* DELIVERED VIA E-MAIL *

Terence A. Russell
Attorney at Law
1040 E. Elm St.
Hillsboro, TX 76645
* DELIVERED VIA E-MAIL *

**RE:**   Court of Appeals Number:   10-15-00157-CR
Trial Court Case Number:   37,458

**STYLE:**   In re Darrell Curlee

Enclosed is a copy of a letter from the Texas Supreme Court assigning the Honorable Ralph T. Strother to sit with Justice Davis and Justice Scoggins in the above referenced proceeding.

Sincerely,

SHARRI ROESSLER, CLERK

By: Nita Whitener
Nita Whitener, Deputy Clerk

CC:   Hon. A. Lee Harris (DELIVERED VIA E-MAIL)
L. T. Butch" Bradt (DELIVERED VIA E-MAIL)
Lyle Vincent Gripp (DELIVERED VIA E-MAIL)



A CERTIFIED COPY
ATTEST 8-31 , 2015
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY




FILED
ANGELIA ORR DISTRICT
CLERK HILL C...

2015 JUN 15 AM 10: 32

# IN THE
# TENTH COURT OF APPEALS

### No. 10-15-00157-CR

## IN RE DARRELL CURLEE

### Original Proceeding

---

## MEMORANDUM OPINION

---

Relator's petition for writs of mandamus and prohibition are denied.

AL SCOGGINS
Justice

Before Justice Davis,
      Justice Scoggins, and
      Judge Strother[1]
Petition denied
Opinion delivered and filed June 11, 2015
[OT06]

---

[1] Ralph T. Strother, Judge of the 19th District Court of McLennan County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Section 74.003(h) of the Texas Government Code. See TEX. GOV'T CODE ANN. § 74.003(h) (West 2013).

A CERTIFIED COPY
ATTEST 8-31 2015
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY




# TENTH COURT OF APPEALS

**Chief Justice**
*Tom Gray*

**Justices**
*Rex D. Davis*
*Al Scoggins*

McLennan County Courthouse
501 Washington Avenue, Rm. 415
Waco, Texas 76701-1373
Phone: (254) 757-5200     Fax: (254) 757-2822

**Clerk**
*Sharri Roessler*

June 11, 2015

Mark F. Pratt
Hill County District Attorney
P.O. Box 400
Hillsboro, TX 76645
* DELIVERED VIA E-MAIL *

Terence A. Russell
Attorney at Law
1040 E. Elm St.
Hillsboro, TX 76645
* DELIVERED VIA E-MAIL *

**RE:**     Court of Appeals Number:     10-15-00157-CR
Trial Court Case Number:     37,458

**STYLE:** In re Darrell Curlee

The Court this day issued an opinion and judgment in the above referenced cause. TEX. R. APP. P. 48.

Sincerely,

SHARRI ROESSLER, CLERK

By: Nell Hegefeld
Nell Hegefeld, Deputy Clerk

CC:   Hon. A. Lee Harris (DELIVERED VIA E-MAIL)
L. T. Butch" Bradt (DELIVERED VIA E-MAIL)
Lyle Vincent Gripp (DELIVERED VIA E-MAIL)

A CERTIFIED COPY
ATTEST  8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY  Mary Mullen



#37,458

2015 JUN 15 AM 10:32

BE IT REMEMBERED:

THAT at the term of the Honorable Court of Appeals for the Tenth District of the State of Texas, begun and holden at Waco on the 1st day of January, 2015, present Justices REX D. DAVIS and AL SCOGGINS and Judge RALPH STROTHER

In the cause

No. 10-15-00157-CR

IN RE DARRELL CURLEE

Original Proceeding

the following Judgment was entered on the 11th day of June, 2015:

"Came on to be heard the original Petition for Writ of Mandamus filed in this Court on May 5, 2015, by Relator Darrell Curlee, and the same having been considered, because it is the opinion of the Court that the Petition for Writ of Mandamus should be denied; it is therefore ordered, adjudged and decreed that the Petition for Writ of Mandamus be, and hereby is, denied. It is further ordered that the Relator Darrell Curlee, pay all costs in this behalf expended and incurred in this Court."

I, SHARRI ROESSLER, Clerk of the Court of Appeals for the Tenth District of Texas, at the City of Waco, hereby certify that the foregoing is a true copy of the Judgment entered herein by this Court in the above entitled and numbered cause as appears of record in Minute Book 13, Page 519.

IN WITNESS WHEREOF, I hereunto set my hand and affix the seal of said Court at Waco, this 11th day of A.D. June 2015.

Sharri Roessler, Clerk

By: Nita Whitener

Nita Whitener, Deputy Clerk

A CERTIFIED COPY
ATTEST  8-31  20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY

(Amended)

# INDICTMENT

CAUSE NO. 37458

FILED
ANGELA ORR, DISTRICT CLERK
HILL COUNTY, TEXAS
DATE 7-31-15
TIME 3:30 PM

BOND $ 45,000 @ Court

JUDGE _____

## THE STATE OF TEXAS VS. DARREL ALLEN CURLEE

## CHARGE: AGGRAVATED ASSAULT WITH A DEADLY WEAPON

[AGGRAVATED ASSAULT THREAT WITH A DEADLY WEAPON

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Hill, State of Texas, duly selected, empaneled, sworn, charged and organized as such at the JULY/DECEMBER term, A.D., 2012 of the 66th Judicial District Court for said County, upon their oaths present in and to said court at said term that **DARREL ALLEN CURLEE** hereinafter styled Defendant, on or about the **15TH DAY OF JUNE 2012** and before the presentment of this indictment, in the County of Hill and State aforesaid, did then and there unlawfully, intentionally or knowingly or recklessly cause bodily injury to Christopher Jordan Wally by cutting him with a knife, and the defendant did use or exhibit a deadly weapon during the commission of the assault, to-wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury.

And it is further presented that prior to the commission of the primary offense by the said Darrel Allen Curlee, to-wit: on the 25th day of February 1983, in the District Court of San Miguel County, New Mexico in Cause No. 81-73-CR on the docket of said Court, the said Darrel Allen Curlee, under the name of Darrerll Allen Curlee, was duly and legally convicted in said last named Court of a felony, to-wit: Second Degree Murder upon an indictment then legally pending in said last named Court and of which said Court had jurisdiction; and said conviction was a final conviction and was a conviction for an offense committed by him, the said Darrel Allen Curlee, prior to the commission of the primary offense.

NC
7/31/2015



A CERTIFIED COPY
ATTEST 8-31 _____ 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _____

And it is further presented that before the commission of the primary offense and after the conviction in Cause No. 81-73-CR was final, the defendant, Darrel Allen Curlee, committed the felony of Burglary and was convicted on the 9th day of May 1989 in the Seventh Judicial District Court of San Juan County, Utah, in Cause No. 767.

And it is further presented that on or about the **15TH DAY OF JUNE 2012** in the County of Hill and State of Texas, the defendant, **DARREL ALLEN CURLEE** , did then and there intentionally or knowingly threaten Jerry Wayne Vessells with imminent bodily injury by attempting to cut and/or stab him with a knife and the defendant did use or exhibit a deadly weapon during the commission of the assault, to-wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury.

And it is further presented that prior to the commission of the primary offense by the said Darrel Allen Curlee, to-wit: on the 25th day of February 1983, in the District Court of San Miguel County, New Mexico in Cause No. 81-73-CR on the docket of said Court, the said Darrel Allen Curlee, under the name of Darrell Allen Curlee, was duly and legally convicted in said last named Court of a felony, to-wit: Second Degree Murder upon an indictment then legally pending in said last named Court and of which said Court had jurisdiction; and said conviction was a final conviction and was a conviction for an offense committed by him, the said Darrel Allen Curlee, prior to the commission of the primary offense.

And it is further presented that before the commission of the primary offense and after the conviction in Cause No. 81-73-CR was final, the defendant, Darrel Allen Curlee, committed the felony of Burglary and was convicted on the 9th day of May 1989 in the Seventh Judicial District Court of San Juan County, Utah, in Cause No. 767.

Foreman of the Grand Jury

## Certification of Defendant's Right of Appeal

No. 37,458

The State of Texas

In the _66th_ Court

v.

Darrell Curlee

_Hill_ County, Texas

Defendant

### TRIAL COURT'S CERTIFICATION OF DEFENDANT'S RIGHT OF APPEAL*

I, judge of the trial court, certify this criminal case:

☐ is not a plea-bargain case, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, but matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, but the trial court has given permission to appeal, and the defendant has the right of appeal. [or]

☒ is a plea-bargain case, and the defendant has NO right of appeal. [or]

☐ the defendant has waived the right of appeal.

_____
Judge

**7/31/15**
_____
Date Signed

I have received a copy of this certification. I have also been informed of my rights concerning any appeal of this criminal case, including any right to file a *pro se* petition for discretionary review pursuant to Rule 68 of the Texas Rules of Appellate Procedure. I have been admonished that my attorney must mail a copy of the court of appeals's judgment and opinion to my last known address and that I have only 30 days in which to file a *pro se* petition for discretionary review in the Court of Criminal Appeals. TEX. R. APP. P. 68.2 I acknowledge that, if I wish to appeal this case and if I am entitled to do so, *it is my duty to inform my appellate attorney, by written communication, of any change in the address at which I am currently living or any change in my current prison unit.* I understand that, because of appellate deadlines, if I fail to timely inform my appellate attorney of any change in my address, I may lose the opportunity to file a *pro se* petition for discretionary review.

_____
Defendant
Mailing Address: Jail
Telephone number:
Fax number (if any)

_____
Defendant's Counsel Lyle Gripp
State Bar of Texas ID number 08503006
Mailing Address: 100 N. 64th A 767
Telephone number:
Fax number (if any): 756-1117

* "A defendant in a criminal case has the right of appeal under these rules. The trial court shall enter a certification of the defendant's right to appeal in every case in which it enters a judgment of guilt or other appealable order. In a plea bargain case -- that is, a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant -- a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal." TEXAS RULE OF APPELLATE PROCEDURE 25.2(a)(2)

A CERTIFIED COPY
ATTEST 8-31, 20_15_
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY TEXAS
BY _____

## STATEMENT OF FACTS FORM

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY

2015 JUL 31 PM 3:48

TO:  DIRECTOR, BUREAU OF CLASSIFICATON
     TEXAS DEPARTMENT OF CORRECTIONS
     BOX 99
     HUNTSVILLE, TEXAS

FROM:  NICOLE CRAIN, PROSECUTING ATTORNEY
     HILL COUNTY, TEXAS

Cause No.: **37458**

Name of Inmate: **Darrell Curlee**

Date of Sentence: **7/31/2015**  Penal Code: **22.02**

1. Statement of offense or offenses (including time, date, place, manner in which committed, mitigating or aggravating circumstances).

> On or about 6/15/2012 the defendant attacked a girl + her boyfriend out walking with a knife, no one injured in Hill Co TX

2. Name of co-defendants, disposition of their cases

3. Name and addresses of injured party, value of property stolen or the amount of loss sustained by injured party. Was stolen property returned to owner without loss?

> Christopher Walky  Jerry Vessels
> 164 Reagon Rd   322 HCR 3108
> Whitney, TX 76692  Hillsboro, TX 76645

4. Other cases against defendant, dismissed or pending:

Sincerely,

Nicole Crain
Prosecuting Attorney
Hill County, Texas

A CERTIFIED COPY
ATTEST 8-31, 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY

# Incident Report #2012181816

**HILL COUNTY SHERIFFS OFFICE**
SHERIFF JEFFREY T. LYON
406 HALL STREET
HILLSBORO, TX
TEL. 254-582-5313
FAX. 254-582-3848
sheriff@co.hill.tx.us



## Event Info

| Date Reported | Time Reported | Time Dispatched | Time Arrived | Time Completed |
|---|---|---|---|---|
| 06/15/2012 | 21:09 | 21:09 | 21:11 | 22:10 |

| Addr. Of Occ. | City | District | Grid | Shift |
|---|---|---|---|---|
| 322 CR 3108 | HILLSBORO | H | 1 | B |

| How Reported | Dispatch Disposition |
|---|---|
| 911 | OR |

**Synopsis**
CALL TYPE: ASSAULT

**Dispatch Notes**
CURLEE IN CUSTODY 6/15/2012 9:14:02 PM
HEMS ENR TO SCENE 6/15/2012 9:16:26 PM
109 HAS RECOVERED WEAPON, IS SECURED IN HIS VEHICLE FOR EVIDENCE 6/15/2012 9:30:31 PM

| Agency 1 | Event Status/Dispo | Event Status/Disp | Initial Investigator |
|---|---|---|---|
| HCSO | CLEARED ADULT ARREST | 06/15/2012 | BARNES, HUNTER |

## Classification

### Classification Info

COMPLETED

| Class | Subclass |
|---|---|
| ASSAULT | AGGRAVATED ASSAULT, NONFAMILY, KNIFE/CUT INSTR |

### Event MO

| Hate/Bias Motivation | Domestic Violence | Premise | Auto Weapon Indicator |
|---|---|---|---|
| NONE | N | OTHER LOCATION | N |

| Type Weap/Force | Suspected Using |
|---|---|
| KNIFE/CUTTING INSTRUMENT | NOT APPLICABLE |

## Arrested Persons

### Arrestee Information

| Name Type | Name |
|---|---|
| ARRESTEE | CURLEE, DARREL ALLEN |

| Address | City | State | DL No | DL State |
|---|---|---|---|---|
| 804 S. 3RD ST, LOT #6 | GRANDVIEW | TX | 04173584 | TX |

| DOB | SEX | RACE | EO | HT | WT |
|---|---|---|---|---|---|
| 10/30/1946 | M | WHITE | NON-HISPANIC | 600 | 200 |

| HAIR | EYES |
|---|---|

GRY            BLU

## Arrestee Details

| Charge Code | Charge Description | | Charge Dispo |
|---|---|---|---|
| 22.02(A)(2) | AGG ASSAULT W/DEADLY WEAPON | | ARRESTED |
| 22.02(A)(2) | AGG ASSAULT W/DEADLY WEAPON | | ARRESTED |

| Ref Date | Arr Time | Arr By | Arr Agency | Arrest Location |
|---|---|---|---|---|
| 06/15/2012 | 10:00 | BARNESH | HCSO | HCR 3108 AND HCR 3121 |

| Type Arrest | Armed With |
|---|---|
| ON-VIEW ARREST | LETHAL CUTTING INSTRUMENT |

## Suspects

### Suspect Information

| Name Type | Name |
|---|---|
| SUSPECT | CURLEE, DARREL ALLEN |

**Relationships**
ASSAULT/AGGRAVATED ASSAULT, NONFAMILY, KNIFE/CUT INSTR

| Address | City | State | DL No | DL State |
|---|---|---|---|---|
| 804 S. 3RD ST, LOT #6 | GRANDVIEW | TX | 04173584 | TX |

| DOB | SEX | RACE | EO | HT | WT |
|---|---|---|---|---|---|
| 10/30/1946 | M | WHITE | NON-HISPANIC | 600 | 200 |

| HAIR | EYES |
|---|---|
| GRY | BLU |

### Suspect Information

| Name Type | Name |
|---|---|
| SUSPECT | CURLEE, DARREL ALLEN |

**Relationships**
ASSAULT/AGGRAVATED ASSAULT, NONFAMILY, KNIFE/CUT INSTR

| Address | City | State | DL No | DL State |
|---|---|---|---|---|
| 804 S. 3RD ST, LOT #6 | GRANDVIEW | TX | 04173584 | TX |

| DOB | SEX | RACE | EO | HT | WT |
|---|---|---|---|---|---|
| 10/30/1946 | M | WHITE | NON-HISPANIC | 600 | 200 |

| HAIR | EYES |
|---|---|
| GRY | BLU |

## Victims

### Victim Information

| Name Type | Name |
|---|---|
| VICTIM | WALLY, CHRISTOPHER JORDAN |

**Relationships**
ASSAULT/AGGRAVATED ASSAULT, NONFAMILY, KNIFE/CUT INSTR

| Address | City | State | Zip | DOB |
|---|---|---|---|---|
| 164 REAGON RD | WHITNEY | TX | 76692 | 03/13/1994 |

| SEX | RACE | EO | HT | WT | HAIR |
|---|---|---|---|---|---|

| M | WHITE | NON-HISPANIC | 604 | 185 | BRN |

Res Phone
(254)479-1296

## Victim Details

| Type Victim | Aggravated Assault/Homicide Circumstances |
|---|---|
| INDIVIDUAL | OTHER CIRCUMSTANCES |

Type Injury
APPARENT MINOR INJURY

---

## Victim Information

Name Type     Name
VICTIM        VESSELS, JERRY WAYNE

Relationships
ASSAULT/AGGRAVATED ASSAULT, NONFAMILY, KNIFE/CUT INSTR

| Address | | City | State | Zip | SSN |
|---|---|---|---|---|---|
| 322 HCR 3108 | | HILLSBORO | TX | 76645 | 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 |
| Misc ID No | DL No | DL State | DOB | SEX | RACE |
| 7035 | TX-16098630 | TX | 01/03/1977 | M | WHITE |
| EO | HT | WT | HAIR | EYES | Res Phone |
| NON-HISPANIC | 600 | 170 | BRO | BRO | 254-266-0133 |
| Occupation | Marital Status | Resid Status | POB | | |
| CONSTUCTION | MARRIED | RESIDENT | UGOTE, TX | | |

## Victim Details

| Type Victim | Aggravated Assault/Homicide Circumstances |
|---|---|
| INDIVIDUAL | OTHER CIRCUMSTANCES |

Type Injury
NONE

---

| Rptg Party |
|---|

## RPTG PARTY Information

Name Type     Name
RPTG PARTY    VESSELS, SHEILA

| Address | City | State | Res Phone |
|---|---|---|---|
| 322 CR 3108 | HILLSBORO | TX | (254) 266-0487 |

| Property |
|---|

## EVIDENCE

| Date Reported | Status | Evidence Item No. | Property Type | Color |
|---|---|---|---|---|
| 06/15/2012 | EVIDENCE IN CUSTODY | 2012181816-1 | WEAPON, NON FIREARM | BLK / SIL |
| Brand | Property Quantity | | | |
| EMIRIL | 1 | | | |

| Vehicle |
|---|

## Record Type - IMPOUNDED

---

| Date Reported | Status | LIC Plate No | State | Vehicle ID No |
|---|---|---|---|---|
| 06/16/2012 | POLICE TOW | 207XPM | TX | 1G4HP54K214208555 |
| Year | Make | Model | Style | Color |
| 2001 | BUIC | 4-DOOR | PC | TAN/TAN |

Comments
BIG DADDYS WRECKER SERVICE

---

## Narrative

Written By:
BARNES, HUNTER

On 06/15/2012 at approximately 9:09 P.M. SGT.Barnes and Deputy Sanchez were dispatched to HCR 3108 in reference to an Aggravated Assault. Dispatch stated that the suspect had possibly stabbed two victims with a knife, and that the suspect was in the roadway. Dispatch also stated that the suspect who was an older man was driving a Gold Buick passenger car. Dispatch stated that the caller advsied that the suspect was trying to get her 16 year old daughter.

Deputies arrived on location and observed a Gold in color Buick four door passenger vehicle in parked with the driver side door that was open, and a white male who was later identified as Darrel Allen Curlee (W/M 10/30/46) sitting in the driver seat. SGT. Barnes observed that as he activated his overhead red and blue lights, the brake lamps came on the vehicle. With the information that was provided from the caller and that it was unkown if Curlee was still armed, SGT. Barnes via his patrol units P.A. system was able to get Curlee out of the vehicle and on the ground where he was safely detained.

Deputy Sanchez remained on location with Curlee who appeared to have an injury to his right eye until Hillsboro Fire and EMS arrived to treat Curlee who later refused transport.

SGT. Barnes went back to the complainants residence located at 322 HCR 3108 and made contact with the caller who was identified as Shiela Vessels (W/F 01/28/77). Sheila stated that her 16 year old daughter Megan Vessels (W/F 06/14/96) was walking with some friends down the road, and that an older white male (later ID as Curlee) attemtped to get Megan and possibly try to rape her. Shiela stated that Megan called her and was crying as she was telling her what happened. SGT. Barnes asked Megan if Curlee ever touched her or grabbed her, she stated no he didn't, he only was making comments towards her and repeatedly kept saying "hey girl". Megan stated that the man (Curlee) then got out of the car and started towards her and attempted to grab her, at which point (Jordan) also known as Christopher Jordan Wally (W/M 03/13/94) stepped between her and Curlee and told him to quit. Megan stated that Curlee then pulled a knife out on Jordan, who in return hit Curlee and she took off running and called her mother. Megan stated that her dad was able to get the knife away from Curlee.

SGT. Barnes then spoke with Christopher Jordan Wally (W/M 03/13/94) (victim #1) who stated that they were walking down the roadway throwing rocks and running, when they passed the Gold vehicle, they turned back around to head back home and that there was a man standing outside of the car at this point. Wally stated at this point the man (Curlee) went after Megan and tried to grab her, in which he couldn't allow to happen so he attempted to stop him, when Curlee pulled a knife on him and said " you pussy's want some". Christopher stated that the man (Curlee) then cut him with the knife so he in self defense hit Curlee twice and pushed him to the ground at which point he left to go back to the house.

SGT. Barnes observed a small minor cut on the left shoulder and left chest of Christopher where he advised

that he was cut by Curlee. SGT. Barnes captured digital images of the injury.

SGT. Barnes then spoke with Megan's Father, who was identified as Jerry Vessels (W/M 01/03/77) (victim#2). Jerry stated that Megan called his wife saying that there was a man that was trying to attack her and was saying nasty things to her and Jordan. Jerry stated that Megan advised that Jordan Wally was trying to keep the man (Curlee) from getting Megan. Jerry stated that he then left his residence at 322 HCR 3108 and ran as fast as he could to stop things from getting worse.

Jerry stated he got there and asked what was going on, and the man that was on the ground pulled a knife and came towards him trying to cut him. Jerry stated that he at this point did strike the man and was able to get the knife away from him and returned to his residence and waited on Deputies to arrive.

SGT. Barnes took possession of one Black handle with metal blade knife and captured digital images. SGT. Barnes later secured the knife that was used in the offense into the evidence lockers at the Hill County Sheriff's Office.

Hillsboro Fire and EMS checked all subjects involved in which all including Curlee advised they didn't want to be transported to the hospital.

Both Jerry Vessels and Christopher Jordan Wally were provided an affidavit of complaining witness form in which they both showed the desire to prosecute Curlee for Agg. Assault with Deadly Weapon(knife). SGT. Barnes also obtained voluntary statements from Wally, Jerry Vessels, and Megan Vessels as to the events in which they happened.

SGT. Barnes asked Curlee to provide his side of the story, at which point he stated he never had a knife, then said he did have a knife in which he did pull out but doesn't remember trying to stab anyone with it. Curlee stated that he thought he pulled the knife because he thought that the kids were going to hurt him.

With the evidence that was gathered on location and witness statements gathered, it was determined that Curlee did then and there while being located in Hill County, Texas commit two seperate offenses against two seperate victims of Aggravated Assault with a Deadly Weapon. Curlee was hit by the victims in self defense to prevent Curlee from stabbing them.

Curlee was then transported to the HCLEC without further incident.

| Supplemental Narrative |
| --- |

**Date Written:**
06/16/2012

**Written By:**
SANCHEZ, ALBERTO

On 06-15-2012 at approximately 9:09 pm I, Deputy Albert Sanchez along with Sgt.H.Barnes were dispatched to 322 HCR 3108 in reference to an Aggravated Assault. HCSO dispatch advised that a male subject had possibly stabbed two victims, advised that he was out by the roadway.

Deputies observed a W/M later identified as one CURLEE, DARREL ALLEN (W/M 10-30-1946) sitting in his Gold Buick 4 door passenger vehicle bearing Texas L/P 207-XPM just past HCR 3121 right before the Hill College Rodeo grounds.

CURLEE was detained until the incident could be investigated. I observed CURLEE to have dried blood on

his right eye and some on his body. CURLEE was not wearing a shirt, had jeans on and boots. CURLEE appeared to have an injury to his right eye.

CURLEE advised that he had stopped on HCR 3108 and was fixing himself a sandwich and was drinking water. He advised that before he knew it that he had been jumped by some people down the road. He advised that he did not know why he got jumped and assaulted. I remained on scene with CURLEE while Sgt.H.Barnes went back to 322 HCR 3108 to speak with the complainants and get written statements in reference to the incident.

Paramedics arrived on scene and attended to CURLEE. He later refused transport to the hospital. Sgt.H.Barnes was provided with written statements in reference to the assault by two separate victims. Sgt.H.Barnes placed CURLEE under arrest for aggravated assault with a deadly weapon times two. CURLEE was transported to HCSO jail where he was booked in. End of report.

A.S.

## Graphics









WALLY INJURY CAUSED BY KNIFE THAT CURLEE USED

## Attachment List

| Attachment Title | Date Entered | Entered By | File Name |
|---|---|---|---|
| 2012181816 CURLEE | 06/16/2012 | BARNESH | 2012181816IMPOUND SHEET CURLEE.PDF |
| 2012181816 CURLEE | 06/16/2012 | BARNESH | 20121818162012181816 CURLEE.PDF |

## Case Management

| Initial Investigator | Event Status/Dispo | Event Status/Dispo Date | Report Status |
|---|---|---|---|
| BARNES, HUNTER | CLEARED ADULT ARREST | 06/15/2012 | APPROVED |

| Approved By | Solvability Percentage | | |
|---|---|---|---|
| BARNES, HUNTER | 0.00% | | |

# WAIVER OF TRIAL BY JURY AND AGREEMENT TO STIPULATE TESTIMONY

Cause No. 37454

STATE OF TEXAS

VS.

Darrell Curlee

2015 JUL 31 PM 3:02

IN THE 66TH JUDICIAL

DISTRICT COURT OF

HILL COUNTY, TEXAS

## WAIVER OF TRIAL BY JURY AND OTHER MATTERS

Came now the defendant, Darrell Curlee, on 7/31, 2015 in the above styled and numbered cause in open Court and before having pled to the indictment herein, announces that defendant will plead guilty to said charge and hereby requests the consent and approval of the Court and of the attorney for the State that defendant may waive the right to trial by jury herein and does, upon the consent of the Court and State's Attorney, waive trial by Jury and enter his/her plea of guilty; and defendant and his/her attorney waive the 10 day waiting period for trial after appointment of counsel; under Article 27.18 CCP the defendant and the attorney representing the state and the attorney representing the defendant file this their written consent to the use of closed circuit video teleconferencing, if applicable, and stipulate all prerequisites of said statute have been satisfied.

_____
Defendant

_____
Attorney for the Defendant

Before the said defendant enters his/her plea herein, the above matters and requests of the defendant herein are hereby consented to; and approved by me, the attorney representing the State herein.

_____
District Attorney, Hill County, Texas

The above and foregoing application of the defendant and approval of the district attorney herein, having been duly considered by the Court and it appearing to the court that the defendant is herein charged with a ___2nd felony___, that the defendant is represented by counsel, and that the attorney representing the State herein has given the consent and approval to same, that defendant and his attorney have waived the 10 day waiting period for trial after appointment of counsel, therefore consent and approval of the Court is hereby granted, and all other matters as applicable, are approved.

_____
JUDGE PRESIDING

## AGREEMENT TO STIPULATE TESTIMONY

Said defendant, defendant's counsel, and the State's Attorney do hereby enter into an agreement that the defendant waives the appearance, confrontation, and cross examination of witnesses in the above entitled and numbered cause and agrees that the testimony of said witnesses may be stipulated into the record by the State's Attorney, such testimony being the same as testifying under oath and the defendant further consents to the introduction of testimony by affidavit, written statements of witnesses, and all other documentary evidence that may be introduced by the State, and waives the filing of all such testimony, affidavits and statements among the papers in this cause.

_____
DEFENDANT

_____
STATE'S ATTORNEY

_____
ATTORNEY FOR DEFENDANT

_____
JUDGE PRESIDING

A CERTIFIED COPY
ATTEST 8-31-2015
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _____

Cause No. 37,458

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| VS. | § | OF |
| Darrell Curlee | § | HILL COUNTY, TEXAS |

FILED
ANGELIA ORR
CLERK HILL DISTRICT
2015 JUL
PM 3: 02

## WAIVER OF TX C.C.P., ART. 39.14 ADDITIONAL DISCLOSURES

Comes now the defendant and hereby waives any additional right to inspection or copying of discoverable items in the State's possession as permitted by Texas Code of Criminal Procedure article 39.14, other than to the State's continuing duty under article 39.14(k), as well as under the United States and Texas Constitutions, to provide exculpatory, impeachment, or mitigation evidence tending to negate the defendant's guilt or tending to reduce his punishment for the charged offense. My attorney has fully and completely explained to me my right to further discovery pursuant to article 39.14, and I understand that right. I am freely, knowingly, and voluntarily waiving that right after my attorney has fully informed me of the consequences of this waiver. I am waiving the right to additional discovery in order to accept the State's recommended punishment. I am choosing to agree to the State's recommendation of my own volition because I believe it is in my best interests to accept the agreement after receiving the full advice of counsel and explanation of my rights.

Darrell A. Curlee                          7/31/15
Defendant                                  Date

I represent the defendant in this case, and I believe that this document was executed by him freely, knowingly, and voluntarily, and after I fully discussed this waiver and its consequences with him. I believe that he understands the consequences of this waiver, that he is competent to knowingly make this waiver, and along with him and at his instruction I also waive any further discovery pursuant to article 39.14 to which the defendant was entitled, other than to the State's continuing duty under article 39.14(k), as well as under the United States and Texas Constitutions, to provide exculpatory, impeachment, or mitigation evidence tending to negate the defendant's guilt or tending to mitigate punishment for the charged offense.

Kyle Gripp                          _____
Defense Attorney (print)            Signature of Defense Attorney

7/31/15
Date

This document was executed by the defendant, defendant's attorney, and then filed with the papers of the case. The defendant came before me and I approved the above waiver along with the defendant's plea of guilty or no contest. After I admonished the defendant of the consequences of his waiver, I ascertained that defendant entered it knowingly and voluntarily after discussing it with defendant's attorney. It appears that the defendant is mentally competent to waive any additional discovery, and is doing so freely and voluntarily. I find that the defendant's attorney adequately informed defendant of his article 39.14 rights and the effects of this waiver.

Signed this 31 day of July, 2015.

_____
Judge Presiding

A CERTIFIED COPY
ATTEST 8-31 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY TEXAS
BY Mary Mullin

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY
2015 JUL 31 PM 3: 02

Cause No. 37458

| STATE OF TEXAS | § | IN THE 66TH DISTRICT |
|---|---|---|
| VS. | § | COURT OF |
| Darrell Curlee | § | HILL COUNTY, TEXAS |

## WAIVER OF PRE-SENTENCE INVESTIGATION

Now comes _Darrell Curlee_, Defendant and waives a pre-sentence investigation in the above captioned cause, Code of Criminal Procedure 42.12, Section 9.

Signed this ____ day of _____, 20__.

_____
Defendant

_____
Attorney for the State

_____
Attorney for the Defendant

SIGNED AND APPROVED this __31__ day of __July__, 20_15_.

_____
Judge Presiding

A CERTIFIED COPY
ATTEST __8-31__ . 20_15_
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _____

FILED
ANGELIA ORR
CLERK HILL DISTRICT
2015 JUL 31 PM 3: 02

Cause 37,458

| STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
| --- | --- | --- |
| VS. | § | DISTRICT COURT OF |
| Darrell Curlee | § | HILL COUNTY, TEXAS |

## COURT'S ADMONISHMENT TO DEFENDANT

The Court, prior to accepting the above named Defendant's plea in this cause, admonishes said Defendant,

(1) The range of punishment for the offense of Agg Assault with a deadly weapon SECOND DEGREE, which is a FELONY, alleged in this cause is punishable by confinement in the Institutional Division of the Department of Criminal Justice for a term of not more than twenty (20) years or less than two (2) years; in addition to imprisonment, an individual adjudged guilty of a felony of the second degree may be punished by a fine not to exceed $10,000.

(2) Any recommendation of the prosecuting attorney as to punishment is not binding on the Court, and the Court may set punishment within the range recited above;

(3) If you and your attorney have reached a plea bargain with the prosecuting attorney, the Court will inform you if it accepts or rejects such agreement before any finding on your plea. If the Court rejects the plea bargain, you will be permitted to withdraw your plea of guilty or nolo contendere;

(4) A plea of nolo contendere (or "no contest") has the same legal effect in this criminal case as a plea of guilty;

(5) If the punishment assessed does not exceed the punishment recommended by the prosecuting attorney and agreed to by you and your attorney, this Court must give its permission to you before you may prosecute an appeal to a higher court on any matter in this case except for those matters raised by written motions filed prior to trial;

(6) If you are not a citizen of the United States of America, it is presumptively mandatory and virtually certain under federal law that a plea of guilty or nolo contendere for this offense will result in deportation, the exclusion from admission to this country, or the denial of naturalization under federal law. Counsel for defendant certifies that proper legal advice about the adverse consequences of such a plea has been provided to the defendant prior to the plea herein.

(7) If you are convicted of an offense involving violence where you are or were a spouse, intimate partner, parent, or guardian of the victim or are or were involved in another, similar relationship with the victim, or unlawfully possess a firearm, a felony, it would be unlawful for you to possess or purchase a firearm, including a handgun or long gun, or ammunition, pursuant to federal law under 18 U.S.C. Section 922[g][9] or Section 46.04[b], Texas Penal Code. If you have any questions whether these or other applicable laws make it illegal for you to possess or purchase a firearm, you should consult an attorney.

(8) You may not be compelled to give evidence or testify against yourself. You have the right to remain silent and not testify. However, if you elect to waive these rights and testify, anything you say can and will be used as evidence against you.

*SECOND DEGREE* Jan. 2015                                                                 Page 1

A CERTIFIED COPY
ATTEST 8-31 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _____

(9) Where Deferred Adjudication Probation is granted, and if there is a later violation of a condition of probation, you may be arrested and detained. You will then be entitled to a hearing limited to the determination by the Court of whether it proceeds with an adjudication of guilt on the original charge. No appeal may be taken from this determination. After an adjudication of guilty, all proceedings, including assessment of punishment, pronouncements of sentence, granting of probation, and your appeal; if any, continue as if the adjudication of guilt had not been deferred, and the range of punishment for the original charge could then be considered by the Court and imposed on you.

(10) Under HB 1106 of the 2011 legislative session, you are admonished, before being placed on deferred adjudication community supervision, if applicable, of your right to petition the Court for an order of nondisclosure, unless you are ineligible to pursue that right because of: (A) the nature of the offense for which you would be placed on deferred adjudication community supervision; or (B) your criminal history.

(11) If this proceeding takes place on or after January 1, 2014, and the alleged offense was committed on or after January 1, 2014 and before the Court accepts a plea of guilty or nolo contendere, or before trial, each party acknowledges by this writing, or on the record, in open court, that disclosure, receipt, and a list of all documents, items and information as required under SB1611, 2013 legislative session, amending Article 39.14 CCP, has been provided the defendant.

SIGNED 31 day of July, 20 15

APPROVED AS TO FORM:

_____
DISTRICT ATTORNEY/ASSISTANT DISTRICT ATTORNEY

_____
PRESIDING JUDGE, 66TH JUDICIAL
DISTRICT COURT OF HILL COUNTY, TEXAS

On this the 31 day of July, 20__, I, Darrell Curlee, Defendant herein, and Lyle Gripp, Counsel for the Defendant, hereby certify that we have received, read and understand the foregoing Court's admonitions, are fully aware of the consequences of the Defendant's plea in this case, waive the Defendant's right to remain silent, and execute this in open court on the date previously shown.

_____
DEFENDANT

_____
COUNSEL FOR DEFENDANT

Cause No. 37,458

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| Darrell Curlee | § | HILL COUNTY, TEXAS |

## STIPULATION OF EVIDENCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, The State of Texas, by and through her District Attorney, and the Defendant, _Darrell Curlee_, in person and by and through his/her attorney, _Kyle Gripp_, in open Court stipulates to the following facts:

*At the trial of this cause the State could and would produce witnesses who would testify and establish, beyond a reasonable doubt, the truth of all of the material allegations in the indictment and/or information and charging instrument herein, (including enhancement charges) and such allegations are in fact true.*

SIGNED AND STIPULATED IN OPEN COURT this _3_ day of _July_, 20 _15_

_____
Mark F. Pratt, District Attorney
Nicole Crain, Assistant District Attorney

_____
Defendant

_____
Attorney for Defendant (if applicable)

_Kyle V. Gripp_
Printed Name of Attorney

A CERTIFIED COPY
ATTEST 8-31 2015
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _____

State's
exhibit #1

FILED
ANGELIA ORR
CLERK HILL DISTRICT
2015 JUL 31 PM 3: 02

NO. 37,458



| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| VS. | § | OF |
| Darrell Curlee | § | HILL COUNTY, TEXAS |

## ARTICLE 39.14 DISCOVERY DISCLOSURE FORM

The State of Texas and the Defendant in the above styled and numbered cause hereby acknowledge, prior to the Court's acceptance of the Defendant's plea or before trial, the disclosure, receipt and a list of all documents, items, and information required to be made available by the State to the Defense.

Said documents, items and information made available to the Defendant include those items set forth in Exhibit A attached hereto.

## SIGNATURES AND ACKNOWLEDGEMENTS

### Defendant Represented by Attorney

I, the Defendant herein, acknowledge that my attorney has explained to me, and provided me the opportunity to review the above referenced items.

### Pro-Se Defendant

I, the Defendant herein, acknowledge that the State has provided me an opportunity to review the above referenced items.

Date: 7/31/15

_____
Defendant's Signature

Darrell Curlee
_____
Defendant's Printed Name

A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY TEXAS
BY _____

1

Pursuant to CCP 39.14, by my signature below, I certify, as counsel for the Defendant that the documents, items, and information set forth above have been made available to me. I understand that non-public information received pursuant to 39.14 is not subject to disclosure without a Court order. I further understand that I cannot allow the Defendant, witnesses, or prospective witnesses to have copies of this information other than a copy of the witness's own statement and before showing this information to a defendant, I must redact it as set forth in the statute. I approve and agree to all waivers, statements, and agreements of the defendant herein and ask the Court to accept them and the defendant's plea.

_____          7/31/15
Defense Attorney's Signature                      Date


As attorney for the State, I represent that the above referenced materials have been available as set forth above.


_____          _____
Date                                                MARK F. PRATT, District Attorney, Hill County


By: _____
       NICOLE CRAIN, ASSISTANT D.A., Hill County


The Court accepts these documents as compliance with Art. 39.14 of the Texas Code of Criminal Procedure.


Signed this 31 day of July, 20 15

_____
Judge Presiding

2

DISTRICT ATTORNEY
MARK F PRATT
66TH JUDICIAL DISTRICT
HILL COUNTY, TEXAS

DEFENDANT'S NAME: <u>DARREL ALLEN CURLEE</u>
CAUSE NO: <u>37,458</u>
ATTORNEY: <u>LYLE GRIPP</u>
DATE: 3-16-15

REQUEST FOR DISCOVERY

INCLUDED IN DISCOVERY IS THE FOLLOWING
REPORTS AND/OR VIDEO IF APPLICABLE:

1. INDICTMENT – CAUSE NO. 37,458
2. STATE'S ANNOUNCEMENT OF READY – CAUSE NO. 37,458
3. COMPLAINT
4. (10) SETTING ORDERS
5. HILL COUNTY SHERIFF'S OFFICE (HCSO) INCIDENT REPORT #2012181816
6. VEHICLE IMPOUND SHEET
7. HILL COUNTY ARREST REPORT
8. AFFIDAVIT FOR WARRANTLESS ARREST
9. VOLUNTARY STATEMENT – MEGAN VESSELS
10. AFFIDAVIT OF COMPLAINING WITNESS – JERRY W. VESSELS
11. VOLUNTARY STATEMENT – JERRY VESSELS
12. AFFIDAVIT OF COMPLAINING WITNESS – CHRISTOPHER WALLY
13. VOLUNTARY STATEMENT – CHRISTOPHER WALLY
14. HCSO PROPERTY DISPOSITION REPORT
15. LETTER & ENVELOPE FROM DARREL CURLEE TO DAN DENT
16. STATE OF NEW MEXICO CORRECTIONS DEPARTMENT COVER LETTER
17. CERTIFICATION BY THE RECORDS MANAGER, STATE OF NEW MEXICO
18. STATE OF NEW MEXICO JUDGMENT AND SENTENCE
19. (5) BOOKING PHOTOS FROM NEW MEXICO
20. (2) COPIES OF FINGERPRINT CARDS FROM NEW MEXICO PENITENTIARY
21. FINDINGS, JUDGMENT AND COMMITMENT FROM STATE OF UTAH
22. COPY OF FINGERPRINT CARD FROM UTAH STATE PRISON
23. CERTIFICATE OF RECARDS AUTHENTICITY , UTAH STATE PRISON
24. BOOKING PHOTO FROM UTAH STATE PRISON
25. LETTER & ENVELOPE FROM DARREL CURLEE TO JUDGE LEE HARRIS
26. LETTER FROM TEXAS DEPARTMENT OF STATE HEALTH SERVICES
27. TRIAL COMPETENCY EXAMINATION
28. EVALUATION BY DR. OLUMUYIWA ABDUL, NORTH TEXAS STATE HOSPITAL
29. LETTER FROM NORTH TEXAS STATE HOSPITAL
30. WAIVER OF APPEARANCE/JURY TRIAL
31. PHYSICIAN'S CERIFICATE OF MEDICAL EXAM FOR MENTAL ILLNESS
32. COMPETENCY EVALUATION
33. EVALUATION BY DR. VERL CHILDERS
34. DR. VERL CHILDERS INVOICE
35. LETTER FROM DR. VERL CHILDERS TO JUDGE BOB MCGREGOR
36. LETTER FROM DARREL CURLEE TO JUDGE BOB MCGREGOR
37. RESPONSE LETTER FROM JUDGE BOB MCGREGOR TO DARREL CURLEE
38. INMATE SICK CALL SLIP
39. LETTER FROM JUDGE BOB MCGREGOR REGARDING MEDICAL EVALUATION
40. ORDER APPOINTING A DISINTERESTED EXPERT TO EXAMINE DEFENDANT
41. INDICTMENT – CAUSE NO. 37,458
42. FAX FROM NICOLE CRAIN TO TERRENCE RUSSEL
43. STATE'S POTENTIAL WITNESS LIST

44. STATE'S NOTICE OF INTENT TO OFFER EXTRANEOUS OFFENSES
45. HCSO TRANSPORTATION MILEAGE REPORT INVOICE
46. COMPENTENCY REPORT FROM NORTH TEXAS STATE HOSPITAL
47. COMPENTENCY EVALUATION

SIGNATURE _____   DATE: 3/17/16

RETAINED OR APPOINTED                COST: $ _____



CASE NO. 37,458          COUNT ONE
INCIDENT NO./TRN: 914316336X A001

| | | |
|---|---|---|
| THE STATE OF TEXAS | § § | IN THE 66TH DISTRICT |
| V. | § § | COURT |
| DARRELL ALLEN CURLEE | § | HILL COUNTY, TEXAS |
| STATE ID NO.: TX02717859 | § § | |

## JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. LEE HARRIS | Date Judgment Entered: | 7/31/2015 |
| Attorney for State: | NICOLE CRAIN | Attorney for Defendant: | LYLE GRIPP |

Offense for which Defendant Convicted:
**AGGRAVATED ASSAJLT WITH A DEADLY WEAPON**

| Charging Instrument: | Statute for Offense: |
|---|---|
| **INDICTMENT** | **22.02 Penal Code** |

Date of Offense:
**6/15/2012**

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| **2ND DEGREE FELONY** | **GUILTY** | YES - A KNIFE |

Terms of Plea Bargain:
**SIX YEARS INSTITUTIONAL DIVISION, TDCJ**

| Plea to 1st Enhancement Paragraph: | N/A | Plea to 2nd Enhancement/Habitual Paragraph: | N/A |
|---|---|---|---|
| Findings on 1st Enhancement Paragraph: | N/A | Findings on 2nd Enhancement/Habitual Paragraph: | N/A |

| | | | |
|---|---|---|---|
| Date Sentence Imposed: | 7/31/201● | Date Sentence to Commence: | 7/31/2015 |

| Punishment and Place of Confinement: | **SIX YEARS INSTITUTIONAL DIVISION, TDCJ** |
|---|---|

### THIS SENTENCE SHALL RUN CONCURRENTLY.

☐ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR N/A .

| Fine: | Court Costs: | Restitution: | Restitution Payable to: | |
|---|---|---|---|---|
| $ N/A | $ 316.00 | $ N/A | ☐ VICTIM (see below) | ☐ AGENCY/AGENT (see below) |

☒ Attachment A, Order to Withdraw Funds, is incorporated into this judgment and made a part hereof.

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was N/A .

If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order.

| | From | to | From | to | From | to |
|---|---|---|---|---|---|---|
| Time Credited: | From | to | From | to | From | to |

If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below.

1143 DAYS          DAYS    NOTES: N/A

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in Hill County, Texas. The State appeared by her District Attorney.

**Counsel / Waiver of Counsel (select one)**

☒ Defendant appeared in person with Counsel.
☐ Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above. The Court then admonished Defendant as required by law. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of this plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court found Defendant guilty of the offense indicated above. In the presence of Defendant the Court pronounced sentence against Defendant.



ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK idg
HILL COUNTY, TEXAS
BY

Page 1 of 2

The Court FINDS Defendant com...ted the above offense and ORDERS, ADJU...ES AND DECREES that Defendant is GUILTY of the above offense. The Court FINDS the Presentence Investigation, if so ordered, was done according to the applicable provisions of TEX. CODE CRIM. PROC. art. 42.12 § 9.

The Court ORDERS Defendant punished as indicated above. The Court ORDERS Defendant to pay all fines, court costs, and restitution as indicated above.

### Punishment Options (select one)

☒ **Confinement in State Jail or Institutional Division.** The Court ORDERS the authorized agent of the State of Texas or the Sheriff of this County to take, safely convey, and deliver Defendant to the **Director, Institutional Division, TDCJ.** The Court ORDERS Defendant to be confined for the period and in the manner indicated above. The Court ORDERS Defendant remanded to the custody of the Sheriff of this county until the Sheriff can obey the directions of this sentence. The Court ORDERS that upon release from confinement, Defendant proceed immediately to the Hill County District Clerk. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ *County Jail—Confinement / Confinement in Lieu of Payment.* The Court ORDERS Defendant immediately committed to the custody of the Sheriff of _____ County, Texas on the date the sentence is to commence. Defendant shall be confined in the County Jail for the period indicated above. The Court ORDERS that upon release from confinement, Defendant shall proceed immediately to the _____. Once there, the Court ORDERS Defendant to pay, or make arrangements to pay, any remaining unpaid fines, court costs, and restitution as ordered by the Court above.

☐ **Fine Only Payment.** The punishment assessed against Defendant is for a FINE ONLY. The Court ORDERS Defendant to proceed *immediately to the Office of the* _____ *County District Clerk.* Once there, the Court ORDERS Defendant to pay or make arrangements to pay all fines and court costs as ordered by the Court in this cause.

### Execution / Suspension of Sentence (select one)

☒ The Court ORDERS Defendant's sentence EXECUTED.

☐ The Court ORDERS Defendant's sentence of confinement SUSPENDED. The Court ORDERS Defendant placed on community supervision for the adjudged period (above) so long as Defendant abides by and does not violate the terms and conditions of community supervision. The order setting forth the terms and conditions of community supervision is *incorporated into this judgment by reference.*

The Court ORDERS that Defendant is given credit noted above on this sentence for the time spent incarcerated.

### Furthermore, the following special findings or orders apply:

**Signed and entered on July 31, 2015**

LEE HARRIS
*JUDGE PRESIDING*

Clerk: Angelia Orr, District Clerk

By:

**Right Thumbprint**

Cause No. 37,458

| STATE OF TEXAS | § | IN THE 66TH DISTRICT COURT |
| | § | |
| V. | § | |
| | § | HILL COUNTY, TEXAS |
| DARRELL ALLEN CURLEE | § | |
| | § | |

**ATTACHMENT A**
**ORDER TO WITHDRAW FUNDS**

TO:    INMATE TRUST ACCOUNT, TEXAS DEPARTMENT OF CRIMINAL JUSTICE
COPY TO: **Darrell Allen Curlee**         TDCJ #:      SID #: TX02717859

GREETINGS:

THE ABOVE named Texas Department of Criminal Justice offender has of this date been assessed court costs, fees and/or fines and/or restitution in the 66th District Court of Hill County, Texas, in the above entitled cause in accordance with the sentence imposed as reflected in the judgment to which this Order is attached. The Court finds that the offender is unable to pay the court costs, fees and/or fines and/or restitution on this date and that the funds should be withdrawn from the offender's Inmate Account. Court costs, fees and/or fines and/or restitution have been incurred in the amount of $ 316.00

> THE COURT ORDERS that payment be made out of the offender's Inmate Account as follows:
> Pay an initial amount equal to the lesser of:
> > (1)   15% of the account balance up to and including $100, plus 25% of any portion of the account balance that is between $100.01 and $500 inclusive, plus 50% of any portion of the account balance that is more than $500; or
> > (2)   The total amount of court costs, fees and/or fines and/or restitution that remains unpaid.
> After the payment of the initial amount, the offender shall pay an amount equal to the lesser of:
> > (1)   10% of each deposit in the offender's Inmate Account; or
> > (2)   The total amount of court costs, fees and/or fines and/or restitution that remains unpaid.
> Payments are to continue until the total amount of the court costs, fees and/or fines and/or restitution are paid, or the offender is released from confinement.

On receipt of a copy of this Judgment, the department (Inmate Trust Account) shall withdraw money from the account of the offender, hold same in a separate account, and shall forward said money to the 66th County District Clerk, P.O. Box 634, Hillsboro, Texas 76645 monthly.

THIS ORDER is entered and incorporated into the Judgment and Sentence of this Court and pursuant to Government Code, Section 501.014, on this 30th day of July, 2015.

Cause No. 37,458

The State of Texas

VS.

DARRELL ALLEN CURLEE

IN THE 66th JUDICIAL

DISTRICT COURT

OF HILL CO TEXAS

ENDORSEMENT

     The Defendant DARRELL ALLEN CURLEE, in the above cause, is given credit on his/her sentence for 1143 days spent in jail pending dispostion of the above cause.

     The Sheriff of Hill County, Texas is hereby directed to attach to the commitment papers in this cause a statement assessing the defendant's conduct while in jail during this time.

     Signed and Entered this the 3rd day of August, A.D., 2015.

_____
Judge Presiding

A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY

COMMITMENT
TO PENITENTIARY
NO 37,458
THE STATE OF TEXAS
VS

DARRELL ALLEN CURLEE

THE STATE OF TEXAS                    {}        IN THE 66TH DISTRICT COURT⊙
COUNTY OF HILL ·                      {}        JULY-DEC.  TERM, 2015

To the Director of Corrections of the Institutional Division of The Texas Department of Criminal Justice, or any other officer legally authorized to receive convicts, greeting;

Whereas by the judgment of the Honorable 66th Judicial District Court of Hill County Texas in the above styled and numbered cause, made and entered on the 31st of July 2015, on optical .  Page ON, the above named defendant was adjudged to be guilty of the offense of AGG ASSLT W/DEADLY WEAPON a 2nd Degree Felony, on his plea of Guilty;  and whereas by proper sentence of said court, dated 07/31/15, and recorded in VOL.  BASE , Page ON , the above named defendant was sentenced to 6 Years 0 Months 0 Days .·

Sentence to be served CONCURRENT WITH  , the service of any other
sentence(s) imposed upon said defendant, to-wit:

And whereas, the Sheriff has been instructed  to  include  with this commitment the following report(s):
__XX__ A written report to the director of the Department of Corrections that states:
1) the offense or offenses for which the defendant has been sentenced;
2) the nature and seriousness of each offense.
in jail.

Wherefore,  you are hereby commanded that you take into custody the above named defendant and convey him to said penitentiary, and  that  you execute the sentence herein as  required of you by law confining the said defendant in the State Penitentiary for the term stated above, subject to the rules and regulations of the penitentiary authorities.

ANGELIA ORR, Clerk, District Court
Hill County, Texas

By_____Deputy

Capias  served by placing the defendant under arrest on the _____ day of _____, A.D., 20____, at _____ o'clock ____.M.

A CERTIFIED COPY
ATTEST____8-31_____.20|5
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY. TEXAS
BY_____

Sheriff Hill County,Texas

Plea Date: 7|31|2015

By: Indictment X Information _____

CAUSE NO. 37458

THE STATE OF TEXAS §

VS. §

Darrell Allen Curlee §

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY
2015 JUL 31 PM 3:02

IN THE 66TH JUDICIAL

DISTRICT COURT

HILL COUNTY, TEXAS

## PLEA BARGAIN AGREEMENT AND WAIVER OF RIGHTS

P.C./H.S.C./T.C. 22.02 OFFENSE: Agg Asslt DW (a Xnife)

DEGREE OF FELONY: 1 (2) 3 STATE JAIL CLASS OF MISDEMEANOR: A B C

Q143163336X A001 02717859

COMES NOW Defendant, Counsel for Defendant, and Counsel for the State of Texas herein, and would show that the following plea bargain agreement has been entered into between the undersigned:

Defendant will plead: X GUILTY _____ NOLO CONTENDERE _____ TRUE

X Imprisonment in the Texas Dept. of Criminal Justice – Institutional Division for 6 years.

_____ Confinement in State Jail for _____ months.

___ Punishment under 12.44 (a) Tex. Penal Code

___ Offense under 12.44 (b) Tex. Penal Code

_____ Confinement in County Jail for _____ days. (□ as a condition of community supervision)

_____ Fine of $_____    CC $316.00

_____ No Community Supervision to be granted.

_____ Deferred adjudication and community supervision.

_____ Community Supervision to be granted for _____ years, subject to all the terms and conditions imposed by the trial court. Further, the judge may at any time during the period of community supervision alter or modify the conditions.

_____ Restitution of $_____    Payable to:_____

Address: _____

_____ The parties request the additional offense(s) of _____ in Cause No.(s)_____ be pled in bar under 12.45 of the Tex. Penal Code.

Additional provisions: Defendant will pay court costs, including indigent health, restitution, attorney fees and processing fees as ordered by the Court. Defendant waives right to appeal and to file motion for new trial or in arrest of judgment; and, if community supervision (probation) is granted, such standard and other terms of supervision as may be set by or at the direction of the court, and Defendant waives any right to early release from community supervision and to time credits under Texas Code of Criminal Procedure Art. 42.12 sec. 20 and 20A, except by written agreement of the State of Texas

1143 Days Credit

The undersigned certify that they have read the terms of the above agreement and state that it fully contains all of the provisions of said agreement.

_____
Defendant

DISTRICT ATTORNEY MARK F PRATT

BY: _____

Assistant District Attorney

Attorney for Defendant, ___Retained ___Appointed

A CERTIFIED COPY
ATTEST 8-31 , 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY _____

# CRIMINAL DOCKET

Case #: <u>37,458</u>

| | Style of Case | Attorneys | Offense | Date of Filing | | |
|---|---|---|---|---|---|---|
| | | | | Mo. | Day | Year |
| | **State Of Texas** | **DAN V DENT** State | AGGRAVATED ASSAULT W/ A DEADLY WEAPON | | | |
| | VS. | | | 8 | 24 | 2012 |
| | **DARREL ALLEN CURLEE** | *Terrence "Tiger" Russell* Defendant | AGG ASSAULT THREAT-WITH A DEADLY WEAPON | | | |

| Date of Orders | | | ORDERS OF COURT | Process |
|---|---|---|---|---|
| 9 | 24 | 12 | State & Def. agree on Def. being examined by Dr. Carl Childers, Ph.D. re Competency & Insanity. Order to be signed later. SV or AN to show. C locks Childers. *[signature]* | |
| 9 | 24 | 12 | PT 10-18-12 FPTC 11-13-12 JT 1-14-13 | |
| 2 | 22 | 13 | Reset. Mr. Russell brings to atten his Mo. for Expert assistance labeled Ex Parte, but which is fld-marked apparently. He advises that Susan Russell believes Dr. Childers a "child" psychologist." Court drops a copy of old Dr. Childers for his information. *[signature]* | |
| 3 | 6 | '13 | Hring. on Competency. State by N. Crain, ADA. Def. in person via video & by atty & all ready. C Kosler cl Rptr. Def. found incompetent & ordered into state hospital for further evaluation. *[signature] Judge* | |
| 6 | 24 | '13 | Order of Extended Commitment hrig. Present — Mr Russell, atty for Def Add Ms. Crain. Waiver on it. Testimony heard. Flex relief's ab nulla. Order signed. *[signature] Judge* | |
| 6 | 5 | '14 | Status hrig. Conducted. Failings established *[signature]* | |

A CERTIFIED COPY
ATTEST 8-31 20 15
ANGELIA ORR
DISTRICT CLERK
HILL COUNTY, TEXAS
BY Mary Mullins

SCANNED

State of Texas
VS. No 37,458

DARREL ALLEN CURLEE

| Date of Orders | ORDERS OF COURT |
|---|---|
| 2 3 15 | JT 4/13/15 @ 1:00 am |
| 6 29 15 | JT 7/13/15 @ 9:00AM |
| 7 31 15 | State by District Attorney. Defendant in person and by counsel. Arraigned. Waived right to trial by jury, ten (10) day waiting period and reading of indictment/information. Pled GUILTY Admonished as to effect of plea. Defendant advised of provisions Article 44.02 and 26.13, Section A, Code of Crimal Procedure Evidence heard and Defendant found guilty. Defendant advised of right to appeal. Punishment assessed at 6 TD & etc. _____ Judge Presiding     Deadly Weapon Yes a knife per Nicholson GM 8-3-15 |

# EXHIBIT B

Felony 37458
Misdimeano 573-12

Dear Judge Lee Harris

My name is Darrel Carlee
I am 69 years old and
have been incarserated since
the Fall of 2012.
I have been to court one
time and was passed.
Iv been her close to 3 years
and im nearly 70 years old and
My memory is not so clear
on even why I'm here. I
remember the Incodent of when
I was asulted by 2 younger
Males and was charged with
assalt with a deadly weapon for
trying to defend myself because
I was infear for my Life
I sastained Maltiple Injuries
and pictures were taken
I feel like nearly 3 years
of my life incarcerated for a
charge i bearly remember and understand
should be adiquite amount of time
And would like to get time served
on my charges. Today April 13, 2015

it seems that The powers that
be have once again have neglected
to get me to court so I can
be see and heard.
   I would really appriciate
your attention on these matters
because of my current situation
I am helpless to do for Myself

          Thank you so much
                    Darrel A. Gulee


Darrel has a problem reading and writing
so he has ask For Help writing this
for him.    His Court appointed attorney
seems to be doing nothing to help
him    "Tarrance Russell"

# EXHIBIT C

## CAUSE NO 37,458

| | | |
|---|---|---|
| STATE OF TEXAS | § | 66TH DISTRICT COURT |
| VS | § | HILL COUNTY, TEXAS |
| DARRELL CURLEE | § | |

## ORDER APPOINTING ATTORNEY

On the 27TH day of February, 2015, the Court determined that additional counsel was needed in the above reference case. Therefore, it is ORDERED that Lyle Gripp be appointed as additional counsel and designated as lead counsel in the above cause.

This defendant has been charged with:    AGG ASSAULT W/DEADLY WEAPON X 2 COUNTS
**ATTORNEY CONTACT INFO:**
100 N. 6TH STE. 703
WACO, TEXAS 76701
254-756-1112

**NEXT HEARING DATE:**  JURY TRIAL April  13, 2015 @9Am

Signed this 27TH day of February, 2015

_____
Presiding Judge

☒ Defendant is in the Hill County Jail

☐ Defendant is not in the Hill County Jail and can be reached as follows:

CC:    ATTORNEY VIA FAX
       TERRENCE RUSSELL VIA FAX
       DEFENDANT VIA ☐ US MAIL    ☒ JAIL MAIL

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY TX
2015 MAR -2 PM 12:52

# EXHIBIT D

NO. 37228

| STATE OF TEXAS | IN THE 66TH JUDICIAL |
|---|---|
| vs. | DISTRICT COURT |
| JAMES RYDER | HILL COUNTY, TEXAS |

## MOTION FOR NEW TRIAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

Under Texas Rules of Appellate Procedure 21 and 22, Defendant, James Ryder, files this Motion for New Trial:

1. Defendant was sentenced on August 28, 2014. This Motion for New Trial, filed within the thirty-day timetable following sentencing is therefore timely. A hearing must be commenced before the 75th day after sentencing, or this motion is overruled by operation of law.

2. The verdict in this cause is contrary to the law and the evidence. *See* Tex. Rule App. Proc. 21.3.

3. The trial court has the discretion to grant a new trial in the interests of justice, as courts have emphasized in *Mullins v. State*, 37 Tex. 337, 339-340 (1873) and *State v. Gonzalez*, 855 S.W.2d 692 (Tex. Crim. App. 1993).

4. Trial counsel was ineffective in the course of this trial by failing to subpoena a necessary expert witness, Dr. Jonathan Trent Terrell. *See* Affidavit of Terrence Russell.

5. When this witness did not appear, the Court denied trial counsel's motion for continuance to secure the expert witness's presence. *See* Affidavit of Terrence Russell.

6. Dr. Terrell is an expert in cognitive psychology, including memory formation and retrieval, as well as eyewitness testimony. *See* Exhibit B of Affidavit of Terrence

Russell, Exhibit A of Declaration Under Penalties of Perjury of Dr. Jonathan Trent Terrell.

7. Had Dr. Terrell been properly subpoenaed, he would have testified that the memory, especially in young children, is often inaccurate and is shaded by suggestion and therefore, often unreliable. *See* Affidavit of Terrence Russell, Declaration Under Penalties of Perjury of Dr. Jonathan Trent Terrell.

8. Dr. Terrell would have also testified about the phenomena known as "childhood amnesia," which is present in varying degrees in all persons. *See* Affidavit of Terrence Russell, Declaration Under Penalties of Perjury of Dr. Jonathan Trent Terrell.

9. Dr. Terrell would have presented valuable testimony, which was material to the Defendant's case. *See* Affidavit of Terrence Russell and Declaration Under Penalties of Perjury of Dr. Jonathan Trent Terrell.

10. Had trial counsel secured the expert witness's presence through subpoena, the outcome of the trial would likely have been different. *See* Affidavit of Terrence Russell and Declaration Under Penalties of Perjury of Dr. Jonathan Trent Terrell.

11. Trial counsel was ineffective in the course of this trial by failing to seek appointment of an expert, despite the Defendant's indigent status. *See* Declarations Under Penalties of Perjury of Dr. Jonathan Trent Terrell and Larenda Nichole Watkins.

12. Defendant would ask the Court to take judicial notice of the Court's file, particularly the lack of an *Ake* motion seeking expert assistance for an indigent defendant.

13. Trial Counsel required Defendant to pay an expert fee of $1500.00, despite the fact that Defendant was indigent. *See* Declaration of Larenda Nichole Watkins.

14. Trial Counsel paid Dr. Jonathan Trent Terrell, by check, a total of $1000.00—the amount agreed upon for Dr. Terrell's expert opinion and testimony. *See* Declaration of Dr. Jonathan Trent Terrell.

15. After the trial was over, Dr. Terrell returned Mr. Russell's check to him, uncashed. *See* Declaration of Dr. Jonathan Trent Terrell.

16. Mr. Russell refunded, to Larenda Nichole Watkins, $1000.00 of the $1500.00 paid for Dr. Terrell's assistance. *See* Declaration of Larenda Nichole Watkins.

17. Mr. Russell has not refunded, and has failed to account for, the remaining $500.00 paid by the Defendant for Dr. Terrell's expert services. *See* Declaration of Larenda Nichole Watkins.

18. The Affidavit of Material Fact of Terrence Russell, Defendant's Trial Counsel, is attached and Defendant incorporates it, in full, into this motion.

19. The Declaration Under Penalties of Perjury of Larenda Nichole Watkins is attached and Defendant incorporates it, in full, into this motion.

20. The Declaration Under Penalties of Perjury of Dr. Jonathan Trent Terrell is attached and Defendant incorporates it, in full, into this motion.

21. For the foregoing reasons, and for such other reasons that may arise on the hearing of this Motion, Defendant requests a new trial.

Defendant prays that the Court set aside the judgment of conviction entered in this cause and order a new trial on the merits.

Respectfully submitted,

The Law Office of Kristin R. Brown, PLLC

1701 North Market St., Suite 402
Dallas, Texas 75202
Tel: 214-446-3909
Fax: 214-481-4868
Email: kbrown@idefenddfw.com

*/S/ Kristin R. Brown*

By:_____

Kristin R. Brown
State Bar No. 24081458
Attorney for James Duval Ryder

## Certificate of Presentment

I certify that a true and correct copy of this document will be hand-delivered to the court

through the Clerk on the same day this document is received by the clerk.

*/s/ Kristin R. Brown*

_____

Kristin R. Brown

## Certificate of Service

This certifies that on _____, a true and correct copy of this document was served on

_____ of the Hill County District Attorney, Appellate Division, PO Box

400, Hillsboro, Texas 76645-0400, phone (254) 582-4070, fax (254) 582-4036, by email to

*/s/ Kristin R. Brown*

_____

Kristin R. Brown

## Order for a Setting on this Motion

On _____, _____, the Defendant filed a Motion for

New Trial. The Court finds that the party is entitled to a hearing on this matter, and it is

THEREFORE ORDERED that a hearing on this motion is set for _____.

Signed on _____.


_____
JUDGE PRESIDING

NO. 37,228

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 66th JUDICIAL DISTRICT |
| | § | |
| JAMES DUVAL RYDER | § | HILL COUNTY, TEXAS |

## AFFIDAVIT OF MATERIAL FACT

| STATE OF TEXAS | § |
| | § |
| COUNTY OF HILL | § |

On September 11, 2014, Terence A. Russell appeared before the undersigned notary public and made the following affidavit:

"I, Terence A. Russell, was trial counsel for the above referenced Defendant in a trial beginning on August 25, 2014. In anticipation of such trial, I had, on July 22, 2014 contacted an expert on memory and memory development to assist me in defending against outcries from a young girl who was almost an infant at the time of the supposed events described in such outcries.

"On August 20, 2014, arrangements were made with Dr. Trent Terrell, Psychology Chair at Mary Hardin Baylor (CV attached as Exhibit 'A') to appear and testify on Defendant's behalf. Dr. Terrell sent to me a copy of the proposed direct examination he felt would be appropriate in this case, a copy of such is attached hereto as Exhibit 'B.'

"In an email received on the morning of August 25, 2014 (a copy of which is attached as Exhibit 'C'), Dr. Terrell had said that Wednesday would be the only day open for him to come to Hillsboro to testify. Prior to the beginning of voir dire, in chambers, trial scheduling was discussed. The court determined that Dr. Terrell's testimony would not be needed until Wednesday.

"In an email on the morning of August 26, 2014 (a copy of which is attached as Exhibit 'D'), I advised Dr. Terrell that his testimony would not be needed until the following day, Wednesday.

"During that day, an email exchange took place wherein Dr. Terrell advised that he woould be free the whole next day and wanted to know what time he be testifying; I responded that he should be present at 12:30 p.m. (email attached as Exhibit 'E')

"At some point during August 26, 2014, my emails to Dr. Terrell did not all go through (see attached Exhibit 'F' and compare to Exhibit 'G').

"Desperately, I began, during every break in the trial, attempts to contact Dr. Terrell via email to an alternate address, texting and calling his cell phone, calling his mother's cell phone, and finally, during the lunch hour, spoke with Dr. Terrell who stated that he would be unable to appear given such late notice of the time of his testimony.

"I had no strategy in not having Dr. Terrell present. I was of the belief that continued communication by email was the most suitable form, but believe I failed to provide effective awssistance of counsel in not subpoenaing Dr. Terrell or otherwise use a form of communication that would have ensured that this most essential witness would have appeared to testify on behalf of Defendant.

"I feel that the testimony of Dr. Terrell was material to the defense. Prior to closing of testimony, I made an oral motion for continuance to allow for the time necessary to secure the presence of Dr. Terrell, which was denied by the Court.

"Further Affiant sayeth not."

_____
Terence A. Russell, Affiant

Sworn to and subscribed before me on _September 11, 2014_ .

_____
NOTARY PUBLIC

SUSAN M. RUSSELL
MY COMMISSION EXPIRES
January 1, 2015

**Jonathan Trent Terrell, Ph.D.**
University of Mary Hardin-Baylor
Assistant Professor and Chairperson, Department of Psychology
900 College Street
Belton, TX 76513
254-295-4630
806-570-6849 (cell)
tterrell@umhb.edu

## EDUCATION

Bachelor of Arts in Psychology, Baylor University, May 2003

Master of Arts in Neuroscience, Baylor University, August 2005

Doctor of Philosophy in Experimental Psychology, Baylor University, May 2008

Specialization: Cognitive Psychology, Eyewitness Memory
Academic Mentor: Charles A. Weaver, III

## COURSES TAUGHT

| | |
|---|---|
| General Psychology | Psychological Methods |
| Experimental Psychology | Developmental Psychology |
| Cognition | Neurophysiological Psychology |
| Psychology and Film | |
| Freshman Seminar | |

## PROFESSIONAL AFFILIATIONS

Association for Psychological Science
American Association for the Advancement of Science
Psychonomic Society—Associate
Armadillo (Association for Research in Memory, Attention, Decision making, Intelligence, Language, Learning, and Organization)

## CONFERENCES ATTENDED

Annual Meeting of the Psychonomic Society: 2006, 2007, 2009, 2010, 2011
Armadillo: 2006, 2007
Texas A&M Annual Assessment Conference: 2010, 2011

*Exhibit 'A'*

## CONSULTING WORK

I have consulted and testified in many criminal cases as an expert on eyewitness memory. My testimony addresses the basic processes of memory formation and retrieval, as well as estimator variables (such as event duration, stress, weapon focus, witness intoxication) and system variables (such as lineup construction, instructions given to witnesses, etc).

## COMMITTEE WORK

Academic Institutional Quality Committee
Student Success Team Committee
Online Education Task Force
Strategic Planning Stewardship Committee
Chair—Student Scholars Day and Research Symposium Planning Committee, 2010-2011
UMHB Quality Enhancement Project Planning Team

## PUBLICATIONS, PRESENTATIONS & AWARDS

Weaver, C. A. III & Terrell, T. (2004). Laboratory in cognitive psychology: Student Manual. Published by Baylor University.

Weaver, C. A. III, Terrell, T., & Krug, K. S. (2004). Evaluating the reliability of witness memories in product identification cases. In *Andrews Publications' Asbestos Litigation 2004* (Section 19, pp. 1-18). New Orleans, LA: Thompson-West.

Weaver, C. A. III, Terrell, T. & Krug, K. (2004, April). *Remembrance of thing past: Evaluating the reliability of witness memories in product identification cases*. Andrews Publications' Asbestos Litigation 2004 Conference: New Orleans.

Weaver, C. A. III. & Terrell, J. T . (2005, May). *Eyewitness memory and product identification?* Harris Martin Publications Asbestos Litigation Conference: The Increasing Prominence of Equipment, Gasket and Friction Defendants. Las Vegas.

Weaver, C. A. III, Terrell, J. T., Krug, K., & Kelemen, W. L. (2005, November). *The delayed JOL effect with very long delays: Evidence from Flashbulb Memories*. Paper presented at *Memory and Metamemory: Papers in Honor of Thomas O. Nelson*, Toronto.

Terrell, T. J., & Weaver, C. A., III (2005, November). *The effects of misinformation on eyewitness memory and product identification*. Paper presented at the 45th annual meeting of the Psychonomic Society, Toronto.

Terrell, J. T. (2006, February). *The effects of misinformation on eyewitness memory and product identification*. Invited address. Baylor University Interdisciplinary

Scholarship Forum.

**Terrell, J. T.** (2006, May). Winner, Outstanding Graduate Research, Baylor University Interdisciplinary Scholarship Forum.

Weaver, C. A. III., **Terrell, J. T.**, & Holmes, A. E. (2006, October). Evaluating the reliability of eyewitness memory in product identification cases, Asbestos Litigation in the 21st Century. New Orleans: American Law Institute/American Bar Association.

**Terrell, J. T.** (2006, October). *Creating new memories, destroying old ones: Refreshing recollections of eyewitnesses.* Invited address. Baylor University Nu Rho Psi Society.

**Terrell, J. T.**, & Weaver, C. A. III. (2006, October). *Eyewitness memory in civil cases: Photo refreshing, suggestion, and product identification.* Poster presented at the 16th annual Southwest Conference on Cognition, Texas Tech University: Lubbock.

**Terrell, J. T.**, & Weaver, C. A., III. (2006, November). *"Refreshing recollection" of eyewitnesses: Memory retrieval or memory creation?* Poster presented at the 47th annual meeting of the Psychonomic Society, Houston.

Weaver, C. A., III, & **Terrell, J. T.** (2007, October). *Remembering bad things, not bad guys: Eyewitness memory in product liability cases.* Paper presented at the 17th annual Southwest Conference on Cognition. Trinity University: San Antonio.

**Terrell, J. T.** (2007, October). *Eyewitness memory and product identification: Suggestibility and false memory creation.* Poster presented at the 17th annual Southwest Conference on Cognition. Trinity University: San Antonio.

**Terrell, J. T.**, & Weaver, C. A., III. (2007, November). *Remembering products, not faces: "Refreshing recollection" of eyewitnesses in product liability situations.* Paper presented at the 48th annual meeting of the Psychonomic Society, Long Beach.

Weaver, C. A. III, **Terrell, J. T.**, Krug, K. S., & Kelemen, W. L. (2008, May). The Delayed JOL Effect with very long delays: Evidence from flashbulb memories. In J. Dunlosky and R. A. Bjork (Eds.), *A handbook of memory and metacognition.* Hillsdale, NJ: Lawrence Erlbaum Associates.

**Terrell, J. T.** & Weaver, C. A. III (2008). Eyewitness testimony in civil litigation: Retention, suggestion, and misinformation in product identification. *North American Journal of Psychology, 10*, 323-346.

**Terrell, J. T.** (2009, November). *Repeated photo refreshing and product identification.* Poster presented at the 50th annual meeting of the Psychonomic Society, Boston.

Weaver, C. A. III, Parra, K. F, & **Terrell, J. T.** (2010, November). Addressing memory-related issues in asbestos cases. San Diego: Defense Research Institute.

Weaver, C. A., III, Krug, K. S., **Terrell, J. T.,** & Holmes, A. E. (in press). Eyewitness memory Issues in civil litigation. In A. Jamieson & A. Moenssens (Eds.), Wiley Encyclopedia of Forensic Science: Behavioral Sciences. Chichester, UK: John Wiley & Sons, Ltd.

**Terrell, J. T.** (2011, April). Invited response to Frederick, K. (2011). The creation of a measurement instrument. The Evolution of a Psychometric Tool from Development to Application. Baylor University, Department of Educational Psychology Spring, 2011 Doctoral Student Symposium.

**Terrell, J. T.** (2011, July). *The dynamics of eyewitness identification.* Paper presented at the Texas State Bar CLE Advanced Criminal Law Course and Criminal Law 101, Houston.

Parra, K. F., **Terrell, J. T.,** & Weaver, C. A. III (2011, October). *Differing cognitive loads affect knowledge updating in jurors.* Poster presented at the 21st annual Armadillo Conference on Cognition: Texas A&M Commerce University: Commerce, TX.

Parra, K. F., **Terrell, J. T.,** & Weaver, C. A. III (2011, October). *Do common misunderstandings of memory extend to attorneys?* Poster presented at the 21st annual Armadillo Conference on Cognition: Texas A&M Commerce University: Commerce, TX.

**Terrell, J. T.** (2011, November). *Effects of repeated photo refreshing on eyewitness identification.* Poster presented at the 52nd annual meeting of the Psychonomic Society, Seattle.

## INVITED PRESENTATIONS

2008, October: Eyewitness Testimony in Civil Litigation: Retention, Suggestion and Misinformation in Product Identification. UMHB College of Sciences Brown Bag Presentation

2010, March: Assessment Brown Bag, part of UMHB IQ Council's Assessment Series.

2010, November: Presenter at UMHB Central Texas Book Club's discussion of "The Screwtape Letters" by C.S. Lewis.

2011, March: Presenter at UMHB Central Texas Book Club's discussion of "Into the Wild" by Jon Krakauer.

2011, April: Class Size 60: How I Put General Psychology Online and Lived to Tell About It. Faculty Conversation sponsored by UMHB's Center for Effectiveness in Learning and Teaching.

2011, July:  Dynamics of Eyewitness Identification.  Paper presented at the 37th Annual State Bar of Texas Advanced Criminal Law Course, Houston.

2012, July:  Eyewitness Identifcation: Exploring the Relevant Factors Through Case Examples.  Paper to be presented at the 38th Annual State Bar of Texas Advanced Criminal Law Seminar, San Antonio.

2012, September (pending):  Counter Evidence of Eyewitness Unreliability: The Science. Paper to be presented at a training sponsored by the National District Attorneys Association in Harris County.

## Direct Examination of Dr. Terrell

**Name:** Dr. Trent Terrell

**Where do you live?** Temple, Texas

**How are you currently employed?**

> 9/08- present: Associate Professor of Psychology, University of Mary Hardin-Baylor,
>
> Belton, TX.

**What are your areas of Specialization?** Learning, Memory, and Cognition

### EDUCATIONAL BACKGROUND

**Academic Degrees?**

B.A., Psychology '03, M.A. Neuroscience '05, Ph.D. Experimental Psychology '08, all from

Baylor University, Waco, TX

**What type of graduate training did you receive in the area of Memory at that time?**

> Ph. D. in Experimental Psychology, (eyewitness memory). Classes, research,
>
> dissertation.

### PROFESSIONAL RESPONSIBILITIES

**Could you describe your current responsibilities at the University of Mary Hardin-Baylor?**

> Cognitive psychologist with emphasis in memory
>
> Psychology Department Chairperson, August 2010-present
>
> Teach 4 classes a semester—General Psychology, Psychological Methods, Experimental
>
> Psychology, Cognitive Psychology, Theories of Learning, Neurophysiological
>
> Psychology, Developmental Psychology
>
> Supervise undergraduate research in Memory
>
> Numerous campus committees

**Do you belong to any Professional Associations?**

Association for Psychological Science

Psychonomic Society—Associate Member

American Association for the Advancement of Science

PRIMARY RESEARCH INTERESTS

> Confidence and Accuracy in Eyewitness Testimony

*Exhibit 'B'*

In general, confident witnesses are perceived as more credible than less confident witnesses. However, confident witnesses are <u>not</u> necessarily more accurate. This research investigates factors that may inflate *confidence* without improving memory accuracy.

## Lineup Construction and Photo Refreshing

How does the construction and presentation of lineups affect the likelihood of correct identifications? How do multiple opportunities to view lineups affect the likelihood of correct identifications?

**Have you published any works in the field of Eyewitness Identification memory accuracy?** Yes

**Have you performed your own "hands-on" tests regarding memory accuracy?** Yes, in the lab

**Have you testified as an expert at other hearings?** Yes

**Have you given any presentations about eyewitness memory?** Yes, I presented at the Texas State Bar Advanced Criminal Law Seminar in Houston in July, 2011, and again in San Antonio in 2012. I've also spoken to the National District Attorneys Association in Houston and the Center for American and International Law in Plano.

**Are you being paid by the defense to testify in this case?** Yes.

## What is the most common mistaken belief about memory?

That memory works like a video recorder or computer disk. Both these metaphors suggest that memory retains everything that has ever happened to us, implying that all events are ultimately retrievable. Memory is a **reconstructive** phenomenon, not a video recorder:

> *In essence, all memory is false to some degree. Memory is inherently a reconstructive process, whereby we piece together the past to form a coherent narrative that becomes our autobiography. In the process of reconstructing the past, we color and shape our life's experiences based on what we know about the world. (Bernstein & Loftus, 2009)*

## How does memory work then?

Memory has three processes—encoding, storage, and retrieval. (NOTE: If you look to the bottom, there's a general Q&A about memory section. I can go into as much or as little detail as you think would be necessary here. I've worked with people who want to devote fifteen minutes to it, others who just want a brief answer. Whatever works for you.)

## Are memories of alleged sexual abuse the same as eyewitness memories?

Not exactly—most research on eyewitness memory focuses on an individual witnessing a crime being committed by someone they do not know, and later trying to identify that person after a very limited exposure to them. In alleged cases of sexual abuse, the focus is not on who, but what and if. They're different kinds of memories, but the same factors can affect their reliability.

## Will we discuss some of those factors today?

Yes.

**What documents have you reviewed?**

Very little. I've looked at an amended summary of what outcries would be described in court.

**Is it usual for you to review so few documents in a case like this?**

Each case is different, but especially in cases of alleged sexual abuse, my role is not to interpret the specifics of what happened, but rather to talk about factors that have been experimentally demonstrated to affect the reliability of such memories.

**So to clarify, you will not be testifying that the alleged abuse in this case did not take place?**

No, my testimony will only involve descriptions of how memory works and doesn't work.

**Have we spoken before today?**

Yes, via phone and email.

**Before we begin, let's be clear: are you going to offer testimony that the witnesses in this case are lying, or that they are not credible?**

No. Credible witnesses can experience and report false memories without intending to be deceptive or lying. The empirical evidence from years of false memory research indicates that most false memories seem as subjectively real to witness as true memories.

**Why are you here, then?**

To provide information to the jury about how memory works from a scientific background, to identify some of the factors known to affect reliability, and to provide tools that the jury can use as they evaluate the reliability of the child in this case.

**In general, how do memory researchers classify factors that alter witness reliability?**

In the Eyewitness Memory literature, researchers discuss two broad classes of factors: Estimator variables and system variables. That distinction is not as important in this kind of case, but I do want to discuss one estimator variable, so I'll mention it. *Estimator variables* are those that cannot be controlled by the criminal justice system—they are simply the facts of what happened. How long something lasted, how long it has been since the event took place, stress levels of the victim/witness, etc. Many things about an event can affect the likelihood that it will be correctly remembered later. These are called estimator variables because we can only estimate the impact they might have had on memories. *System variables* are those that investigators have some degree of control over, such as how information is gathered after the event. In a case of alleged sexual abuse, system variables in play are how the child is interviewed, who conducts the interview, and in what context that interview takes place.

**What estimator variables do you feel might be relevant to this case?**

Latency, or the time between the event and the time when memories of that event were first reported. One of the most basic findings of eyewitness memory research is that memories decay over time. Just about every experimental protocol that manipulates the interval between exposure and testing has found that the longer this interval, the greater the likelihood of memory errors (Wells et al., 2006). In some scenarios, witnesses may not be prompted to think about an event at all after it has occurred, enhancing decay from memory (also called transience). This is true of lab studies, information learned in school, and eyewitness memory (Shapiro & Penrod, 1986).

NOTE: Stress is also an estimator variable that reduces accuracy of subsequent memories. It's a double-edged sword though. If abuse did happen, it was likely stressful for the children. But if it's your case

that it didn't happen, it wouldn't make sense to talk about the stress of it interfering with subsequent recall). In the previous sex abuse case I did, the state was eager to make the argument that stressful/traumatic events are more likely to be remembered than more run-of-the-mill encounters. I think it's probably best to not mention this in the direct, and if the state mentions it in cross, I can talk about how stressful events are actually less likely to be well-remembered.

**What system variables could be relevant?**

Most research suggests that children are very suggestible witnesses. It is difficult to question young children about sexual acts without being suggestive to what may have happened.

**Why is it difficult to not be suggestive with them?**

The clearest and most obvious guideline for how to conduct interviews non-suggestively is to use open-ended questions. Open-ended questions are ones that contain no information in them, and require an expository answer, such as "What happened next?" In contrast, closed questions contain information in the question, and generally only require a yes/no answer. Such as "Did he touch you here?" Young children will likely be able to fully articulate the details of sexual abuse without being guided by closed questions.

**Is there empirical evidence that closed or suggestive questioning can cause children to create memories?**

Yes. While there are numerous experimental protocols that have demonstrated this, one of the most commonly discussed is known as the "Sam Stone" paradigm of research. In short, in these protocols someone named Sam Stone visits a classroom of young children, and subsequently the students are presented with the idea that Sam is a clumsy man who is always breaking things. Teachers or adults may say things like "Sam certainly was a clumsy man." Over a period of weeks, they are interviewed with suggestive questions like "Do you remember when Sam Stone ripped the book?" Eventually, many of the students incorporate the suggestions into their memory, and will tell you about the time Sam Stone visited and ripped the book, and in some cases even add additional components of clumsiness not mentioned by adults in the questions. Naturally, the actor portraying Sam was very careful not to be clumsy during the visit. While some of the things the interviewers asked about did happen, all of the clumsy things referred to by the questions did not

There are myriad factors that affect the likelihood that children will come to accept these suggestions and modify their memories accordingly, including the age of the children and the

strength and modality (open/closed) of the suggestions. Generally speaking, the younger the children the more likely they are to incorporate suggestions, and the more likely they are to answer yes to a closed question (whether *yes* is the correct answer or not). The take-home fact is that if children are asked questions that presume something has happened and are placed in an environment where others seem to think it happened, there's empirical data illustrating they can and often will come to believe it themselves.

**The Sam Stone experiments seem to discuss children modifying their memories of something that really happened. Is there any evidence that people can come to remember things from their childhood that did not occur at all?**

Yes, there are several examples. One experimental protocol involves what is known as the "Lost in the Mall" procedure. In this protocol, researchers enlist the help of family members to help make false suggestions to experimental participants that they were lost in the mall for an extended period of time when they were a child. When family members combine suggestions about true events along with the suggestion of being lost in the mall (or being hospitalized overnight, or other traumatic events), many subjects not only come to accept that the event happened, but begin to elaborate add their own details of the event in subsequent recollections. When family are able to provide convincing details, such as the name of the mall they would've been lost in as a child, or even a store which they frequently shopped at, the subjects are able to imagine how that event might've occurred. There's a well-documented phenomenon known as imagination inflation—when subjects are asked to imagine something occurring for just one minute, they are subsequently more likely to remember what they imagined as something that actually occurred. There's also a natural tendency to think that if everyone else in the family remembers this, I probably should, too.

NOTE: DA's like to pick apart the lost in the mall experiment, because the original study tried it with 25 people, and only produced the phenomenon in 6 of them. The small sample size has to do with the complexities of recruiting family involvement, etc. It's a very time-intensive and personal protocol. And they'll say that creating this in 6 people is hardly overwhelming evidence, but the point is that it's possible at all—it's really a pretty surprising thing that it happens at all. The protocol is also used on adults. not children, and all the evidence supports the idea that the younger the child, the more suggestible they are. The broad, concrete point is that

we've taken things that we know didn't happen, and convinced people it did so that they remember it as if it did. And the stakes are lower in experiments—it doesn't really matter if you got lost in the mall or not. But, there's a lot more pressure to report sexual abuse, so it's not really a one-to-one comparison.

**Are there any developmental factors that may be relevant to this case?**

Potentially. Some possible factors are childhood amnesia, encoding specificity (which I'll explain below), "magical thinking" and an underdeveloped "Theory of Mind.

Taking these one-by-one:

**Childhood amnesia.** All of us have limited episodic memories from ages 3-5 of our lives, and all of us have virtually no episodic memories of the first two years of our lives. The time of offset of childhood amnesia (the ability to start to form long-term memories accessible as adults) is different for all people. Most of us would say our first memory is from around age 3 or 4.

What causes childhood amnesia?

A few things, the most important of which is the progression of language development. Our long-term memories are anchored in meaning and are rehearsed and stored phonologically (using language). In short, children can't form memories accessible as adults in the first 2-3 years of life because they do not have the vocabulary necessary to represent those ideas in their minds and rehearse them. When children start learning language proficiently, they are able to rehearse better and begin to store memories that will be accessible as adults. Another factor potentially relevant here is a bit complicated to explain--the concept of encoding specificity. This means that memories are encoded in a certain way, using a certain way of thinking and a certain viewpoint, and that they need to be retrieved with that same way of thinking and that same viewpoint. (Another more formal way of putting is to say that recreating the context of encoding at the time of retrieval makes it more likely to remember what was encoded). Most of the memories we have from childhood are encoded from a child's point of view, using childlike interpretations and childlike terminology. When we grow up, we are unable to access those memories because we no longer view the world in that childlike way—we think in adult terms and from adult viewpoints, and find it virtually impossible to remember the world the way we did when we were children.

**Encoding Specificity.** This idea of encoding specificity may be particularly important in a sexual abuse case, especially involving very young children. Young children (hopefully) do not understand sexual actions and sexual terms as abuse is taking place. It's not at all likely that young children immediately understand that they have been sexually abused. They may have been uncomfortable or upset or scared, but they're likely not able to encode what happened as sexual abuse. Therefore, when asked about sexual abuse as an adult (or an older child), the adult definition of abuse calls to mind different things than were likely encoded during the abuse as a very young child. This explains why directive and closed questioning often has to be used, and illustrates the difficulty of interviewing children about possible abuse without being suggestive. Investigators likely use euphemistic questions about touching and parts of the body touched, and the possibility must at least be considered that children cannot separate innocuous touching (such as diaper changing) from harmful touching. As an example, many children will respond to the closed question "Did the doctor hurt you?" with an emphatic "yes"—even if the reality is that the doctor just gave the child an injection. The child doesn't understand that the injection was for his/her benefit, and is just as upset with the doctor as would be if he/she had touched the child malevolently.

It is vital to underscore that not being able to remember abuse doesn't mean it didn't happen. It is nearly an impossible task to derive the pertinent information without speaking vaguely (with euphemism) or suggesting the possibility of actions with closed questions.

**Magical Thinking/Theory of Mind.** Refers to the idea that children in Piaget's Pre-operational stage of cognitive development (roughly ages 2-7) are not yet logical thinkers, and often easily bridge gaps in their understanding with assumptions that logical adults wouldn't make. Magical thinking is often seen during the grieving process as children are first encountering the concept of death. Not able to understand the finality of death, they rationalize the absence in the only way they have experienced—by assuming the loved one is out of town or has a gone away temporarily but will return. When presented with other information that is outside what they understand (such as the idea that Sam Stone was very clumsy), children of this young age are much more likely than adults to bridge the gap in what they understand than to challenge discrepancies. Often the shortest bridge is to accept what the adult says is true, or to accept what the other children are saying as true, and then build upon that concept subsequently. This

happens frequently when children are corrected by their parents about the names of things, colors of things, about language usage and other areas in which they make wrong assumptions. It is a normal part of cognitive development to accept ideas presented by an adult—Piaget calls this assimilation and accommodation. This all relates to the process of the child developing a Theory of Mind. A Theory of Mind is the understanding that all individuals have their own minds and their own way of seeing the world, and that different people have different opinions and not everyone knows the same information. While adults take this for granted, children have to learn this through trial and error. Piaget called this stage "egocentrism", because children do not understand that people have different feelings and desires as they do. Young children often exemplify egocentrism when, for example, they are asked to show their mother the picture they drew, and they hold the picture out with the back of the picture facing mom and the actual picture visible to them. They feel that because they can see the picture, mom can too. It's understandable that this concept can be reversed. If a non-fact is suggested to young children as if it is fact, children are likely to accept this fact because they don't understand that the adult could have a different set of knowledge than they do, or that the adult might be lying or be mistaken. All of this speaks to why young children are more suggestible than adults and have a harder time saying "no" to closed questions.

**Are there protocols that can be used to reduce the suggestiveness of child interviews?**

While there is not a formally-agreed upon process, there are suggestions for how to reduce the likelihood of suggesting information to children:

- Use open-ended questions when possible
- Listen as much as possible and try to let the child be in control of the direction of the conversation
  - In other words, refrain from pushing them back towards what is suspected to have happened as much as possible
- Have someone not emotionally-involved with the situation conduct the interview
  - This reduces demand characteristics placed on the child to be a good boy or girl for a known authority figure
- Attempt to establish rapport with the child with a series of unrelated questions before moving on to the more important questions

- Conduct a formal, documented interview as soon as possible after initial outcry. Try to limit other discussions/interviews with family members before this interview, as these discussions can be very suggestive

- Limit repeat interviews if possible. The Sam Stone paradigm of research has demonstrated that off-the-cuff and non-factual narrative offered by children in one interview are often recalled as factual memories in subsequent interviews, especially if the content of that narrative is encouraged or met with positive response by the interviewers.

Ask this if you want, I think it'd be a decent way to end: **It's the defense's argument that the children in this case were brainwashed to believe that these events happened. Is there any evidence in your field that this is possible?**

Brainwashing is really more of a colloquial term than one we use routinely in the field. What I'm comfortable saying is that there is empirical evidence that people can come to remember things that didn't occur because that suggestion was made to them. Sometimes those suggestions are deliberate and purposeful, as in the lost in the mall procedure, and other times those suggestions are unintentional—such as might occur when an investigator asks if something happened.

I would reiterate that the biggest and most persistent misconception about memory is that once they're formed in the brain, they don't change. Memories are not shrink-wrapped facts stored in the brain waiting to be opened. They're reconstructed each time an event is re-experienced mentally, and every time that happens what's re-experienced is different. How you ask questions can change how memories are reconstructed, just as how an interviewer responds to answers can change how memories are reconstructed next time. It's an incredibly dynamic process. I wouldn't call that brainwashing, I would say that memories are very malleable and change over time.

## Background information

*Just an FYI section—it sounds like you've already got a lot of background info. Some of this is very similar to my talk in Houston.*

## General Memory Q&A

**Probably the most common metaphors used to describe human memory are that "memory is a videotape" and "memory works like storage on a computer disk." Are these good analogies for human memory?**

No, and this is probably the most important finding of the last 100 years or so in memory research. Both videotapes and computer disks are <u>reproductive</u> media, meaning that they store information in a more-or-less literal manner.

Both represent memory as being static and unchanging, and imply that what is stored in memory is always a faithful representation of the actual event. Furthermore, both metaphors suggest that memory retains everything that has ever happened to us, implying that all events are ultimately retrievable. For example, we may have a difficult time remembering something, just as we might have troubling finding a certain 5-second clip on a videotape. Since we will eventually find this 5-second segment if we keep rewinding and reviewing the videotape, we often assume memories will be similarly accessible.

But memory is <u>not</u> like a videotape or hard disk. Videotape and hard disks are reproductive storage device, always retrieving the same information. In addition, what is stored on the tape or disk is a literal representation of the original event. But memory does not work this way. In fact, the single most important principle underlying memory is this: <u>memory is a dynamic, creative, and reconstructive process</u>. Memory works by storing bits and pieces of the original events, combining those fragments with other sources of information to reconstruct the original event.

**What are the basic processes used in memory formation and retrieval?**

Memory researchers typically speak of memory formation as having three distinct stages, <u>encoding</u> of new information, <u>consolidation and storage</u> of the information, and <u>retrieval</u> of the memory. The process of **encoding** refers to the conversion of perceptual and sensory

information into a form that the brain can represent and store. In virtually all cases, encoding alters the sensory information in some way. In fact, two people listening to the same conversation may have drastically different recollections of the same event. Memory researchers would say that these two individuals <u>encoded</u> the information in different ways.

A great deal of what we call "forgetting" is often a failure of the encoding process. One classic demonstration involves the inability of most people to recall the front of a penny from memory. Which way does Lincoln face? Where is the date? What is written across the top and bottom of the coin? Some people can get close, but few are able to draw the coin with complete accuracy. Even when shown several possible alternatives and asked to identify the correct one-- usually, recognition is easier than recall--this task is still difficult. We might be tempted to say that we "forgot" what a penny looks like, but it would be more accurate to say we never knew in the first place. *Memory fails because the information was never encoded to begin with.*

## 2. Consolidation and Storage

**Consolidation** is the term used to refer to the process by which short-term memories are converted into long-term memories. Consolidation of memories in the brain is something like water being frozen into ice cubes. Both processes take time, and both can be disrupted. For example, if an ice cube tray filled with water is taken from the freezer and vigorously shaken before the cubes have started forming, the process of ice cube formation has been irreversibly stopped. Once the water is spilled from the tray, there is nothing that can be done to get that water back in. Generally speaking, the degree of disruption is directly related to the severity of the injury.

**Storage** refers to the preservation of the memory over a period of time. One of the most profound generalizations one can make about memory is that memory strength and accuracy declines predictably with the passage of time.

## 3. Retrieval

Finally, **retrieval** is the process of finding and accessing previously stored memories. Retrieval does not occur in a vacuum. It is guided by **retrieval cues,** or bits of information that are related to items stored in memory. Retrieval cues can exert powerful effects on memory. Unfortunately, retrieval is the stage of memory where errors are most likely to be introduced. Memory is a reconstructive phenomenon, and most of the reconstruction occurs during retrieval.

When misleading or biasing cues exist at retrieval, they can seriously compromise the accuracy of retrieval.

**If memory is reconstructive, then, it must make errors. Has a taxonomy of memory errors and distortions been developed?**

Harvard University psychologist Daniel Schacter, one of the country's most prolific and distinguished memory researchers, recently identified seven factors clearly shown to reduce the reliability of memory. He identifies these as follows:

- *transience,* or forgetting that occurs with the passage of time. As discussed earlier this is perhaps the most profound generalization one can make about memory.

- *absent-mindedness*, a lapse in attention during an event that inhibits (or precludes entirely) the successful encoding of a memory. As noted earlier, such encoding failures are devastating; one cannot retrieve what was never encoded to begin with.

- *blocking*, or the inability to retrieve information due to interference by other items stored in memory. For example, learning a new computer password is often complicated by the intrusive recollection of previous passwords.

- *misattribution*, whereby an event that occurred in one context is mistakenly attributed to another. Furthermore, sometimes current feelings of familiarity are mistakenly attributed to past events. Phenomena such as source confusion and even *déjà vu* result from misattribution.

- *suggestibility*, in which misleading information from external sources are used to influence memory. In product identification cases, this can often result from reviewing photobooks or reviewing information obtained from Internet searches. (The same factors can also result in misattribution, in which a product is identified as familiar, and thus selected. Having reviewed the product in a book of photos can induce a sense of familiarity, even when a product was never actually used.)

- *bias*, where various factors cause distortions in memory. *Change* and *consistency biases* cause us to reconstruct the past in a way that is different from (for change biases) or similar to (for consistency biases) the present. If memory of our past behavior is disturbing in some way, we may reconstruct the memory in a less threatening manner. *Hindsight biases* occur when we reinterpret past events in terms of currently available

(but initially unavailable) information. *Egocentric biases* occur when we exaggerate our role or importance in past events. Finally, *stereotypical biases* influence memory by distorting them based on generic memories, what "usually" or "probably" happened.

- *persistence*, in which (usually) emotionally charged memories intrusively come to mind, even when we attempt to suppress them. Persistence is responsible for such clinical phenomena as post-traumatic stress disorder and flashbulb memories.

**Does inaccurate identification by eyewitnesses cause innocent people to be convicted?**

Memory's reconstructive nature has profound implications one the role eyewitness memory testimony in the courtroom. Recent advances in DNA technology has further demonstrate eyewitness fallibility. Based on information tracked by the Innocence Project, by August, 2007, more that 200 falsely convicted individuals have been exonerated by DNA evidence. Mistaken eyewitness identification was involved in more than 75% of those false convictions (see Innocence Project, 2008; The Justice Project, 2007).

**What kind of errors are common among eyewitnesses?**

**1. Source Monitoring and Source Confusion**

**Source monitoring** is defined as the ability to recall not only the content of memories, but also the source from which the information was obtained. According to Johnson et al, (1993), "source monitoring is based on qualities of experience resulting from combinations of perceptual and reflective processes, usually requires relatively differentiated phenomenal experience, and involves attributions varying in deliberateness. These judgments evaluate information according to flexible criteria and are subject to error and disruption" (p. 3).

**Source confusion**, then, results from a failure of source memory. Source confusion occurs when information is learned from one source but misattributed to another source. This can occur when witnesses are shown photographs of suspects or objects prior to questioning, and later are asked to identify the suspects or objects. In cases where the source of the information is entirely forgotten, source confusion can still exert effects by increasing self-reported confidence.

Source confusion can also result from simply *thinking about* something. For example, individuals who are asked to imagine that a remote event happened to them later have difficulty

in distinguishing actual events from imagined events, a phenomenon known as "imagination inflation" (M. Garry & Polaschek, 2000; Roediger & McDermott, 2000). A person's subjective confidence in these memories is similarly inflated by imagination (Maryanne Garry, Manning, Loftus, & Sherman, 1996), further illustrating why confidence is not a reliable indicator of accuracy. The erroneous memories are quickly and easily formed; they can be created in real-world settings with a single imagination episode, within a few days of the imagined event (Seamon, Philbin, & Harrison, 2006).

## 2. Demand Characteristics

**Demand characteristics** refer to biases introduced in research by the expectations of the researchers, the participants, or both. Well-known "halo effects" often occur in education settings, with teachers assigning higher grades to students from which they had <u>expected</u> better performance.

In eyewitness memory settings, demand characteristics operate in any situation where there is an expectation of the witness. Most witnesses in criminal cases want to be helpful to the investigators, to be "good witnesses." When asked to view lineups in the presence of police officers, witnesses frequently make an identification even when they are uncertain (Wells & Luus, 1990). For this reason, the US. Dept. of Justice now recommends that lineups be conducted by individuals who are unaware which person is the actual suspect (U. S. Department of Justice, 1999).

Demand characteristics combine Schacter's "bias" and "suggestibility."

## 3. Leading Questions

**Leading questions**, as described in an earlier section, introduce errors through the reconstructive processes of retrieval. Information present in the questions themselves becomes incorporated into a witness's memory. Furthermore, these effects are persistent; the biasing effects may permanently change the memory for an event. Leading questions result from Schacter's "suggestibility" and are exaggerated by the problems of transience.

## 4. Hindsight bias.

**Hindsight bias** refers to the tendency of witnesses to report higher subjective confidence after making an identification than before. The diagnostic value of the confidence judgment, however, is impaired. This effect is exacerbated by any verbal reinforcement given after an

identification is made. Wells (Wells & Bradfield, 1998) found that telling eyewitnesses "good, you identified the suspect" distorted further report. These biases need not be explicit, however. If a witness makes an identification but is asked to "look again," the implied message (i. e., the demand characteristics) is that the first identification was wrong (Wells & Bradfield, 1999).

## 5. Encoding Failures

Some memory errors can be overcome. Sometimes retrieval of information is temporarily blocked, as in so-called "Tip of the Tongue" states. When retrieval blocks are removed (either experimentally, or by the passage of time), the correct answer can often be retrieved.

Encoding failures, however, are "fatal" memory errors. Information that was never encoded in the first place is impossible to retrieve. Poorly encoded information, on the other hand, is more likely to suffer suggestibility effects (Hyman & Loftus, 2002).

Encoding failures are the cause of Schacter's "absent-mindedness."

## 6. Post-Event Information

Because memories are not static snapshots in time, they can be influenced by events or information learned after the event in question. That is, our memories for the past are influenced not only by the events itself, but by what we have learned since the event happened. Post-event information has its greatest effect when there is a relatively long delay between the event and post-event information and a short delay between the information and the test (Loftus, Miller, & Burns, 1978). Furthermore, it is difficult or impossible for witnesses to distinguish post-event information from real event information, a phenomenon known as the "knew-it-all-along effect" (Metcalfe, 2000).

Mazzoni and her colleagues (Mazzoni, Loftus, & Kirsch, 2001) have proposed that the creation of false memories can be understood as a 3-phase process. First, individuals have to see the event as plausible, something that *could* have happened to them. Second, individuals come to believe that the event *did* happen to them, and begin imagining or generating elaborations concerning the fictitious event. Finally, individuals begin to mistake these internally generated events and details for external, real events (a problem of *source confusion*).

**Subject:** RE: Creating memories

**From:** Terrell, Dr. Trent (TTerrell@umhb.edu)

**To:** tiger_russell@att.net;

**Date:** Monday, August 25, 2014 8:40 AM

Tuesday is a really full day on my end, I have class from 9:30-2:30 with only a short break, so probably the earliest I could realistically get up there is 3:30-4:00. Wednesday the only class I have is cancelled for a university assembly, so that would be a perfect day for me to be there at any time.

Thanks...

**Trent Terrell, Ph.D.**

Associate Professor and Chair, Psychology

University of Mary Hardin-Baylor

900 College Street, Box 8014

Belton, TX 76513

254-295-4630

tterrell@umhb.edu

**From:** Terence Russell [mailto:tiger_russell@att.net]
**Sent:** Sunday, August 24, 2014 9:11 PM
**To:** Terrell, Dr. Trent
**Subject:** Re: Creating memories

I am hopeful. I should know tomorrow if it will be Tuesday or Wednesday.

Terence A. "Tiger" Russell

Attorney & Counselor at Law

PO Box 306

Hillsboro, Texas 76645

**Subject:** Re: Creating memories

**From:** Tiger Russell (tiger_russell@att.net)

**To:** TTerrell@umhb.edu;

**Date:** Tuesday, August 26, 2014 8:57 AM

From discussions with the State and Judge yesterday, it was confirmed that you would not be called before Wednesday.

Terence A. "Tiger" Russell
Attorney at Law
PO Box 306
Hillsboro, Texas 76645

254-396-3219
254-582-5593 (fax)

Sent from my awesome new iPad!

On Aug 25, 2014, at 8:40 AM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:

Tuesday is a really full day on my end, I have class from 9:30-2:30 with only a short break, so probably the earliest I could realistically get up there is 3:30-4:00. Wednesday the only class I have is cancelled for a university assembly, so that would be a perfect day for me to be there at any time.

Thanks...

**Trent Terrell, Ph.D.**

Associate Professor and Chair, Psychology

University of Mary Hardin-Baylor

900 College Street, Box 8014

Belton, TX 76513

254-295-4630

tterrell@umhb.edu

**From:** Terence Russell [mailto:tiger_russell@att.net]

exhibit 'D'

**Subject:** Re: Creating memories

**From:** Tiger Russell (tiger_russell@att.net)

**To:** TTerrell@umhb.edu;

**Date:** Tuesday, August 26, 2014 4:04 PM

Location is correct. Just talked with Court and judge said it would be safe to be here by 12:30 p.m. State has 3 witnesses for the morning, so we should reach you after lunch. If State finishes before lunch, Court say we will take early lunch and start earlier following lunch.

Terence A. "Tiger" Russell
Attorney at Law
PO Box 306
Hillsboro, Texas 76645

254-396-3219
254-582-5593 (fax)

Sent from my awesome new iPad!

On Aug 26, 2014, at 9:17 AM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:

Good deal. If you can just let me know sometime tonight what time you think you'll need me, anytime tomorrow should work. I would be great with getting there at 9 AM and being first up, if that's when court starts.

Is this where I'm headed?: **Hill County Courthouse, 1 North Waco Street, Hillsboro, Texas 76645**

I updated the direct a little bit (see attached). I really didn't change the content, but I just incorporated some more questions for you to ask me so as to keep me on point.

Thanks,

Trent

**Trent Terrell, Ph.D.**

Associate Professor and Chair, Psychology

University of Mary Hardin-Baylor

900 College Street, Box 8014

**Subject:** Re: Creating memories

**From:** Terrell, Dr. Trent (TTerrell@umhb.edu)

**To:** tiger_russell@att.net;

**Date:** Wednesday, August 27, 2014 7:02 AM

Terence,

I still haven't received any info from you about when I should appear in court. I'm persisting in emailing you because you said this was the best way to contact you.

Lacking any further information, I'm heading into the office this morning. I have obligations there that I can work around with notice, but without a concrete time to plan around I have to give my full-time job priority. As I said, I have a night class this evening and a 9:30-2:30 teaching schedule Tuesday/Thursday. I also have meetings scheduled today that I could've missed, but I'll move forward with my regular schedule unless I hear from you very soon.

Thanks,
Trent

Sent from my iPhone

> On Aug 26, 2014, at 7:40 PM, "Tiger Russell" <tiger_russell@att.net> wrote:
>
> Did you receive my earlier message about the time?
>
> Terence A. "Tiger" Russell
> Attorney at Law
> PO Box 306
> Hillsboro, Texas 76645
>
> 254-396-3219
> 254-582-5593 (fax)
>
> Sent from my awesome new iPad!
>
>> On Aug 26, 2014, at 6:22 PM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:
>>
>> Please advise as soon as possible this evening when you'll need me tomorrow, so I can plan out my day. It's at least an hour drive, depending on 35. I do have an evening class starting at 6, so need to be done before the end of the day in order to get back in time.
>>
>> Thanks..
>>
>> Sent from my iPhone
>>
>> On Aug 26, 2014, at 8:57 AM, "Tiger Russell" <tiger_russell@att.net<mailto:tiger_russell@att.net>> wrote:

*Exhibit F*

**Subject:**   Re: Creating memories

**From:**     Terence Russell (tiger_russell@att.net)

**To:**       TTerrell@umhb.edu;

**Date:**     Tuesday, August 26, 2014 10:23 PM

Judge said it would be safe to be here by 12:30 p.m. State has 3 witnesses for the morning, so we should reach you after lunch. If State finishes before lunch, Court say we will take early lunch and start earlier following lunch.

Terence A. "Tiger" Russell
Attorney & Counselor at Law
PO Box 306
Hillsboro, Texas 76645
254-580-9282
254-582-5593 (fax)

On Aug 26, 2014, at 7:41 PM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:

> No, all I got this morning was that you wouldn't need me before Wednesday. So, what time will you need me?
>
> Sent from my iPhone
>
>> On Aug 26, 2014, at 7:40 PM, "Tiger Russell" <tiger_russell@att.net> wrote:
>>
>> Did you receive my earlier message about the time?
>>
>> Terence A. "Tiger" Russell
>>
>> Attorney at Law
>>
>> PO Box 306
>>
>> Hillsboro, Texas 76645
>>
>> 254-396-3219
>>
>> 254-582-5593 (fax)

*Exhibit 'G'*

**Cause No. 37228**

| STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
| | § | |
| vs. | § | DISTRICT COURT OF |
| | § | |
| JAMES DUVAL RYDER | § | HILL COUNTY, TEXAS |

## DECLARATION UNDER PENALTIES OF PERJURY

STATE OF TEXAS,

COUNTY OF _Bell_

I, Jonathon Trent Terrell, declare under penalties of perjury that the foregoing information and allegations of this Declaration are true and correct, and I say:

1. I have personal knowledge of the facts stated in this declaration.

2. I have not been compelled or threatened to sign this declaration in any manner.

3. I am signing this declaration knowingly, voluntarily, and freely.

4. My date of birth is October 9, 1980.

5. I fully understand the contents of this declaration, and I read, write, and speak English.

6. I am trained in the field of Psychology, specifically Cognitive Psychology and Eyewitness Memory.

7. I regularly consult and testify as an expert witness on matters related to my specialty.

8. I am educated as a Doctor of Philosophy in Experimental Psychology.

9. In addition to consulting and testifying as an expert witness, I am an Assistant Professor and the Chairperson of the Psychology Department at the University of Mary Hardin-Baylor.

10. I have published numerous articles and presented numerous times on the subject matter of memory formation and retrieval and eyewitness testimony.

11. My curriculum vitae is attached as Exhibit A.

12. I was contacted initially by Tiger Russell regarding testifying on behalf of the defense in the matter of *State of Texas v. James Duval Ryder*, Cause No. 37228, in Hill County, Texas.

13. Because Mr. Russell did not want to approach the judge about securing funds for an expert witness citing the Defendant's indigence, I agreed to a minimal fee--$1000.00, and was sent a check from Mr. Russell.

14. Because I have a full time job at the University of Mary Hardin-Baylor, I told Mr. Russell, in advance and up front, that I must have 24 hours notice that my presence would be expected at trial.

15. I was not served with a subpoena to appear.

16. As the week of the trial began, Mr. Russell was unable to confirm when I would be needed in court.

17. It ultimately appeared that I would be needed on August 27, 2014.

18. On the evening of August 26, 2014, I emailed Mr. Russell three times, but received no response from him.

19. At approximately 10:15 the following morning, August 27, 2014, I received a phone call from Mr. Russell telling me that I would be needed for testimony at 12:30 p.m.

20. I was not able to retrieve that message and return Mr. Russell's call until approximately noon on August 27, 2014.

21. Unfortunately, I could not leave my job responsibilities and travel two hours to Hill County at a moment's notice.

22. I have returned the $1000.00 check, un-cashed to Mr. Russell.

23. I believe that my testimony would have been material to the defense of James Ryder.

24. The attached planned line of testimony would have been my testimony and opinion had I been properly subpoenaed, and I incorporate it in full into this affidavit.

Further Affiant sayeth not.

## DECLARATION

Under 28 U.S.C. § 1746 and Texas Civil Practice and Remedies Code § 132.001 *et seq.*, I declare that my name is Jonathan Trent Terrell. I am over the age of 18 years, and am competent to make this declaration. My date of birth is October 9, 1980. I have not been forced to sign this declaration. I declare that under the penalties of perjury that all assertions provided in this document are correct and true.

Executed on September 25, 2014, in __Bell__ County, Texas.

_____
Jonathan Trent Terrell, Ph. D.

Cause No. 37228

| STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
|---|---|---|
| | § | |
| vs. | § | DISTRICT COURT OF |
| | § | |
| JAMES DUVAL RYDER | § | HILL COUNTY, TEXAS |

## DECLARATION UNDER PENALTIES OF PERJURY

STATE OF TEXAS,

COUNTY OF LEON

I, Larenda Nichole Watkins, declare under penalties of perjury that the foregoing information and allegations of this Declaration are true and correct, and I say:

1. I have personal knowledge of the facts stated in this declaration.

2. I have not been compelled or threatened to sign this declaration in any manner.

3. I am signing this declaration knowingly, voluntarily, and freely.

4. My date of birth is December 29, 1985.

5. I fully understand the contents of this declaration, and I read, write, and speak English.

6. I am engaged to be married to James Duval Ryder, the Defendant in Cause No. 37228.

7. Because the Defendant was found to be indigent, he was appointed an attorney, Mr. Terrence Russell, for his defense.

8. In preparing for trial on this case, Mr. Russell informed us that we needed an expert on memory and that the expert's testimony would be key to the defense.

9. Mr. Russell did not suggest that he could have the court appoint an expert.

10. Mr. Russell informed us that to have the expert that was vital to the case, and we would need to pay $1500.00 for that expert's services.

11. On August 14, 2014, we paid Mr. Russell $1500.00.

12. We received receipt no. 067001 for that payment.

13. A photograph was taken of that receipt, a copy of which is attached and I incorporate in full into this affidavit.

14. Mr. Russell hired Jonathan Trent Terrell, Ph.D. as a testifying expert in this case.

15. Mr. Russell failed to secure the presence of Dr. Terrell through a subpoena.

16. Dr. Terrell did not appear and did not testify on behalf of the defense in this case.

17. Mr. Russell refunded $1000.00 of the $1500.00 payment made to him to secure Dr. Terrell's presence at trial.

18. The refund was issued to me by check number 1221.

19. A photograph was taken of this check, a copy of which is attached and I incorporate in full into this affidavit.

Further affiant says not.

# DECLARATION

Under 28 U.S.C. § 1746 and Texas Civil Practice and Remedies Code § 132.001 *et seq.*, I declare that my name is Nichole Watkins. I am over the age of 18 years, and am competent to make this declaration. My date of birth is December 29, 1985. I have not been forced to sign this declaration. I declare that under the penalties of perjury that all assertions provided in this document are correct and true.

Executed on September 25, 2014, in Leon County, Texas.

Larenda Nichole Watkins, Declarant

CITIZENS
NATIONAL BANK
Hillsboro, Texas
(254) 582-2531

1221
88-169/1119
02

ROSA RUSSELL
JOHN M. RUSSELL
STREET
76645

Date 9/16/14

$1000.00

Thousand and 00/100 Dollars

Susan M. Russell



# EXHIBIT E

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME

TRIAL COURT CAUSE NO. 37,228

STATE OF TEXAS                    )        IN THE DISTRICT COURT
                                  )
                                  )
VS.                               )        HILL COUNTY, TEXAS
                                  )
                                  )
JAMES DUVAL RYDER                 )        66TH JUDICIAL DISTRICT

This document contains some pages that are of poor quality at the time of imaging.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**HEARING ON MOTION TO RESCIND AND**

**SECOND MOTION FOR NEW TRIAL**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

On the 6th day of November, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Alan Mayfield, Judge presiding, held in Hillsboro, Texas:

Proceedings reported by machine shorthand.

ORIGINAL

**APPEARANCES**

MS. NICOLE CRAIN
Assistant District Attorney
SBOT NO. 24034548
Post Office Box 400
Hillsboro, Texas 76645
Phone: (254) 582-4070
ATTORNEY FOR STATE


MS. KRISTIN R. BROWN
The Law Office of Kristin R. Brown, PLLC
SBOT NO. 24081458
1701 North Market Street, Suite 402
Dallas, Texas 75202
Phone: (214) 446-3909
ATTORNEY FOR DEFENDANT

**VOLUME 1**

**HEARING ON MOTION TO RESCIND AND
SECOND MOTION FOR NEW TRIAL**

**November 6, 2014**                                    **Page**        **Vol.**

Announcements ........................    4           1

| **DEFENDANT'S WITNESSES** | Direct | Cross | | **Vol.** |
|---|---|---|---|---|
| Terence Russell | 5,19 | 16 | | 1 |
| Nicole Watkins | 24 | // | | 1 |

Defendant Rests .......................   31          1

State Rests ...........................   31          1

Closing Arguments by Ms. Brown ........   31          1

Closing Arguments by Ms. Crain ........   36          1

Closing Arguments by Ms. Brown, Cont...   39          1

Court's Ruling ........................   41          1

Adjournment ...........................   42          1

Court Reporter's Certificate ..........   43          1

**EXHIBIT INDEX**

**DEFENDANT'S**

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Terrell affidavit | 24 | 24 | 1 |
| 2 | Receipt | 28 | 28 | 1 |
| 3 | Copy of check | 30 | 30 | 1 |
| 4 | Proposed testimony of J. Terrell | 9 | 9 | 1 |
| 5 - 9 | E-mails | 13 | 13 | 1 |

**PROCEEDINGS**

THE COURT: We are here in Cause Number 37,228 for the purpose of a hearing to determine if the Court should rescind its prior ruling in regard to a motion for new trial and to consider the grounds for a possible new trial in the event that it does rescind. And the motion has been filed by Mr. Ryder's attorney, Ms. Brown. You're ready to proceed?

MS. BROWN: We are ready, Your Honor.

THE COURT: Thank you.

And the State is ready to proceed?

MS. CRAIN: We're ready, Your Honor.

THE COURT: Thank you very much.

All right. Well, I think the burden is on you at this point or at least you'd like it to be. You'd like to go first, right?

MS. BROWN: Yes, please, Your Honor.

THE COURT: Okay. You may proceed.

MS. BROWN: Your Honor, do you want to take up the motion to rescind first or do you want to just --

THE COURT: Let's just do them together.

MS. BROWN: Okay. Thank you.

THE COURT: I don't see any reason not to. I think that the evidence that you want to put on in regard to the other one applies to that, so --

MS. BROWN: Okay.

THE COURT: -- so I think we just do both at the same time and then make a ruling when we get to the end.

MS. BROWN: Okay. Thank you. We'll call Terence Russell.

THE COURT: Mr. Russell. If you'll raise your right hand.

(Witness sworn)

THE COURT: Thank you very much. Please be seated.

**TERENCE RUSSELL,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MS. BROWN:**

Q     Good morning. Could you please state your name for the court reporter?

A     Terence Russell. Often I'm called Tiger.

Q     Tiger, what do you do for a living?

A     I'm an attorney.

Q     Okay. Were you the attorney appointed to represent James Duval Ryder in Cause Number 37,228 in Hill County, Texas?

A     I was.

Q     Okay. And do you see Mr. Duval in the

courtroom today?

A I do.

Q Could you identify him for us? Just tell us where he's sitting and describe an article of clothing he's wearing.

A Yes. He'd be seated to your right, and he's wearing the green jail uniform.

MS. BROWN: The record --

THE COURT: The record will reflect that the witness has identified Mr. Ryder as the person that was his client at the prior hearing.

Q (By Ms. Brown) And, Tiger, were you the attorney for James Russell during the trial on this matter which began on August 25th of 2014?

THE COURT: James Ryder.

MS. BROWN: James Ryder. Sorry.

A Yes, I was.

Q (By Ms. Brown) Thank you. What were the charges in this case?

A He had one charge of aggravated assault -- sexual assault of a child, one charge of indecency with a child by contact, and one charge of indecency with a child by exposure.

Q Okay. How old was the complaining witness at the time of this alleged event?

A      At the time it happened they -- it was my belief that they were in -- about two to -- I mean, three to four years old.

Q      Okay.  In contemplation of trial, did you contact an expert on July 22nd of 2014 to help in James's defense?

A      I did.

Q      And who was this expert?

A      His name was Trent Terrell.

Q      What was Dr. Terrell's expertise?

A      Dr. Terrell is an expert on basically memory and memory development.

Q      Okay.  You exchanged e-mails with Dr. Terrell regarding his testimony and the questions that you planned to ask and answers that he expected to be giving.  Is that correct?

A      That's correct.

          MS. BROWN:  May I approach, Your Honor?

          THE COURT:  You may.

Q      (By Ms. Brown) I'm showing you what has been marked as Defendant's Exhibit 4.  Do you recognize that document?

A      I do.

Q      What do you recognize it to be?

A      This was the proposed direct examination that

Dr. Terrell sent me regarding the exact type of testimony he expected to give in this case.

Q    And were those the questions you planned to ask him in his direct testimony?

A    Yes.  I would ask him every one of these questions.

Q    And the answers that he expected to be giving?

A    Yes.

Q    Okay.  And is this, in fact, the Exhibit B that was attached to your affidavit in our motion for new trial?

A    It is.

Q    Okay.  Is that a true and correct copy of that --

A    It --

Q    -- affidavit or that exhibit from that affidavit?

A    It is.

Q    Thank you.

MS. BROWN:  Tendering to defense -- or to the State.

MS. CRAIN:  I have no objection.

MS. BROWN:  Offer Defendant's Exhibit 4.

THE COURT:  Defendant's Exhibit 4 has

been offered. No objection has been made. It is admitted.

Q (By Ms. Brown) Tiger, you believed and still believe that the testimony of Dr. Terrell was material to James's defense. Is that correct?

A Not only material but essential to my theme which I announced in my opening argument.

Q And what was that?

A Was that these children were just mistaken about what they saw and had created the events that they described from things that they had viewed within the home.

Q Okay. Were there other reasons that you believed that Dr. Terrell's testimony was material to James's defense?

A That was primary the reason I was going to have him here --

Q Was --

A -- was due to the fact that he could describe the development of memory and how memories were developed and how children use various objects and visions and surroundings -- will incorporate those into memories that they believe they have.

Q And who was the witness to that event -- to the alleged event?

A    Kira Ryder and Cole Ryder.

Q    Okay.  And these were both very small children at the time of the alleged event.

A    That's correct.

Q    And did you believe that Dr. Terrell would testify that suggestion is a powerful influence on a young child's memory?

A    Yes.  He would testify to that.

Q    And that that was material to James's defense?

A    Yes, it was material.

Q    Did you believe that Dr. Terrell would testify that children have difficulty in correctly remembering events --

A    Yes.

Q    -- that happened when they were young?

A    Yes.

Q    And do you believe that that testimony is material and favorable to James's defense?

A    Yes.

THE COURT:  You know, what this witness believed the witness might testify to --

MS. BROWN:  What the --

THE COURT:  -- is kind of hearsay on top of that hearsay.  So it's not terribly relevant.

However, Dr. Terrell's statements as to what he would have been asked and what he would have testified to have been admitted. So that's there. Anything else that this witness believed is simply a subjective belief that can't be established unless Dr. Terrell were here, and I understand he's not available. So --

MS. BROWN: I understand.

THE COURT: Thank you.

MS. BROWN: One note on that, Your Honor. Dr. Terrell is available by phone if we should need him for anything.

THE COURT: Thank you.

Q    (By Ms. Brown) Did you make arrangements for Dr. Terrell to testify on behalf of the defendant?

A    Yes, we did.

Q    Okay. Did you then discuss trial scheduling with the Court and come to an agreement that Dr. Terrell would be called after lunch on Wednesday, August 27th, 2014?

A    We did do that prior to beginning trial on Monday.

Q    Did you subpoena Dr. Terrell, requiring his presence on August 27th of 2014?

A    I did not.

Q    Did you attempt to contact him via e-mail to

let him know that his presence was needed at 12:30 on that day?

A     I did.  On more than one occasion, actually.

MS. BROWN:. May I approach?

THE COURT: ·Yes.

Q     (By Ms. Brown) Tiger, I'm showing you what has been marked Defendant's Exhibits 5 through 9.  Do you recognize those documents?

A     Yes.  These are hard copies of some e- -- of some of the e-mails that I was doing with Dr. Trent trying to secure his appearance at trial.

Q     And are these true and correct copies of the e-mails that were exchanged between you and Dr. Terrell?

A     Yes.

Q     And are these, in fact, Exhibits C, D, E, F, and G from the affidavit that was filed by you with -- excuse me, in conjunction with our motion for new trial?

A     I didn't file an affidavit --

Q     Okay.  I understand.

A     -- but I did create one --

Q     You did create one?

A     -- and they were exhibits to that, yes.

Q     And this was created with your affidavit.  Is

that correct?

A    Yes.  I attached those to my affidavit.

MS. CRAIN:  Your Honor, I have no objection.

MS. BROWN:  Offer Defendant's 5 through 9.

THE COURT:  5 through 9 are admitted.

Q    (By Ms. Brown) Did you -- in your attempts to contact Dr. Terrell, did you try more than one e-mail address?

A    I did.

Q    Okay.  Did you ever receive an e-mail confirmation back from him stating that he would be present at 12:30 p.m. on August 27th of 2014?

A    I did not.

Q    When you were unsuccessful at contacting Dr. Terrell via e-mail, did you attempt to contact him by phone?

A    I did on the day that he was supposed to testify because I assumed that maybe he had gotten the information and just had not responded.

Q    Okay.  Did you, in fact, call him on multiple numbers?

A    I actually -- yes.  I called him, I called his mother, I called -- and I finally called the actual

psychology department and asked them to have him contact me.

Q    After calling those multiple numbers multiple times, were you finally able to reach Dr. Terrell on August 27th of 2014?

A    I was.  It was sometime between 12:00 and 1:00.

Q    So this was less than an hour before testimony would resume?

A    That's correct.

Q    And before he was supposed to be there to testify?

A    That's correct.

Q    Where would Dr. Terrell have been traveling from?

A    He would -- he is the psychology chair at Mary Hardin Baylor, and I believe that's in Belton.

Q    That's about two hours away.  Is that correct?

A    I wouldn't say two, but somewhere between one and two.

Q    Okay.  Did Dr. Terrell ultimately appear to testify on behalf of James?

A    No.

Q    Did you move the Court for a continuance so

that you could secure Dr. Terrell's presence?

A    Dr. Terrell did tell me when he would be able to appear, and I did ask the Court to continue the trial to that date, which would have been Thursday afternoon, I believe.

Q    Was that motion granted?

A    No.

Q    Do you believe that Dr. Terrell would have been present to testify on behalf of the defense had you properly secured his presence via subpoena or some other method?

A    I do.

MS. CRAIN:  Your Honor, I'm going to object.  That calls for speculation.

THE COURT:  Sustained.

Q    (By Ms. Brown) Did you have any trial strategy in not subpoenaing Dr. Terrell?

A    No.

Q    Do you believe that you were ineffective as trial counsel in not securing the presence of a material witness on behalf of the defense?

A    I do, regrettably.

Q    Is it your belief that the outcome of trial would have been different had you not been ineffective in your representation?

A    Yes.

Q    You were appointed by the Court to represent James, correct?

A    That's correct.

Q    Okay.  Did you seek to have Dr. Terrell appointed by filing an Ake motion?

A    No.

Q    Why not?

A    I did not really discover that Dr. Terrell might be useful to our case until like right before the trial, and I felt like it was probably a little bit too late to be asking the Court to appoint an expert at that point.  So we were able to retain him.

Q    So you hired Dr. Terrell?

A    The family did.  Yes.

Q    So it wasn't with your own funds.  It was from funds from James's family.

A    That's correct.

Q    Okay.

MS. BROWN:  Pass the witness, Your Honor.

**CROSS-EXAMINATION**

**BY MS. CRAIN:**

Q    Now, in regards to Mr. Terrell, what did you provide him for trial preparation?

A    I sent him, I believe, the offense reports.  I

believe that's all I sent him, was just the offense reports, so he would have some kind of idea what was alleged.

Q    Okay.  So if he stated in his affidavit that he was only provided with the outcry notice, then that would be incorrect?

A    No.  That may be what I did send him.  My -- I was trying to recollect.  I knew I didn't send him very much because I wanted him to just basically testify as to generalities and not specifically to this situation.

Q    Okay.  And he had not interviewed the defendant?

A    No.

Q    And he had not interviewed the victim?

A    No.

Q    And you -- I mean, just to clarify, you only wanted him to testify to generalities and nothing specific in regards to this case?

A    Yes.

Q    Okay.

A    And that just -- or I did -- yeah.  I did not expect him to testify regarding the specific incident in this case but just to the development of memory and where children's memory exist at the time that these children initially indicated that these offenses had

occurred.

Q Okay. And you had an oral contract with Mr. -- I can't remember what his last name is, but Mr. Terrell. Is that correct?

A I believe so.

Q To appear?

A I believe so.

Q Okay. You had contacted him by phone, and it was -- you felt like that he had agreed to appear?

A We had been communicating via e-mail.

Q Okay. And y'all had agreed even on a price in regards to this case on how much he would accept for his testimony?

A We did agree on the price.

Q Okay. So while you did not subpoena him, you did have an oral contract with him to appear as an expert in this case, you believed?

A I'd have to review the actual correspondence we had to find out if there actually had been an acceptance of that because I do know that he did tell me at one time that if for some reason he could not testify, he would refund the money. So it had to -- whether he -- you know, the scheduling was very important to him when he was going to appear.

Q Okay. So he had not made it clear to you that

he was going to be available for this trial?

A    He stated that he could be available on a certain day, yes, and certain time.

Q    Okay.  And you testified that these were some of the e-mails that y'all had exchanged between the two of you.  Were there other e-mails in regards to date and time and appearance?

A    No.  I believe that's all of them.

Q    And he stated that he could not appear until almost the close of business 4:00 on Thursday afternoon, correct?

A    That's correct, due to his class schedule and other commitments he had.

MS. CRAIN:  I'll pass the witness.

**REDIRECT EXAMINATION**

**BY MS. BROWN:**

Q    Mr. Russell, had you subpoenaed him, he would be required by the Court by law to be here, right?  Is that correct?

A    That's my understanding of the law.

Q    Okay.  Did you ever at any time believe that you had actually secured his presence for Wednesday afternoon at 12:30?

A    No.  He -- I tried to notify him more than once via e-mail of the date and time that we had

secured, which was going to be within the window he discussed. He never responded to any of those e-mails, and then actually it was two or three days after the trial was over I started getting these Daemon failure notices or whatever they call those things coming back saying that he -- that those e-mails had not even gone through to him.

Q    So although you had an oral contract with him to testify on James's behalf if the date and time could be worked out, you were never able to let him know that that date and time actually was worked out.

A    That's correct.

THE COURT:  You could have telephoned him, and you did eventually telephone him and talk to him on the telephone.  Is that correct?

THE WITNESS:  That's correct, Your Honor.

THE COURT:  Okay.  And you were able to reach him by telephone.

THE WITNESS:  With great difficulty, yes.

THE COURT:  And you reached him on the day, Wednesday, prior to proceeding forward with the -- your presentation of the defense.

THE WITNESS:  That's correct, Your Honor. It was -- I contacted him at lunchtime on Wednesday because I was wanting to make sure that he was going to

be here after lunch as we had planned.

THE COURT: Thank you. Now, did you not represent to the Court that you had paid him a thousand dollars out of your personal funds?

THE WITNESS: I don't think I said out of my personal funds, no, Your Honor.

THE COURT: Well, that's what I remembered you saying to me. And did I not tell you that you shouldn't have done that but that you should have petitioned the Court so that -- the Court would have paid experts and that attorneys are not expected to pay experts for their appointed clients?

THE WITNESS: I do recall the Court advising me of such.

THE COURT: Okay. On the petitions here it indicates that you received $1500 from Mr. Ryder's family?

THE WITNESS: That's correct, Your Honor.

THE COURT: You sent a thousand dollars to Dr. Terrell?

THE WITNESS: That's correct, Your Honor.

THE COURT: He returned the thousand dollar check uncashed?

THE WITNESS: That's correct, Your Honor.

THE COURT: And you've returned that

money to the family?

THE WITNESS: I have, Your Honor.

THE COURT: What about the $500 difference?

THE WITNESS: That's still in my trust account currently.

THE COURT: The check that was returned was on your personal account.

THE WITNESS: That's correct, Your Honor.

THE COURT: So you put 500 in your trust account and put the balance of the money in your personal account, paid it out of the personal account to Dr. Terrell, and you have a separate trust account that holds $500? You didn't put the entire amount in your trust account?

THE WITNESS: Well, that is my trust account, Your Honor.

THE COURT: You use your personal account as your client trust account?

THE WITNESS: I -- generally I just put the money in there and write the check. That's the way I do it.

THE COURT: You do not have a separate trust account?

THE WITNESS: I'm in the process of doing

that currently, Your Honor. I've had some difficulty getting the bank to understand what I want, so I may have to go to a different bank.

THE COURT: Thank you.

MS. BROWN: I have no further questions, Your Honor.

THE COURT: Any other questions from the State for this witness?

MS. CRAIN: I have no further questions.

THE COURT: You may step down.

As I recollect the evidence at the trial, the child testified of an -- the incidents occurring when she was age six.

MS. CRAIN: That is my recollection as well, Your Honor, when she was five and six.

THE COURT: The record will show that, but not when she was three or four. The brother was three or four. He did not testify and was not a testifying witness at the trial.

MS. BROWN: Your Honor, I would ask the Court at this time to take judicial notice of the Court's file, particularly the lack of an Ake motion.

THE COURT: The Court will take judicial notice of the Court's file.

MS. BROWN: And, Your Honor, regarding

our unavailable witness, Dr. Terrell, the defendant would like to admit his affidavit testimony and the incorporated exhibits which I have marked as Defendant's Exhibit 1.

MS. CRAIN: Your Honor, I have no objection to that. I believe that affidavits are allowed in motions for new trial.

THE COURT: Defendant's Exhibit 1 is admitted.

MS. BROWN: Your Honor, at this time we would call Nicole Watkins.

THE COURT: Ms. Watkins. Please raise your right hand.

(Witness sworn)

THE COURT: Thank you.

**NICOLE WATKINS,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MS. BROWN:**

Q    Good morning.

A    Good morning.

Q    Please state your name for the record.

A    Nicole Watkins.

Q    And, Nicole, how old are you?

A    28.

Q    Okay.  Do you know James Ryder?

A    Yes.

Q    James Duval Ryder.  And how do you know him?

A    We're currently engaged.

Q    Okay.  And is he in the courtroom today?

A    Yes.

Q    Could you tell me where he is sitting and describe what he's wearing?

A    Yes.  He's to the right of you and he's wearing a green jumper.

Q    Okay.

MS. BROWN:  Record reflect that the witness has identified James Ryder.

THE COURT:  So noted.

Q    (By Ms. Brown) And is James the subject of the Hill County Cause Number 37,228?

A    Yes.

Q    And that is the case that we are here for today on a motion for new trial?

A    Yes.

Q    Nicole, after James was charged in this case, was he appointed an attorney due to being unable to afford one on his own?

A    Yes.

Q    Okay.  And who was the attorney that was

appointed to represent James?

A    Terence Russell.

Q    Okay.  During the preparations for trial, did Mr. Russell inform you that an expert was needed for James's defense?

A    Yes, ma'am.

Q    And did Mr. Russell tell you that this expert was vital to James's defense?

A    He said that he was very well needed in this.

Q    Did he find a suitable expert?

A    Yes.

Q    Who was that?

A    Mr. Terrell.

Q    Jonathan Terrell?

A    Yes.  Yes, Trent Terrell.

Q    Did Mr. Russell tell you that he would try to have the Court appoint Dr. Terrell as an expert?

A    No.

Q    Did he suggest that was an option?

A    No.

Q    Did he ask for the family to come up with the payment for that expert?

A    Yes.

Q    Okay.  How much did Mr. Russell tell you was needed?

A     1500.

Q     Did you pay that amount?

A     Yes.

Q     Who did you pay that to?

A     To Mr. Russell.

MS. BROWN:  Approach the witness, Your Honor?

THE COURT:  You may.

MS. BROWN:  (Indicating).

MS. CRAIN:  I have no objection.  No objection.

Q     (By Ms. Brown) I'm showing you what has been marked as Defendant's Exhibit 2.  Do you recognize that?

A     Yes.

Q     And what do you recognize it to be?

A     That's the receipt for the 1500 for the expert.

Q     And is that a true and correct copy of the receipt that you received on that day?

A     Yes, ma'am.

Q     And who is that signed by?

A     Mr. Russell.

Q     Okay.  And what was the amount on that?

A     1500.

Q    And what was the date of that receipt?

A    August 14th.

Q    And was the number of that receipt 067001?

A    Yes.

MS. BROWN:  Offer Defendant's Exhibit 2.

THE COURT:  Defendant's 2 is offered.  No objection.  It is admitted.

Q    (By Ms. Brown) Did you believe that Mr. Russell had hired Dr. Terrell to appear on James's behalf?

A    Yes.

Q    And that Mr. Russell would use whatever legal means necessary to secure his presence at trial?

A    Yes.

Q    Okay.  Did Dr. -- or did Mr. Russell subpoena Dr. Terrell?

A    No.

Q    Did Dr. Terrell appear and testify on James's behalf?

A    No.

Q    Did Mr. Russell refund you the $1500 paid to secure the presence of Dr. Terrell at trial?

A    He refunded a thousand.

Q    Okay.  How was that partial refund given to you?

A    A check.

MS. BROWN:   Permission to approach?

THE COURT:   You may.

Q    (By Ms. Brown) I'm showing you what has been premarked as Defendant's Exhibit 3.  Do you recognize that?

A    Yes.

Q    What do you recognize it to be?

A    The check for the refund for the thousand dollars.

Q    And is this photograph of this check that you received a true and correct copy?

A    Yes.

Q    Okay.  And who is that signed by?

A    Mr. Russell's wife.

Q    And what account is that drawn on?

A    Terence A. Russell and Susan Russell.

Q    Okay.  Check Number 1221.  Is that correct?

A    Yes.

Q    And what is the amount of that check?

A    1,000.

Q    And the date?

A    9-6 of '14.

Q    Okay.

MS. BROWN:   Offer Defendant's Exhibit 3.

THE COURT: Any objection to 3?

MS. CRAIN: Your Honor, was that included in the --

THE COURT: I think that she showed that to you a moment ago. I don't know if it's included in the others.

MS. CRAIN: I don't think -- I have no objection.

THE COURT: Defendant's 3 is admitted.

Q     (By Ms. Brown) Who was that delivered to you by?

A     The check?

Q     (Moving head up and down).

A     From his wife.

Q     And have you received any further refund from Mr. Russell?

A     No, ma'am.

MS. BROWN: No further questions for this witness.

MS. CRAIN: Your Honor, I have no questions of this witness.

THE COURT: Thank you. You may step down.

MS. BROWN: Defense rests, Your Honor.

THE COURT: Defense rests. Does the

State wish to present anything?

MS. CRAIN: The State does not wish to present any evidence, Your Honor.

THE COURT: Thank you very much. We'll take a short break. The Court will review the exhibits and then come back with a ruling.

MS. BROWN: Could we argue on that, Your Honor?

THE COURT: Sure. Let's take a short break and let me review the exhibits before you argue.

MS. BROWN: Thank you.

THE COURT: Thank you.

(Recess from 9:44 a.m. to 10:00 a.m.)

THE COURT: Okay. The Court will entertain closing statements at this point.

MS. BROWN: Thank you, Your Honor. First I'd just like to note for the record that the sentence in this case was imposed on August 28th of 2014, making our 75-day window on which the Court can rule on this matter open through November 11th of 2014, next week.

On our motion to rescind, defendant would request that you grant our motion to rescind the order denying the first motion for new trial, which was filed by his trial counsel Mr. Russell. It was simply a form motion and was not in any way substantive.

If the Court does not grant our motion to rescind, this hearing and the record created is a legal nullity. Even if you're not inclined to grant our second motion for a new trial, we ask that you please grant our motion to rescind so that we -- so the appellate court on direct appeal will have the benefit of this record. As Your Honor has noted, much time and effort has been put into this by all sides, you being here today and taking the time to get James here today and everything else. It would be a shame for that to be for nothing, and even if you choose not to grant our second motion, it saves the County money and the taxpayers money to be able to have this record to be able to use on direct appeal instead of having to go through the appellate process to a writ process. So we would ask that you please grant our motion to rescind.

Regarding the motion for new trial, defendant requests the Court grant our motion for new trial based on the ineffectiveness of trial counsel. In order to show effective assistance, two things are required. First we must show that trial counsel's performance was deficient at trial, and we must show that the deficient performance prejudiced the defendant. These two components must be proven to a preponderance of the evidence.

Regarding counsel's deficient performance, where it can be argued that counsel made a decision based on reasonable strategy, the Court shouldn't find a deficiency. That can exist here, though, because trial counsel has admitted both in his affidavit and before the Court today in his testimony that he had every intention of having Dr. Terrell here; that Dr. Terrell's testimony was material to the defense of James Ryder; that he was, in fact, deficient in failing to secure Dr. Terrell's presence; that he had no strategic method or decision or anything that went into his not having Dr. Terrell here. There was no strategy involved. Therefore, trial counsel's performance must be found to be deficient because a reasonable attorney would have done so.

Second, prejudice to the defendant. To demonstrate prejudice from the failure to call a witness, it must be shown that the witnesses would have, in fact, testified and that the testimony would have been favorable to the accused. You have testimony in front of you via Defendant's Exhibit 1, the affidavit of Jonathan Trent Terrell and his incorporated exhibits, that show that if he had been subpoenaed or otherwise secured, Dr. Terrell would have been present to testify at trial; that Dr. Terrell would have testified as to

the susceptibility of young children to suggestion and what is remembered; that all persons are subject to childhood amnesia, a period in which little to nothing is remembered; that the complaining witness was in this age that would be affected by childhood amnesia; that a child often believes they are telling the truth and is, in fact, credible even though what they say may have little to no truth to it because of false memory; and Dr. Terrell believed his testimony would not only be favorable to the defense, but material.

Regarding what opposing counsel said regarding no specifics of the case would be testified to, Dr. Terrell stated that each case is different, but especially in cases of alleged sexual abuse, his role is not to interpret the specifics of what happened, but whether to talk about factors that have been shown to affect the reliability of such memories in young children.

Trial counsel also testified that Dr. Terrell's testimony would have been favorable and was vital to his defense. Because Dr. -- or counsel's performance at trial in failing to secure the presence of Dr. Terrell was deficient and because that prejudiced the defendant and there was a reasonable likelihood that the outcome of the trial would have been different had

Dr. Terrell's presence been secured, a motion for new trial should be granted, Your Honor.

I have a case on point, Ex Parte Briggs. May I approach, Your Honor?

THE COURT: You may.

MS. BROWN: Out of the Court of Criminal Appeals in 2005 in which trial counsel did not secure the -- secure an expert because -- in this situation because they wanted -- paid for the expert. The Court stated that a reasonably competent attorney, regardless of whether he is appointed or retained, must seek to advance the client's best interest in a reasonably competent matter. In that case the clear and obvious defense was one that was recognized, focusing on the medical history and the cause of death of the child. In this case it was also recognized by trial counsel, and it was focusing on the reliability of children's memories.

In that case the Court said a reasonably competent attorney where the applicant could not come up with fees for medical experts would either subpoena the treating doctors or would withdraw from the case or would file an Ake motion. Your Honor, Mr. Russell did not subpoena Dr. Terrell. He has admitted that both in his affidavit and today in testimony. He did not

attempt to withdraw from the case, and we know that he did not file an Ake motion either.

The Court stated that the failure by an attorney to take any steps to subpoena a treating doctor, withdraw from the case, or file an Ake motion provided ineffective assistance of counsel, it constituted a deficient performance, and in that case it did prejudice the defendant because the examination would raise considerable doubt as to the reliability of the records.

And in that -- in this case the testimony of Dr. Terrell would have raised doubt as to the reliability of the child witness's memory. So, in fact, it was material to the defense, it was favorable to the defense, and it would have changed -- and it could have changed the outcome of the trial. And we would ask that you grant our motion for new trial.

THE COURT: You may proceed.

MS. CRAIN: Your Honor, the State would object to this amended motion for new trial under 21.4(b), which states that the time to amend on a motion for new trial is within 30 days after the date when the trial court imposes or suspends sentence in open court, but before the Court overrules any preceding motion for a new trial, and that -- then it goes on to say,

Defendant may, without leave of court, file one or more amended motions for new trial.

In this particular situation we would object to the amended motion for new trial being timely filed as the Court had previously overruled -- I mean, had previously overruled the motion for new trial, and we would ask the Court to rely on its initial ruling in this case.

In regards to the determination on whether or not counsel is ineffective in providing expert witness testimony, there is no blanket rule that if counsel does not provide an expert's testimony in a sexual assault case that that is first, per se, ineffective assistance of counsel, Your Honor.

It should be -- and, in fact, in this particular situation what you have to show is that the witness would have been -- or that the witness was unavailable and that -- well, I guess technically that the witness was available to testify at trial and that the result of the proceeding would have been different.

In this particular situation that is not true. It is very clear from the testimony that Mr. Terrell made himself unavailable, Your Honor. It sounds like it was -- precautions were put in place to have him here and he was -- he made himself unavailable to the

Court when he knew that he was requested to be here. Belton is maybe an hour, at most an hour and a half away. We're talking about 12:00 in the afternoon. He could have been here well before the close of business on that day, and he chose to make himself unavailable to the Court.

Your Honor, also, the testimony has been from affidavits as well as from Mr. Russell that it was just going to be generic testimony, that it was nothing specific to the facts of this case, and, therefore, Your Honor, there is nothing that would change the result. You're just testifying to generalities, and there's nothing specific to the case that can point out and say, Hey, this was wrong, this was wrong, this is why in this case the memory of the child is ineffective, this is why the -- her memory has been influenced -- improperly influenced. And there was nothing from that case -- in this case.

And, in addition, Your Honor, the defense counsel had the opportunity to cross-examine the State's witnesses in regards to these matters and, in fact, did cross-examine in regards to several memory issues and procedures used. And therefore -- and he presented his defense through other witnesses as well, and, therefore, he had the opportunity to put on his case.

It's not reasonable to say that if you just present general and unspecific testimony in regards to a case where a child is younger that that's automatically going to be reasonable doubt in the minds of the juries because then the State could never get a conviction if an expert was presented that said a child was of that age. And, therefore, that does not show that the result of the proceeding would have been different in any way.

And, Your Honor, in addition, in this situation I think it's clear that even in the situation where Mr. Russell hadn't contacted an expert, he would not have been ineffective for not providing an expert in this case. And, therefore, the fact that Mr. Terrell did not make himself available to the Court is something similar, and by not providing an expert in the case, it's not automatically going to be ineffective assistance of counsel since it's not necessary in every case to provide an expert.

And that's all we have, Your Honor.

THE COURT: Thank you very much.

Anything further?

MS. BROWN: Brief response on the timeliness issue, Your Honor. As the Court will note from the Court's file, the motion to rescind and the

motion for new trial filed by us was filed within the 30-day time line on September the 26th of 2014. And as noted in our motion to rescind in State versus Awadelkariem - sorry if I did not pronounce that right - 874 S.W.2d 721, texas Court of Criminal Appeals 1998, a court can rescind orders granting or denying motions for new trial so long as it does so within the 75-day limit. As -- and as we've discussed, we are within that limit.

THE COURT: Thank you very much.

MS. BROWN: Thank you.

MS. CRAIN: Your Honor, if I may just briefly respond to that?

THE COURT: Yes.

MS. CRAIN: I would point out to the Court that it's actually at 974. When I was looking it up last night, I did notice that, so just for the Court.

But, also, in State versus Moore, 225 S.W.3d 556, the Court of Criminal Appeals, in that case the defendant filed a motion outside of the 30 days, and the Court said that the Court did have jurisdiction to hear that motion as long as the State did not object, and that's why the State has objected under 21.4 in this case, so that 21.4 will take application.

MS. BROWN: Brief response, Your Honor?

THE COURT: I understand that you filled

within the 30.

MS. BROWN: Exactly. Thank you.

THE COURT: Okay. And the filings are what they are, so I'll take a look at that and somebody smarter than I am can review those issues if they come up at that level.

At this point in time, having considered the evidence in the motion that was brought forward today -- in the motion brought forward today under the Court's direction, I've been requested to rescind and then hear the motion for -- another motion for new trial. The Court is of the opinion that the evidence that's been submitted today, were it to be heard as a motion for new trial, would be insufficient to grant a new trial anyway. But in addition to that, since that's the case, there's no need for the Court to rescind its first order. So at this point the Court denies the motion to rescind its previous order denying the motion for new trial and denies also -- were it to have done that, it would have denied this motion for new trial that's present today. If that's error, there's others that can decide that, but I don't believe it is. I don't think that there's sufficient evidence to justify a new trial. Thank you. You'll prepare an order for the Court?

MS. CRAIN:  Yes, Your Honor.

(Proceedings concluded)

43

THE STATE OF TEXAS )

COUNTY OF HILL )

I, Cindy Kocher, Official Court Reporter in and for the 66th District Court of Hill County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $222.50 and was paid/will be paid by Hill County.

WITNESS MY OFFICIAL HAND this the 23RD day of November, 2014.

_____
CINDY KOCHER, Texas CSR 5387
Expiration Date: 12/31/15
Official Court Reporter,
Hill County, Texas
Post Office Box 274
Hillsboro, Texas 76645
(254)582-4045

Cause No. 37228

| STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
| | § | |
| vs. | § | DISTRICT COURT OF |
| | § | |
| JAMES DUVAL RYDER | § | HILL COUNTY, TEXAS |

## DECLARATION UNDER PENALTIES OF PERJURY

STATE OF TEXAS,

COUNTY OF _Bell_

I, Jonathon Trent Terrell, declare under penalties of perjury that the foregoing information and allegations of this Declaration are true and correct, and I say:

1. I have personal knowledge of the facts stated in this declaration.

2. I have not been compelled or threatened to sign this declaration in any manner.

3. I am signing this declaration knowingly, voluntarily, and freely.

4. My date of birth is October 9, 1980.

5. I fully understand the contents of this declaration, and I read, write, and speak English.

6. I am trained in the field of Psychology, specifically Cognitive Psychology and Eyewitness Memory.

7. I regularly consult and testify as an expert witness on matters related to my specialty.

8. I am educated as a Doctor of Philosophy in Experimental Psychology.

EXHIBIT

A 1

9. In addition to consulting and testifying as an expert witness, I am an Assistant Professor and the Chairperson of the Psychology Department at the University of Mary Hardin-Baylor.

10. I have published numerous articles and presented numerous times on the subject matter of memory formation and retrieval and eyewitness testimony.

11. My curriculum vitae is attached as Exhibit A.

12. I was contacted initially by Tiger Russell regarding testifying on behalf of the defense in the matter of *State of Texas v. James Duval Ryder*, Cause No. 37228, in Hill County, Texas.

13. Because Mr. Russell did not want to approach the judge about securing funds for an expert witness citing the Defendant's indigence, I agreed to a minimal fee--$1000.00, and was sent a check from Mr. Russell.

14. Because I have a full time job at the University of Mary Hardin-Baylor, I told Mr. Russell, in advance and up front, that I must have 24 hours notice that my presence would be expected at trial.

15. I was not served with a subpoena to appear.

16. As the week of the trial began, Mr. Russell was unable to confirm when I would be needed in court.

17. It ultimately appeared that I would be needed on August 27, 2014.

18. On the evening of August 26, 2014, I emailed Mr. Russell three times, but received no response from him.

19. At approximately 10:15 the following morning, August 27, 2014, I received a phone call from Mr. Russell telling me that I would be needed for testimony at 12:30 p.m.

20. I was not able to retrieve that message and return Mr. Russell's call until approximately noon on August 27, 2014.

21. Unfortunately, I could not leave my job responsibilities and travel two hours to Hill County at a moment's notice.

22. I have returned the $1000.00 check, un-cashed to Mr. Russell.

23. I believe that my testimony would have been material to the defense of James Ryder.

24. The attached planned line of testimony would have been my testimony and opinion had I been properly subpoenaed, and I incorporate it in full into this affidavit.

Further Affiant sayeth not.

## DECLARATION

Under 28 U.S.C. § 1746 and Texas Civil Practice and Remedies Code § 132.001 *et seq.*, I declare that my name is Jonathan Trent Terrell. I am over the age of 18 years, and am competent to make this declaration. My date of birth is October 9, 1980. I have not been forced to sign this declaration. I declare that under the penalties of perjury that all assertions provided in this document are correct and true.

Executed on September 25, 2014, in _Bell_ County, Texas.

_____
Jonathan Trent Terrell, Ph. D.

## Direct Examination of Dr. Terrell

**Name:** Dr. Trent Terrell

**Where do you live?** Temple, Texas

**How are you currently employed?**

> 9/08- present: Associate Professor of Psychology, University of Mary Hardin-Baylor, Belton, TX.

**What are your areas of Specialization?** Learning, Memory, and Cognition

### EDUCATIONAL BACKGROUND

**Academic Degrees?**

B.A., Psychology '03, M.A. Neuroscience '05, Ph.D. Experimental Psychology '08, all from Baylor University, Waco, TX

**What type of graduate training did you receive in the area of Memory at that time?**

> Ph. D. in Experimental Psychology, (eyewitness memory). Classes, research, dissertation.

### PROFESSIONAL RESPONSIBILITIES

**Could you describe your current responsibilities at the University of Mary Hardin-Baylor?**

> Cognitive psychologist with emphasis in memory
>
> Psychology Department Chairperson, August 2010-present
>
> Teach 4 classes a semester—General Psychology, Psychological Methods, Experimental Psychology, Cognitive Psychology, Theories of Learning, Neurophysiological Psychology, Developmental Psychology
>
> Supervise undergraduate research in Memory
>
> Numerous campus committees

**Do you belong to any Professional Associations?**

Association for Psychological Science

Psychonomic Society—Associate Member

American Association for the Advancement of Science

### PRIMARY RESEARCH INTERESTS

Confidence and Accuracy in Eyewitness Testimony

In general, confident witnesses are perceived as more credible than less confident witnesses. However, confident witnesses are <u>not</u> necessarily more accurate. This research investigates factors that may inflate *confidence* without improving memory accuracy.

## Lineup Construction and Photo Refreshing

How does the construction and presentation of lineups affect the likelihood of correct identifications? How do multiple opportunities to view lineups affect the likelihood of correct identifications?

**Have you published any works in the field of Eyewitness Identification memory accuracy?** Yes

**Have you performed your own "hands-on" tests regarding memory accuracy?** Yes, in the lab

**Have you testified as an expert at other hearings?** Yes

**Have you given any presentations about eyewitness memory?** Yes, I presented at the Texas State Bar Advanced Criminal Law Seminar in Houston in July, 2011, and again in San Antonio in 2012. I've also spoken to the National District Attorneys Association in Houston and the Center for American and International Law in Plano.

**Are you being paid by the defense to testify in this case?** Yes.

## What is the most common mistaken belief about memory?

That memory works like a video recorder or computer disk. Both these metaphors suggest that memory retains everything that has ever happened to us, implying that all events are ultimately retrievable. Memory is a **reconstructive** phenomenon, not a video recorder:

> *In essence, all memory is false to some degree. Memory is inherently a reconstructive process, whereby we piece together the past to form a coherent narrative that becomes our autobiography. In the process of reconstructing the past, we color and shape our life's experiences based on what we know about the world. (Bernstein & Loftus, 2009)*

## How does memory work then?

Memory has three processes—encoding, storage, and retrieval. (NOTE: If you look to the bottom. there's a general Q&A about memory section. I can go into as much or as little detail as you think would be necessary here. I've worked with people who want to devote fifteen minutes to it, others who just want a brief answer. Whatever works for you.)

## Are memories of alleged sexual abuse the same as eyewitness memories?

Not exactly—most research on eyewitness memory focuses on an individual witnessing a crime being committed by someone they do not know, and later trying to identify that person after a very limited exposure to them. In alleged cases of sexual abuse, the focus is not on who, but what and if. They're different kinds of memories, but the same factors can affect their reliability.

## Will we discuss some of those factors today?

Yes.

## What documents have you reviewed?

Very little. I've looked at an amended summary of what outcries would be described in court.

## Is it usual for you to review so few documents in a case like this?

Each case is different, but especially in cases of alleged sexual abuse, my role is not to interpret the specifics of what happened, but rather to talk about factors that have been experimentally demonstrated to affect the reliability of such memories.

## So to clarify, you will not be testifying that the alleged abuse in this case did not take place?

No, my testimony will only involve descriptions of how memory works and doesn't work.

## Have we spoken before today?

Yes, via phone and email.

**Before we begin, let's be clear: are you going to offer testimony that the witnesses in this case are lying, or that they are not credible?**

No. Credible witnesses can experience and report false memories without intending to be deceptive or lying. The empirical evidence from years of false memory research indicates that most false memories seem as subjectively real to witness as true memories.

**Why are you here, then?**

To provide information to the jury about how memory works from a scientific background, to identify some of the factors known to affect reliability, and to provide tools that the jury can use as they evaluate the reliability of the child in this case.

**In general, how do memory researchers classify factors that alter witness reliability?**

In the Eyewitness Memory literature, researchers discuss two broad classes of factors: Estimator variables and system variables. That distinction is not as important in this kind of case, but I do want to discuss one estimator variable, so I'll mention it. *Estimator variables* are those that cannot be controlled by the criminal justice system—they are simply the facts of what happened. How long something lasted, how long it has been since the event took place, stress levels of the victim/witness, etc. Many things about an event can affect the likelihood that it will be correctly remembered later. These are called estimator variables because we can only estimate the impact they might have had on memories. *System variables* are those that investigators have some degree of control over, such as how information is gathered after the event. In a case of alleged sexual abuse, system variables in play are how the child is interviewed, who conducts the interview, and in what context that interview takes place.

**What estimator variables do you feel might be relevant to this case?**

Latency, or the time between the event and the time when memories of that event were first reported. One of the most basic findings of eyewitness memory research is that memories decay over time. Just about every experimental protocol that manipulates the interval between exposure and testing has found that the longer this interval, the greater the likelihood of memory errors (Wells et al., 2006). In some scenarios, witnesses may not be prompted to think about an event at all after it has occurred, enhancing decay from memory (also called transience). This is true of lab studies, information learned in school, and eyewitness memory (Shapiro & Penrod, 1986).

NOTE: Stress is also an estimator variable that reduces accuracy of subsequent memories. It's a double-edged sword though. If abuse did happen, it was likely stressful for the children. But if it's your case

strength and modality (open/closed) of the suggestions. Generally speaking, the younger the children the more likely they are to incorporate suggestions, and the more likely they are to answer yes to a closed question (whether yes is the correct answer or not). The take-home fact is that if children are asked questions that presume something has happened and are placed in an environment where others seem to think it happened, there's empirical data illustrating they can and often will come to believe it themselves.

**The Sam Stone experiments seem to discuss children modifying their memories of something that really happened. Is there any evidence that people can come to remember things from their childhood that did not occur at all?**

Yes, there are several examples. One experimental protocol involves what is known as the "Lost in the Mall" procedure. In this protocol, researchers enlist the help of family members to help make false suggestions to experimental participants that they were lost in the mall for an extended period of time when they were a child. When family members combine suggestions about true events along with the suggestion of being lost in the mall (or being hospitalized overnight, or other traumatic events), many subjects not only come to accept that the event happened, but begin to elaborate add their own details of the event in subsequent recollections. When family are able to provide convincing details, such as the name of the mall they would've been lost in as a child, or even a store which they frequently shopped at, the subjects are able to imagine how that event might've occurred. There's a well-documented phenomenon known as imagination inflation—when subjects are asked to imagine something occurring for just one minute, they are subsequently more likely to remember what they imagined as something that actually occurred. There's also a natural tendency to think that if everyone else in the family remembers this, I probably should, too.

NOTE: DA's like to pick apart the lost in the mall experiment, because the original study tried it with 25 people, and only produced the phenomenon in 6 of them. The small sample size has to do with the complexities of recruiting family involvement, etc. It's a very time-intensive and personal protocol. And they'll say that creating this in 6 people is hardly overwhelming evidence, but the point is that it's possible at all—it's really a pretty surprising thing that it happens at all. The protocol is also used on adults. not children, and all the evidence supports the idea that the younger the child, the more suggestible they are. The broad, concrete point is that

we've taken things that we know didn't happen, and convinced people it did so that they remember it as if it did. And the stakes are lower in experiments—it doesn't really matter if you got lost in the mall or not. But, there's a lot more pressure to report sexual abuse, so it's not really a one-to-one comparison.

**Are there any developmental factors that may be relevant to this case?**

Potentially. Some possible factors are childhood amnesia, encoding specificity (which I'll explain below), "magical thinking" and an underdeveloped "Theory of Mind.

Taking these one-by-one:

**Childhood amnesia.** All of us have limited episodic memories from ages 3-5 of our lives, and all of us have virtually no episodic memories of the first two years of our lives. The time of offset of childhood amnesia (the ability to start to form long-term memories accessible as adults) is different for all people. Most of us would say our first memory is from around age 3 or 4.

What causes childhood amnesia?

A few things, the most important of which is the progression of language development. Our long-term memories are anchored in meaning and are rehearsed and stored phonologically (using language). In short, children can't form memories accessible as adults in the first 2-3 years of life because they do not have the vocabulary necessary to represent those ideas in their minds and rehearse them. When children start learning language proficiently, they are able to rehearse better and begin to store memories that will be accessible as adults. Another factor potentially relevant here is a bit complicated to explain--the concept of encoding specificity. This means that memories are encoded in a certain way, using a certain way of thinking and a certain viewpoint, and that they need to be retrieved with that same way of thinking and that same viewpoint. (Another more formal way of putting is to say that recreating the context of encoding at the time of retrieval makes it more likely to remember what was encoded). Most of the memories we have from childhood are encoded from a child's point of view, using childlike interpretations and childlike terminology. When we grow up, we are unable to access those memories because we no longer view the world in that childlike way—we think in adult terms and from adult viewpoints, and find it virtually impossible to remember the world the way we did when we were children.

**Encoding Specificity.** This idea of encoding specificity may be particularly important in a sexual abuse case, especially involving very young children. Young children (hopefully) do not understand sexual actions and sexual terms as abuse is taking place. It's not at all likely that young children immediately understand that they have been sexually abused. They may have been uncomfortable or upset or scared, but they're likely not able to encode what happened as sexual abuse. Therefore, when asked about sexual abuse as an adult (or an older child), the adult definition of abuse calls to mind different things than were likely encoded during the abuse as a very young child. This explains why directive and closed questioning often has to be used, and illustrates the difficulty of interviewing children about possible abuse without being suggestive. Investigators likely use euphemistic questions about touching and parts of the body touched, and the possibility must at least be considered that children cannot separate innocuous touching (such as diaper changing) from harmful touching. As an example, many children will respond to the closed question "Did the doctor hurt you?" with an emphatic "yes"—even if the reality is that the doctor just gave the child an injection. The child doesn't understand that the injection was for his/her benefit, and is just as upset with the doctor as would be if he/she had touched the child malevolently.

It is vital to underscore that not being able to remember abuse doesn't mean it didn't happen. It is nearly an impossible task to derive the pertinent information without speaking vaguely (with euphemism) or suggesting the possibility of actions with closed questions.

**Magical Thinking/Theory of Mind.** Refers to the idea that children in Piaget's Pre-operational stage of cognitive development (roughly ages 2-7) are not yet logical thinkers, and often easily bridge gaps in their understanding with assumptions that logical adults wouldn't make. Magical thinking is often seen during the grieving process as children are first encountering the concept of death. Not able to understand the finality of death, they rationalize the absence in the only way they have experienced—by assuming the loved one is out of town or has a gone away temporarily but will return. When presented with other information that is outside what they understand (such as the idea that Sam Stone was very clumsy), children of this young age are much more likely than adults to bridge the gap in what they understand than to challenge discrepancies. Often the shortest bridge is to accept what the adult says is true, or to accept what the other children are saying as true, and then build upon that concept subsequently. This

happens frequently when children are corrected by their parents about the names of things, colors of things, about language usage and other areas in which they make wrong assumptions. It is a normal part of cognitive development to accept ideas presented by an adult—Piaget calls this assimilation and accommodation. This all relates to the process of the child developing a Theory of Mind. A Theory of Mind is the understanding that all individuals have their own minds and their own way of seeing the world, and that different people have different opinions and not everyone knows the same information. While adults take this for granted, children have to learn this through trial and error. Piaget called this stage "egocentrism", because children do not understand that people have different feelings and desires as they do. Young children often exemplify egocentrism when, for example, they are asked to show their mother the picture they drew, and they hold the picture out with the back of the picture facing mom and the actual picture visible to them. They feel that because they can see the picture, mom can too. It's understandable that this concept can be reversed. If a non-fact is suggested to young children as if it is fact, children are likely to accept this fact because they don't understand that the adult could have a different set of knowledge than they do, or that the adult might be lying or be mistaken. All of this speaks to why young children are more suggestible than adults and have a harder time saying "no" to closed questions.

**Are there protocols that can be used to reduce the suggestiveness of child interviews?**

While there is not a formally-agreed upon process, there are suggestions for how to reduce the likelihood of suggesting information to children:

- Use open-ended questions when possible
- Listen as much as possible and try to let the child be in control of the direction of the conversation
  - In other words, refrain from pushing them back towards what is suspected to have happened as much as possible
- Have someone not emotionally-involved with the situation conduct the interview
  - This reduces demand characteristics placed on the child to be a good boy or girl for a known authority figure
- Attempt to establish rapport with the child with a series of unrelated questions before moving on to the more important questions

- Conduct a formal, documented interview as soon as possible after initial outcry. Try to limit other discussions/interviews with family members before this interview, as these discussions can be very suggestive

- Limit repeat interviews if possible. The Sam Stone paradigm of research has demonstrated that off-the-cuff and non-factual narrative offered by children in one interview are often recalled as factual memories in subsequent interviews, especially if the content of that narrative is encouraged or met with positive response by the interviewers.

Ask this if you want, I think it'd be a decent way to end: **It's the defense's argument that the children in this case were brainwashed to believe that these events happened. Is there any evidence in your field that this is possible?**

Brainwashing is really more of a colloquial term than one we use routinely in the field. What I'm comfortable saying is that there is empirical evidence that people can come to remember things that didn't occur because that suggestion was made to them. Sometimes those suggestions are deliberate and purposeful, as in the lost in the mall procedure, and other times those suggestions are unintentional—such as might occur when an investigator asks if something happened.

I would reiterate that the biggest and most persistent misconception about memory is that once they're formed in the brain, they don't change. Memories are not shrink-wrapped facts stored in the brain waiting to be opened. They're reconstructed each time an event is re-experienced mentally, and every time that happens what's re-experienced is different. How you ask questions can change how memories are reconstructed, just as how an interviewer responds to answers can change how memories are reconstructed next time. It's an incredibly dynamic process. I wouldn't call that brainwashing, I would say that memories are very malleable and change over time.

## Background information

*Just an FYI section—it sounds like you've already got a lot of background info. Some of this is very similar to my talk in Houston.*

## General Memory Q&A

**Probably the most common metaphors used to describe human memory are that "memory is a videotape" and "memory works like storage on a computer disk." Are these good analogies for human memory?**

No, and this is probably the most important finding of the last 100 years or so in memory research. Both videotapes and computer disks are reproductive media, meaning that they store information in a more-or-less literal manner.

Both represent memory as being static and unchanging, and imply that what is stored in memory is always a faithful representation of the actual event. Furthermore, both metaphors suggest that memory retains everything that has ever happened to us, implying that all events are ultimately retrievable. For example, we may have a difficult time remembering something, just as we might have troubling finding a certain 5-second clip on a videotape. Since we will eventually find this 5-second segment if we keep rewinding and reviewing the videotape, we often assume memories will be similarly accessible.

But memory is not like a videotape or hard disk. Videotape and hard disks are reproductive storage device, always retrieving the same information. In addition, what is stored on the tape or disk is a literal representation of the original event. But memory does not work this way. In fact, the single most important principle underlying memory is this: memory is a dynamic, creative, and reconstructive process. Memory works by storing bits and pieces of the original events, combining those fragments with other sources of information to reconstruct the original event.

**What are the basic processes used in memory formation and retrieval?**

Memory researchers typically speak of memory formation as having three distinct stages, encoding of new information, consolidation and storage of the information, and retrieval of the memory. The process of **encoding** refers to the conversion of perceptual and sensory

information into a form that the brain can represent and store. In virtually all cases, encoding alters the sensory information in some way. In fact, two people listening to the same conversation may have drastically different recollections of the same event. Memory researchers would say that these two individuals <u>encoded</u> the information in different ways.

A great deal of what we call "forgetting" is often a failure of the encoding process. One classic demonstration involves the inability of most people to recall the front of a penny from memory. Which way does Lincoln face? Where is the date? What is written across the top and bottom of the coin? Some people can get close, but few are able to draw the coin with complete accuracy. Even when shown several possible alternatives and asked to identify the correct one--usually, recognition is easier than recall--this task is still difficult. We might be tempted to say that we "forgot" what a penny looks like, but it would be more accurate to say we never knew in the first place. ***Memory fails because the information was never encoded to begin with.***

### 2. Consolidation and Storage

**Consolidation** is the term used to refer to the process by which short-term memories are converted into long-term memories. Consolidation of memories in the brain is something like water being frozen into ice cubes. Both processes take time, and both can be disrupted. For example, if an ice cube tray filled with water is taken from the freezer and vigorously shaken before the cubes have started forming, the process of ice cube formation has been irreversibly stopped. Once the water is spilled from the tray, there is nothing that can be done to get that water back in. Generally speaking, the degree of disruption is directly related to the severity of the injury.

**Storage** refers to the preservation of the memory over a period of time. One of the most profound generalizations one can make about memory is that memory strength and accuracy declines predictably with the passage of time.

### 3. Retrieval

Finally, **retrieval** is the process of finding and accessing previously stored memories. Retrieval does not occur in a vacuum. It is guided by **retrieval cues**, or bits of information that are related to items stored in memory. Retrieval cues can exert powerful effects on memory. Unfortunately, retrieval is the stage of memory where errors are most likely to be introduced. Memory is a reconstructive phenomenon, and most of the reconstruction occurs during retrieval.

When misleading or biasing cues exist at retrieval, they can seriously compromise the accuracy of retrieval.

**If memory is reconstructive, then, it must make errors. Has a taxonomy of memory errors and distortions been developed?**

Harvard University psychologist Daniel Schacter, one of the country's most prolific and distinguished memory researchers, recently identified seven factors clearly shown to reduce the reliability of memory. He identifies these as follows:

- *transience*, or forgetting that occurs with the passage of time. As discussed earlier this is perhaps the most profound generalization one can make about memory.

- *absent-mindedness*, a lapse in attention during an event that inhibits (or precludes entirely) the successful encoding of a memory. As noted earlier, such encoding failures are devastating; one cannot retrieve what was never encoded to begin with.

- *blocking*, or the inability to retrieve information due to interference by other items stored in memory. For example, learning a new computer password is often complicated by the intrusive recollection of previous passwords.

- *misattribution*, whereby an event that occurred in one context is mistakenly attributed to another. Furthermore, sometimes current feelings of familiarity are mistakenly attributed to past events. Phenomena such as source confusion and even *déjà vu* result from misattribution.

- *suggestibility*, in which misleading information from external sources are used to influence memory. In product identification cases, this can often result from reviewing photobooks or reviewing information obtained from Internet searches. (The same factors can also result in misattribution, in which a product is identified as familiar, and thus selected. Having reviewed the product in a book of photos can induce a sense of familiarity, even when a product was never actually used.)

- *bias*, where various factors cause distortions in memory. *Change* and *consistency biases* cause us to reconstruct the past in a way that is different from (for change biases) or similar to (for consistency biases) the present. If memory of our past behavior is disturbing in some way, we may reconstruct the memory in a less threatening manner. *Hindsight biases* occur when we reinterpret past events in terms of currently available

(but initially unavailable) information. *Egocentric biases* occur when we exaggerate our role or importance in past events. Finally, *stereotypical biases* influence memory by distorting them based on generic memories, what "usually" or "probably" happened.

- *persistence*, in which (usually) emotionally charged memories intrusively come to mind, even when we attempt to suppress them. Persistence is responsible for such clinical phenomena as post-traumatic stress disorder and flashbulb memories.

### Does inaccurate identification by eyewitnesses cause innocent people to be convicted?

Memory's reconstructive nature has profound implications one the role eyewitness memory testimony in the courtroom. Recent advances in DNA technology has further demonstrate eyewitness fallibility. Based on information tracked by the Innocence Project, by August, 2007, more that 200 falsely convicted individuals have been exonerated by DNA evidence. Mistaken eyewitness identification was involved in more than 75% of those false convictions (see Innocence Project, 2008; The Justice Project, 2007).

### What kind of errors are common among eyewitnesses?

#### 1. Source Monitoring and Source Confusion

**Source monitoring** is defined as the ability to recall not only the content of memories, but also the source from which the information was obtained. According to Johnson et al, (1993), "source monitoring is based on qualities of experience resulting from combinations of perceptual and reflective processes, usually requires relatively differentiated phenomenal experience, and involves attributions varying in deliberateness. These judgments evaluate information according to flexible criteria and are subject to error and disruption" (p. 3).

**Source confusion**, then, results from a failure of source memory. Source confusion occurs when information is learned from one source but misattributed to another source. This can occur when witnesses are shown photographs of suspects or objects prior to questioning, and later are asked to identify the suspects or objects. In cases where the source of the information is entirely forgotten, source confusion can still exert effects by increasing self-reported confidence.

Source confusion can also result from simply *thinking about* something. For example, individuals who are asked to imagine that a remote event happened to them later have difficulty

in distinguishing actual events from imagined events, a phenomenon known as "imagination inflation" (M. Garry & Polaschek, 2000; Roediger & McDermott, 2000). A person's subjective confidence in these memories is similarly inflated by imagination (Maryanne Garry, Manning, Loftus, & Sherman, 1996), further illustrating why confidence is not a reliable indicator of accuracy. The erroneous memories are quickly and easily formed; they can be created in real-world settings with a single imagination episode, within a few days of the imagined event (Seamon, Philbin, & Harrison, 2006).

### 2. Demand Characteristics

**Demand characteristics** refer to biases introduced in research by the expectations of the researchers, the participants, or both. Well-known "halo effects" often occur in education settings, with teachers assigning higher grades to students from which they had expected better performance.

In eyewitness memory settings, demand characteristics operate in any situation where there is an expectation of the witness. Most witnesses in criminal cases want to be helpful to the investigators, to be "good witnesses." When asked to view lineups in the presence of police officers, witnesses frequently make an identification even when they are uncertain (Wells & Luus, 1990). For this reason, the US. Dept. of Justice now recommends that lineups be conducted by individuals who are unaware which person is the actual suspect (U. S. Department of Justice, 1999).

Demand characteristics combine Schacter's "bias" and "suggestibility."

### 3. Leading Questions

**Leading questions**, as described in an earlier section, introduce errors through the reconstructive processes of retrieval. Information present in the questions themselves becomes incorporated into a witness's memory. Furthermore, these effects are persistent; the biasing effects may permanently change the memory for an event. Leading questions result from Schacter's "suggestibility" and are exaggerated by the problems of transience.

### 4. Hindsight bias.

**Hindsight bias** refers to the tendency of witnesses to report higher subjective confidence after making an identification than before. The diagnostic value of the confidence judgment, however, is impaired. This effect is exacerbated by any verbal reinforcement given after an

identification is made. Wells (Wells & Bradfield, 1998) found that telling eyewitnesses "good, you identified the suspect" distorted further report. These biases need not be explicit, however. If a witness makes an identification but is asked to "look again," the implied message (i. e., the demand characteristics) is that the first identification was wrong (Wells & Bradfield, 1999).

## 5. Encoding Failures

Some memory errors can be overcome. Sometimes retrieval of information is temporarily blocked, as in so-called "Tip of the Tongue" states. When retrieval blocks are removed (either experimentally, or by the passage of time), the correct answer can often be retrieved.

Encoding failures, however, are "fatal" memory errors. Information that was never encoded in the first place is impossible to retrieve. Poorly encoded information, on the other hand, is more likely to suffer suggestibility effects (Hyman & Loftus, 2002).

Encoding failures are the cause of Schacter's "absent-mindedness."

## 6. Post-Event Information

Because memories are not static snapshots in time, they can be influenced by events or information learned after the event in question. That is, our memories for the past are influenced not only by the events itself, but by what we have learned since the event happened. Post-event information has its greatest effect when there is a relatively long delay between the event and post-event information and a short delay between the information and the test (Loftus, Miller, & Burns, 1978). Furthermore, it is difficult or impossible for witnesses to distinguish post-event information from real event information, a phenomenon known as the "knew-it-all-along effect" (Metcalfe, 2000).

Mazzoni and her colleagues (Mazzoni, Loftus, & Kirsch, 2001) have proposed that the creation of false memories can be understood as a 3-phase process. First, individuals have to see the event as plausible, something that *could* have happened to them. Second, individuals come to believe that the event *did* happen to them, and begin imagining or generating elaborations concerning the fictitious event. Finally, individuals begin to mistake these internally generated events and details for external, real events (a problem of *source confusion*).

**Jonathan Trent Terrell, Ph.D.**
University of Mary Hardin-Baylor
Assistant Professor and Chairperson, Department of Psychology
900 College Street
Belton, TX 76513
254-295-4630
806-570-6849 (cell)
tterrell@umhb.edu

## EDUCATION

Bachelor of Arts in Psychology, Baylor University, May 2003

Master of Arts in Neuroscience, Baylor University, August 2005

Doctor of Philosophy in Experimental Psychology, Baylor University, May 2008

Specialization: Cognitive Psychology, Eyewitness Memory
Academic Mentor: Charles A. Weaver, III

## COURSES TAUGHT

General Psychology
Experimental Psychology
Cognition
Psychology and Film
Freshman Seminar

Psychological Methods
Developmental Psychology
Neurophysiological Psychology

## PROFESSIONAL AFFILIATIONS

Association for Psychological Science
American Association for the Advancement of Science
Psychonomic Society—Associate
Armadillo (Association for Research in Memory, Attention, Decision making,
Intelligence, Language, Learning, and Organization)

## CONFERENCES ATTENDED

Annual Meeting of the Psychonomic Society: 2006, 2007, 2009, 2010, 2011
Armadillo: 2006, 2007
Texas A&M Annual Assessment Conference: 2010, 2011

*Exhibit 'A'*

## CONSULTING WORK

I have consulted and testified in many criminal cases as an expert on eyewitness memory. My testimony addresses the basic processes of memory formation and retrieval, as well as estimator variables (such as event duration, stress, weapon focus, witness intoxication) and system variables (such as lineup construction, instructions given to witnesses, etc).

## COMMITTEE WORK

Academic Institutional Quality Committee
Student Success Team Committee
Online Education Task Force
Strategic Planning Stewardship Committee
Chair—Student Scholars Day and Research Symposium Planning Committee, 2010-2011
UMHB Quality Enhancement Project Planning Team

## PUBLICATIONS, PRESENTATIONS & AWARDS

Weaver, C. A. III & Terrell, T. (2004). Laboratory in cognitive psychology: Student Manual. Published by Baylor University.

Weaver, C. A. III, Terrell, T., & Krug, K. S. (2004). Evaluating the reliability of witness memories in product identification cases. In *Andrews Publications' Asbestos Litigation 2004* (Section 19, pp. 1-18). New Orleans, LA: Thompson-West.

Weaver, C. A. III, Terrell, T. & Krug, K. (2004, April). *Remembrance of thing past: Evaluating the reliability of witness memories in product identification cases.* Andrews Publications' Asbestos Litigation 2004 Conference: New Orleans.

Weaver, C. A. III. & Terrell, J. T . (2005, May). *Eyewitness memory and product identification?* Harris Martin Publications Asbestos Litigation Conference: The Increasing Prominence of Equipment, Gasket and Friction Defendants. Las Vegas.

Weaver, C. A. III, Terrell, J. T., Krug, K., & Kelemen, W. L. (2005, November). *The delayed JOL effect with very long delays: Evidence from Flashbulb Memories.* Paper presented at *Memory and Metamemory: Papers in Honor of Thomas O. Nelson,* Toronto.

Terrell, T. J., & Weaver, C. A., III (2005, November). *The effects of misinformation on eyewitness memory and product identification.* Paper presented at the 45th annual meeting of the Psychonomic Society, Toronto.

Terrell, J. T. (2006, February). *The effects of misinformation on eyewitness memory and product identification.* Invited address. Baylor University Interdisciplinary

Scholarship Forum.

**Terrell, J. T.** (2006, May). Winner, Outstanding Graduate Research, Baylor University Interdisciplinary Scholarship Forum.

Weaver, C. A. III., **Terrell, J. T.**, & Holmes, A. E. (2006, October). Evaluating the reliability of eyewitness memory in product identification cases, Asbestos Litigation in the 21st Century. New Orleans: American Law Institute/American Bar Association.

**Terrell, J. T.** (2006, October). *Creating new memories, destroying old ones: Refreshing recollections of eyewitnesses.* Invited address. Baylor University Nu Rho Psi Society.

**Terrell, J. T.**, & Weaver, C. A. III. (2006, October). *Eyewitness memory in civil cases: Photo refreshing, suggestion, and product identification.* Poster presented at the 16th annual Southwest Conference on Cognition, Texas Tech University: Lubbock.

**Terrell, J. T.**, & Weaver, C. A., III. (2006, November). *"Refreshing recollection" of eyewitnesses: Memory retrieval or memory creation?* Poster presented at the 47th annual meeting of the Psychonomic Society, Houston.

Weaver, C. A., III, & **Terrell, J. T.** (2007, October). *Remembering bad things, not bad guys: Eyewitness memory in product liability cases.* Paper presented at the 17th annual Southwest Conference on Cognition. Trinity University: San Antonio.

**Terrell, J. T.** (2007, October). *Eyewitness memory and product identification: Suggestibility and false memory creation.* Poster presented at the 17th annual Southwest Conference on Cognition. Trinity University: San Antonio.

**Terrell, J. T.**, & Weaver, C. A., III. (2007, November). *Remembering products, not faces: "Refreshing recollection" of eyewitnesses in product liability situations.* Paper presented at the 48th annual meeting of the Psychonomic Society, Long Beach.

Weaver, C. A. III, **Terrell, J. T.**, Krug, K. S., & Kelemen, W. L. (2008, May). The Delayed JOL Effect with very long delays: Evidence from flashbulb memories. In J. Dunlosky and R. A. Bjork (Eds.), *A handbook of memory and metacognition.* Hillsdale, NJ: Lawrence Erlbaum Associates.

**Terrell, J. T.** & Weaver, C. A. III (2008). Eyewitness testimony in civil litigation: Retention, suggestion, and misinformation in product identification. *North American Journal of Psychology, 10,* 323-346.

**Terrell, J. T.** (2009, November). *Repeated photo refreshing and product identification.* Poster presented at the 50th annual meeting of the Psychonomic Society, Boston.

Weaver, C. A. III, Parra, K. F, & **Terrell, J. T.** (2010, November). Addressing memory-related issues in asbestos cases. San Diego: Defense Research Institute.

Weaver, C. A., III, Krug, K. S., **Terrell, J. T.,** & Holmes, A. E. (in press). Eyewitness memory Issues in civil litigation. In A. Jamieson & A. Moenssens (Eds.), Wiley Encyclopedia of Forensic Science: Behavioral Sciences. Chichester, UK: John Wiley & Sons, Ltd.

**Terrell, J. T.** (2011, April). Invited response to Frederick, K. (2011). The creation of a measurement instrument. The Evolution of a Psychometric Tool from Development to Application. Baylor University, Department of Educational Psychology Spring, 2011 Doctoral Student Symposium.

**Terrell, J. T.** (2011, July). *The dynamics of eyewitness identification.* Paper presented at the Texas State Bar CLE Advanced Criminal Law Course and Criminal Law 101, Houston.

Parra, K. F., **Terrell, J. T.,** & Weaver, C. A. III (2011, October). *Differing cognitive loads affect knowledge updating in jurors.* Poster presented at the 21st annual Armadillo Conference on Cognition: Texas A&M Commerce University: Commerce, TX.

Parra, K. F., **Terrell, J. T.,** & Weaver, C. A. III (2011, October). *Do common misunderstandings of memory extend to attorneys?* Poster presented at the 21st annual Armadillo Conference on Cognition: Texas A&M Commerce University: Commerce, TX.

**Terrell, J. T.** (2011, November). *Effects of repeated photo refreshing on eyewitness identification.* Poster presented at the 52nd annual meeting of the Psychonomic Society, Seattle.

## INVITED PRESENTATIONS

2008, October: Eyewitness Testimony in Civil Litigation: Retention, Suggestion and Misinformation in Product Identification. UMHB College of Sciences Brown Bag Presentation

2010, March: Assessment Brown Bag, part of UMHB IQ Council's Assessment Series.

2010, November: Presenter at UMHB Central Texas Book Club's discussion of "The Screwtape Letters" by C.S. Lewis.

2011, March: Presenter at UMHB Central Texas Book Club's discussion of "Into the Wild" by Jon Krakauer.

2011, April: Class Size 60: How I Put General Psychology Online and Lived to Tell About It. Faculty Conversation sponsored by UMHB's Center for Effectiveness in Learning and Teaching.

2011, July: Dynamics of Eyewitness Identification. Paper presented at the 37th Annual State Bar of Texas Advanced Criminal Law Course, Houston.

2012, July: Eyewitness Identifcation: Exploring the Relevant Factors Through Case Examples. Paper to be presented at the 38th Annual State Bar of Texas Advanced Criminal Law Seminar, San Antonio.

2012, September (pending): Counter Evidence of Eyewitness Unreliability: The Science. Paper to be presented at a training sponsored by the National District Attorneys Association in Harris County.

No. 06 001

DATE Aug 14 2014

RECEIVED FROM James Keller

$1500 ⁰⁰

Fifteen hundred DOLLARS

X FOR RENT
☐ FOR deposit

☐ CASH
☐ CHECK
☐ MONEY ORDER

| ACCOUNT | | |
|---|---|---|
| PAYMENT | 1500 | ⁰⁰ |
| BAL. DUE | | |

FROM J Russell

TO

BY

DEFT EXHIBIT
Cause # 37228
Slade v Jamesbridge

Exhibit 2

TERENCE A. RUSSELL,
OR SUSAN M. RUSSELL
1040 E ELM STREET
HILSBORO, TX 76645

1221

86-169/119
02

Citizens
NATIONAL BANK
Hillsboro, Texas
(254) 582-2531

Pay to the
Order of _____

_____ Dollars

Date 9/6/14

$ 1000 00

Susan M Russell

MNT EXHIBIT
Cause # 37228
State v. daveshydo
Exhibit 3

## Direct Examination of Dr. Terrell

**Name:** Dr. Trent Terrell

**Where do you live?** Temple, Texas

**How are you currently employed?**

> 9/08- present: Associate Professor of Psychology, University of Mary Hardin-Baylor, Belton, TX.

**What are your areas of Specialization?** Learning, Memory, and Cognition

### EDUCATIONAL BACKGROUND

**Academic Degrees?**

B.A., Psychology '03, M.A. Neuroscience '05, Ph.D. Experimental Psychology '08, all from Baylor University, Waco, TX

**What type of graduate training did you receive in the area of Memory at that time?**

> Ph. D. in Experimental Psychology, (eyewitness memory). Classes, research, dissertation.

### PROFESSIONAL RESPONSIBILITIES

**Could you describe your current responsibilities at the University of Mary Hardin-Baylor?**

> Cognitive psychologist with emphasis in memory
>
> Psychology Department Chairperson, August 2010-present
>
> Teach 4 classes a semester—General Psychology, Psychological Methods, Experimental Psychology, Cognitive Psychology, Theories of Learning, Neurophysiological Psychology, Developmental Psychology
>
> Supervise undergraduate research in Memory
>
> Numerous campus committees

**Do you belong to any Professional Associations?**

Association for Psychological Science

Psychonomic Society—Associate Member

American Association for the Advancement of Science

PRIMARY RESEARCH INTERESTS

Confidence and Accuracy in Eyewitness Testimony

*Exhibit 'B'*



MN EXHIBIT
Cause # 37228
State v. James Ryder
Exhibit 4

In general, confident witnesses are perceived as more credible than less confident witnesses. However, confident witnesses are <u>not</u> necessarily more accurate. This research investigates factors that may inflate *confidence* without improving memory accuracy.

<u>Lineup Construction and Photo Refreshing</u>

How does the construction and presentation of lineups affect the likelihood of correct identifications? How do multiple opportunities to view lineups affect the likelihood of correct identifications?

**Have you published any works in the field of Eyewitness Identification memory accuracy?** Yes

**Have you performed your own "hands-on" tests regarding memory accuracy?** Yes, in the lab

**Have you testified as an expert at other hearings?** Yes

**Have you given any presentations about eyewitness memory?** Yes, I presented at the Texas State Bar Advanced Criminal Law Seminar in Houston in July, 2011, and again in San Antonio in 2012. I've also spoken to the National District Attorneys Association in Houston and the Center for American and International Law in Plano.

**Are you being paid by the defense to testify in this case?** Yes.

## What is the most common mistaken belief about memory?

That memory works like a video recorder or computer disk. Both these metaphors suggest that memory retains everything that has ever happened to us, implying that all events are ultimately retrievable. Memory is a **reconstructive** phenomenon, not a video recorder:

> *In essence, all memory is false to some degree. Memory is inherently a reconstructive process, whereby we piece together the past to form a coherent narrative that becomes our autobiography. In the process of reconstructing the past, we color and shape our life's experiences based on what we know about the world. (Bernstein & Loftus, 2009)*

## How does memory work then?

Memory has three processes—encoding, storage, and retrieval. (NOTE: If you look to the bottom, there's a general Q&A about memory section. I can go into as much or as little detail as you think would be necessary here. I've worked with people who want to devote fifteen minutes to it, others who just want a brief answer. Whatever works for you.)

## Are memories of alleged sexual abuse the same as eyewitness memories?

Not exactly—most research on eyewitness memory focuses on an individual witnessing a crime being committed by someone they do not know, and later trying to identify that person after a very limited exposure to them. In alleged cases of sexual abuse, the focus is not on who, but what and if. They're different kinds of memories, but the same factors can affect their reliability.

## Will we discuss some of those factors today?

Yes.

**What documents have you reviewed?**

Very little. I've looked at an amended summary of what outcries would be described in court.

**Is it usual for you to review so few documents in a case like this?**

Each case is different, but especially in cases of alleged sexual abuse, my role is not to interpret the specifics of what happened, but rather to talk about factors that have been experimentally demonstrated to affect the reliability of such memories.

**So to clarify, you will not be testifying that the alleged abuse in this case did not take place?**

No, my testimony will only involve descriptions of how memory works and doesn't work.

**Have we spoken before today?**

Yes, via phone and email.

**Before we begin, let's be clear: are you going to offer testimony that the witnesses in this case are lying, or that they are not credible?**

No. Credible witnesses can experience and report false memories without intending to be deceptive or lying. The empirical evidence from years of false memory research indicates that most false memories seem as subjectively real to witness as true memories.

**Why are you here, then?**

To provide information to the jury about how memory works from a scientific background, to identify some of the factors known to affect reliability, and to provide tools that the jury can use as they evaluate the reliability of the child in this case.

**In general, how do memory researchers classify factors that alter witness reliability?**

In the Eyewitness Memory literature, researchers discuss two broad classes of factors: Estimator variables and system variables. That distinction is not as important in this kind of case, but I do want to discuss one estimator variable, so I'll mention it. *Estimator variables* are those that cannot be controlled by the criminal justice system—they are simply the facts of what happened. How long something lasted, how long it has been since the event took place, stress levels of the victim/witness, etc. Many things about an event can affect the likelihood that it will be correctly remembered later. These are called estimator variables because we can only estimate the impact they might have had on memories. *System variables* are those that investigators have some degree of control over, such as how information is gathered after the event. In a case of alleged sexual abuse, system variables in play are how the child is interviewed, who conducts the interview, and in what context that interview takes place.

**What estimator variables do you feel might be relevant to this case?**

Latency, or the time between the event and the time when memories of that event were first reported. One of the most basic findings of eyewitness memory research is that memories decay over time. Just about every experimental protocol that manipulates the interval between exposure and testing has found that the longer this interval, the greater the likelihood of memory errors (Wells et al., 2006). In some scenarios, witnesses may not be prompted to think about an event at all after it has occurred, enhancing decay from memory (also called transience). This is true of lab studies, information learned in school, and eyewitness memory (Shapiro & Penrod, 1986).

NOTE: Stress is also an estimator variable that reduces accuracy of subsequent memories. It's a double-edged sword though. If abuse did happen, it was likely stressful for the children. But if it's your case

that it didn't happen, it wouldn't make sense to talk about the stress of it interfering with subsequent recall. In the previous sex abuse case I did, the state was eager to make the argument that stressful/traumatic events are more likely to be remembered than more run-of-the-mill encounters. I think it's probably best to not mention this in the direct, and if the state mentions it in cross, I can talk about how stressful events are actually less likely to be well-remembered. _

**What system variables could be relevant?**

Most research suggests that children are very suggestible witnesses. It is difficult to question young children about sexual acts without being suggestive to what may have happened.

**Why is it difficult to not be suggestive with them?**

The clearest and most obvious guideline for how to conduct interviews non-suggestively is to use open-ended questions. Open-ended questions are ones that contain no information in them, and require an expository answer, such as "What happened next?" In contrast, closed questions contain information in the question, and generally only require a yes/no answer. Such as "Did he touch you here?" Young children will likely be able to fully articulate the details of sexual abuse without being guided by closed questions.

**Is there empirical evidence that closed or suggestive questioning can cause children to create memories?**

Yes. While there are numerous experimental protocols that have demonstrated this, one of the most commonly discussed is known as the "Sam Stone" paradigm of research. In short, in these protocols someone named Sam Stone visits a classroom of young children, and subsequently the students are presented with the idea that Sam is a clumsy man who is always breaking things. Teachers or adults may say things like "Sam certainly was a clumsy man." Over a period of weeks, they are interviewed with suggestive questions like "Do you remember when Sam Stone ripped the book?" Eventually, many of the students incorporate the suggestions into their memory, and will tell you about the time Sam Stone visited and ripped the book, and in some cases even add additional components of clumsiness not mentioned by adults in the questions. Naturally, the actor portraying Sam was very careful not to be clumsy during the visit. While some of the things the interviewers asked about did happen, all of the clumsy things referred to by the questions did not

There are myriad factors that affect the likelihood that children will come to accept these suggestions and modify their memories accordingly, including the age of the children and the

strength and modality (open/closed) of the suggestions. Generally speaking, the younger the children the more likely they are to incorporate suggestions, and the more likely they are to answer yes to a closed question (whether yes is the correct answer or not). The take-home fact is that if children are asked questions that presume something has happened and are placed in an environment where others seem to think it happened, there's empirical data illustrating they can and often will come to believe it themselves.

**The Sam Stone experiments seem to discuss children modifying their memories of something that really happened. Is there any evidence that people can come to remember things from their childhood that did not occur at all?**

Yes, there are several examples. One experimental protocol involves what is known as the "Lost in the Mall" procedure. In this protocol, researchers enlist the help of family members to help make false suggestions to experimental participants that they were lost in the mall for an extended period of time when they were a child. When family members combine suggestions about true events along with the suggestion of being lost in the mall (or being hospitalized overnight, or other traumatic events), many subjects not only come to accept that the event happened, but begin to elaborate add their own details of the event in subsequent recollections. When family are able to provide convincing details, such as the name of the mall they would've been lost in as a child, or even a store which they frequently shopped at, the subjects are able to imagine how that event might've occurred. There's a well-documented phenomenon known as imagination inflation—when subjects are asked to imagine something occurring for just one minute, they are subsequently more likely to remember what they imagined as something that actually occurred. There's also a natural tendency to think that if everyone else in the family remembers this, I probably should, too. _

NOTE: DA's like to pick apart the lost in the mall experiment, because the original study tried it with 25 people, and only produced the phenomenon in 6 of them. The small sample size has to do with the complexities of recruiting family involvement, etc. It's a very time-intensive and personal protocol. And they'll say that creating this in 6 people is hardly overwhelming evidence, but the point is that it's possible at all—it's really a pretty surprising thing that it happens at all. The protocol is also used on adults, not children, and all the evidence supports the idea that the younger the child, the more suggestible they are. The broad, concrete point is that

we've taken things that we know didn't happen, and convinced people it did so that they remember it as if it did. And the stakes are lower in experiments—it doesn't really matter if you got lost in the mall or not. But, there's a lot more pressure to report sexual abuse, so it's not really a one-to-one comparison.

**Are there any developmental factors that may be relevant to this case?**

Potentially. Some possible factors are childhood amnesia, encoding specificity (which I'll explain below), "magical thinking" and an underdeveloped "Theory of Mind.

Taking these one-by-one:

**Childhood amnesia.** All of us have limited episodic memories from ages 3-5 of our lives, and all of us have virtually no episodic memories of the first two years of our lives. The time of offset of childhood amnesia (the ability to start to form long-term memories accessible as adults) is different for all people. Most of us would say our first memory is from around age 3 or 4.

What causes childhood amnesia?

A few things, the most important of which is the progression of language development. Our long-term memories are anchored in meaning and are rehearsed and stored phonologically (using language). In short, children can't form memories accessible as adults in the first 2-3 years of life because they do not have the vocabulary necessary to represent those ideas in their minds and rehearse them. When children start learning language proficiently, they are able to rehearse better and begin to store memories that will be accessible as adults. Another factor potentially relevant here is a bit complicated to explain--the concept of encoding specificity. This means that memories are encoded in a certain way, using a certain way of thinking and a certain viewpoint, and that they need to be retrieved with that same way of thinking and that same viewpoint. (Another more formal way of putting is to say that recreating the context of encoding at the time of retrieval makes it more likely to remember what was encoded). Most of the memories we have from childhood are encoded from a child's point of view, using childlike interpretations and childlike terminology. When we grow up, we are unable to access those memories because we no longer view the world in that childlike way—we think in adult terms and from adult viewpoints, and find it virtually impossible to remember the world the way we did when we were children.

**Encoding Specificity.** This idea of encoding specificity may be particularly important in a sexual abuse case, especially involving very young children. Young children (hopefully) do not understand sexual actions and sexual terms as abuse is taking place. It's not at all likely that young children immediately understand that they have been sexually abused. They may have been uncomfortable or upset or scared, but they're likely not able to encode what happened as sexual abuse. Therefore, when asked about sexual abuse as an adult (or an older child), the adult definition of abuse calls to mind different things than were likely encoded during the abuse as a very young child. This explains why directive and closed questioning often has to be used, and illustrates the difficulty of interviewing children about possible abuse without being suggestive. Investigators likely use euphemistic questions about touching and parts of the body touched, and the possibility must at least be considered that children cannot separate innocuous touching (such as diaper changing) from harmful touching. As an example, many children will respond to the closed question "Did the doctor hurt you?" with an emphatic "yes"—even if the reality is that the doctor just gave the child an injection. The child doesn't understand that the injection was for his/her benefit, and is just as upset with the doctor as would be if he/she had touched the child malevolently.

It is vital to underscore that not being able to remember abuse doesn't mean it didn't happen. It is nearly an impossible task to derive the pertinent information without speaking vaguely (with euphemism) or suggesting the possibility of actions with closed questions.

**Magical Thinking/Theory of Mind.** Refers to the idea that children in Piaget's Pre-operational stage of cognitive development (roughly ages 2-7) are not yet logical thinkers, and often easily bridge gaps in their understanding with assumptions that logical adults wouldn't make. Magical thinking is often seen during the grieving process as children are first encountering the concept of death. Not able to understand the finality of death, they rationalize the absence in the only way they have experienced—by assuming the loved one is out of town or has a gone away temporarily but will return. When presented with other information that is outside what they understand (such as the idea that Sam Stone was very clumsy), children of this young age are much more likely than adults to bridge the gap in what they understand than to challenge discrepancies. Often the shortest bridge is to accept what the adult says is true, or to accept what the other children are saying as true, and then build upon that concept subsequently. This

happens frequently when children are corrected by their parents about the names of things, colors of things, about language usage and other areas in which they make wrong assumptions. It is a normal part of cognitive development to accept ideas presented by an adult—Piaget calls this assimilation and accommodation. This all relates to the process of the child developing a Theory of Mind. A Theory of Mind is the understanding that all individuals have their own minds and their own way of seeing the world, and that different people have different opinions and not everyone knows the same information. While adults take this for granted, children have to learn this through trial and error. Piaget called this stage "egocentrism", because children do not understand that people have different feelings and desires as they do. Young children often exemplify egocentrism when, for example, they are asked to show their mother the picture they drew, and they hold the picture out with the back of the picture facing mom and the actual picture visible to them. They feel that because they can see the picture, mom can too. It's understandable that this concept can be reversed. If a non-fact is suggested to young children as if it is fact, children are likely to accept this fact because they don't understand that the adult could have a different set of knowledge than they do, or that the adult might be lying or be mistaken. All of this speaks to why young children are more suggestible than adults and have a harder time saying "no" to closed questions.

**Are there protocols that can be used to reduce the suggestiveness of child interviews?**
While there is not a formally-agreed upon process, there are suggestions for how to reduce the likelihood of suggesting information to children:

- Use open-ended questions when possible
- Listen as much as possible and try to let the child be in control of the direction of the conversation
  - In other words, refrain from pushing them back towards what is suspected to have happened as much as possible
- Have someone not emotionally-involved with the situation conduct the interview
  - This reduces demand characteristics placed on the child to be a good boy or girl for a known authority figure
- Attempt to establish rapport with the child with a series of unrelated questions before moving on to the more important questions

- Conduct a formal, documented interview as soon as possible after initial outcry. Try to limit other discussions/interviews with family members before this interview, as these discussions can be very suggestive

- Limit repeat interviews if possible. The Sam Stone paradigm of research has demonstrated that off-the-cuff and non-factual narrative offered by children in one interview are often recalled as factual memories in subsequent interviews, especially if the content of that narrative is encouraged or met with positive response by the interviewers.

Ask this if you want, I think it'd be a decent way to end: **It's the defense's argument that the children in this case were brainwashed to believe that these events happened. Is there any evidence in your field that this is possible?**

Brainwashing is really more of a colloquial term than one we use routinely in the field. What I'm comfortable saying is that there is empirical evidence that people can come to remember things that didn't occur because that suggestion was made to them. Sometimes those suggestions are deliberate and purposeful, as in the lost in the mall procedure, and other times those suggestions are unintentional—such as might occur when an investigator asks if something happened.

I would reiterate that the biggest and most persistent misconception about memory is that once they're formed in the brain, they don't change. Memories are not shrink-wrapped facts stored in the brain waiting to be opened. They're reconstructed each time an event is re-experienced mentally, and every time that happens what's re-experienced is different. How you ask questions can change how memories are reconstructed, just as how an interviewer responds to answers can change how memories are reconstructed next time. It's an incredibly dynamic process. I wouldn't call that brainwashing, I would say that memories are very malleable and change over time.

## Background information

*Just an FYI section—it sounds like you've already got a lot of background info. Some of this is very similar to my talk in Houston.*

## General Memory Q&A

**Probably the most common metaphors used to describe human memory are that "memory is a videotape" and "memory works like storage on a computer disk." Are these good analogies for human memory?**

No, and this is probably the most important finding of the last 100 years or so in memory research. Both videotapes and computer disks are <u>reproductive</u> media, meaning that they store information in a more-or-less literal manner.

Both represent memory as being static and unchanging, and imply that what is stored in memory is always a faithful representation of the actual event. Furthermore, both metaphors suggest that memory retains everything that has ever happened to us, implying that all events are ultimately retrievable. For example, we may have a difficult time remembering something, just as we might have troubling finding a certain 5-second clip on a videotape. Since we will eventually find this 5-second segment if we keep rewinding and reviewing the videotape, we often assume memories will be similarly accessible.

But memory is <u>not</u> like a videotape or hard disk. Videotape and hard disks are reproductive storage device, always retrieving the same information. In addition, what is stored on the tape or disk is a literal representation of the original event. But memory does not work this way. In fact, the single most important principle underlying memory is this: <u>memory is a dynamic, creative, and reconstructive process</u>. Memory works by storing bits and pieces of the original events, combining those fragments with other sources of information to reconstruct the original event.

**What are the basic processes used in memory formation and retrieval?**

Memory researchers typically speak of memory formation as having three distinct stages, <u>encoding</u> of new information, <u>consolidation and storage</u> of the information, and <u>retrieval</u> of the memory. The process of **encoding** refers to the conversion of perceptual and sensory

information into a form that the brain can represent and store. In virtually all cases, encoding alters the sensory information in some way. In fact, two people listening to the same conversation may have drastically different recollections of the same event. Memory researchers would say that these two individuals <u>encoded</u> the information in different ways.

A great deal of what we call "forgetting" is often a failure of the encoding process. One classic demonstration involves the inability of most people to recall the front of a penny from memory. Which way does Lincoln face? Where is the date? What is written across the top and bottom of the coin? Some people can get close, but few are able to draw the coin with complete accuracy. Even when shown several possible alternatives and asked to identify the correct one-- usually, recognition is easier than recall--this task is still difficult. We might be tempted to say that we "forgot" what a penny looks like, but it would be more accurate to say we never knew in the first place. ***Memory fails because the information was never encoded to begin with.***

### 2. Consolidation and Storage

**Consolidation** is the term used to refer to the process by which short-term memories are converted into long-term memories. Consolidation of memories in the brain is something like water being frozen into ice cubes. Both processes take time, and both can be disrupted. For example, if an ice cube tray filled with water is taken from the freezer and vigorously shaken before the cubes have started forming, the process of ice cube formation has been irreversibly stopped. Once the water is spilled from the tray, there is nothing that can be done to get that water back in. Generally speaking, the degree of disruption is directly related to the severity of the injury.

**Storage** refers to the preservation of the memory over a period of time. One of the most profound generalizations one can make about memory is that memory strength and accuracy declines predictably with the passage of time.

### 3. Retrieval

Finally, **retrieval** is the process of finding and accessing previously stored memories. Retrieval does not occur in a vacuum. It is guided by **retrieval cues**, or bits of information that are related to items stored in memory. Retrieval cues can exert powerful effects on memory. Unfortunately, retrieval is the stage of memory where errors are most likely to be introduced Memory is a reconstructive phenomenon, and most of the reconstruction occurs during retrieval.

When misleading or biasing cues exist at retrieval, they can seriously compromise the accuracy of retrieval.

**If memory is reconstructive, then, it must make errors. Has a taxonomy of memory errors and distortions been developed?**

Harvard University psychologist Daniel Schacter, one of the country's most prolific and distinguished memory researchers, recently identified seven factors clearly shown to reduce the reliability of memory. He identifies these as follows:

- *transience*, or forgetting that occurs with the passage of time. As discussed earlier this is perhaps the most profound generalization one can make about memory.

- *absent-mindedness*, a lapse in attention during an event that inhibits (or precludes entirely) the successful encoding of a memory. As noted earlier, such encoding failures are devastating; one cannot retrieve what was never encoded to begin with.

- *blocking*, or the inability to retrieve information due to interference by other items stored in memory. For example, learning a new computer password is often complicated by the intrusive recollection of previous passwords.

- *misattribution*, whereby an event that occurred in one context is mistakenly attributed to another. Furthermore, sometimes current feelings of familiarity are mistakenly attributed to past events. Phenomena such as source confusion and even *déjà vu* result from misattribution.

- *suggestibility*, in which misleading information from external sources are used to influence memory. In product identification cases, this can often result from reviewing photobooks or reviewing information obtained from Internet searches. (The same factors can also result in misattribution, in which a product is identified as familiar, and thus selected. Having reviewed the product in a book of photos can induce a sense of familiarity, even when a product was never actually used.)

- *bias*, where various factors cause distortions in memory. *Change* and *consistency biases* cause us to reconstruct the past in a way that is different from (for change biases) or similar to (for consistency biases) the present. If memory of our past behavior is disturbing in some way, we may reconstruct the memory in a less threatening manner. *Hindsight biases* occur when we reinterpret past events in terms of currently available

(but initially unavailable) information. *Egocentric biases* occur when we exaggerate our role or importance in past events. Finally, *stereotypical biases* influence memory by distorting them based on generic memories, what "usually" or "probably" happened.

- *persistence*, in which (usually) emotionally charged memories intrusively come to mind, even when we attempt to suppress them. Persistence is responsible for such clinical phenomena as post-traumatic stress disorder and flashbulb memories.

### Does inaccurate identification by eyewitnesses cause innocent people to be convicted?

Memory's reconstructive nature has profound implications one the role eyewitness memory testimony in the courtroom. Recent advances in DNA technology has further demonstrate eyewitness fallibility. Based on information tracked by the Innocence Project, by August, 2007, more that 200 falsely convicted individuals have been exonerated by DNA evidence. Mistaken eyewitness identification was involved in more than 75% of those false convictions (see Innocence Project, 2008; The Justice Project, 2007).

### What kind of errors are common among eyewitnesses?

#### 1. Source Monitoring and Source Confusion

**Source monitoring** is defined as the ability to recall not only the content of memories, but also the source from which the information was obtained. According to Johnson et al, (1993), "source monitoring is based on qualities of experience resulting from combinations of perceptual and reflective processes, usually requires relatively differentiated phenomenal experience, and involves attributions varying in deliberateness. These judgments evaluate information according to flexible criteria and are subject to error and disruption" (p. 3).

**Source confusion**, then, results from a failure of source memory. Source confusion occurs when information is learned from one source but misattributed to another source. This can occur when witnesses are shown photographs of suspects or objects prior to questioning, and later are asked to identify the suspects or objects. In cases where the source of the information is entirely forgotten, source confusion can still exert effects by increasing self-reported confidence.

Source confusion can also result from simply *thinking about* something. For example, individuals who are asked to imagine that a remote event happened to them later have difficulty

in distinguishing actual events from imagined events, a phenomenon known as "imagination inflation" (M. Garry & Polaschek, 2000; Roediger & McDermott, 2000). A person's subjective confidence in these memories is similarly inflated by imagination (Maryanne Garry, Manning, Loftus, & Sherman, 1996), further illustrating why confidence is not a reliable indicator of accuracy. The erroneous memories are quickly and easily formed; they can be created in real-world settings with a single imagination episode, within a few days of the imagined event (Seamon, Philbin, & Harrison, 2006).

## 2. Demand Characteristics

**Demand characteristics** refer to biases introduced in research by the expectations of the researchers, the participants, or both. Well-known "halo effects" often occur in education settings, with teachers assigning higher grades to students from which they had <u>expected</u> better performance.

In eyewitness memory settings, demand characteristics operate in any situation where there is an expectation of the witness. Most witnesses in criminal cases want to be helpful to the investigators, to be "good witnesses." When asked to view lineups in the presence of police officers, witnesses frequently make an identification even when they are uncertain (Wells & Luus, 1990). For this reason, the US. Dept. of Justice now recommends that lineups be conducted by individuals who are unaware which person is the actual suspect (U. S. Department of Justice, 1999).

Demand characteristics combine Schacter's "bias" and "suggestibility."

## 3. Leading Questions

**Leading questions,** as described in an earlier section, introduce errors through the reconstructive processes of retrieval. Information present in the questions themselves becomes incorporated into a witness's memory. Furthermore, these effects are persistent; the biasing effects may permanently change the memory for an event. Leading questions result from Schacter's "suggestibility" and are exaggerated by the problems of transience.

## 4. Hindsight bias.

**Hindsight bias** refers to the tendency of witnesses to report higher subjective confidence after making an identification than before. The diagnostic value of the confidence judgment, however, is impaired. This effect is exacerbated by any verbal reinforcement given after an

identification is made. Wells (Wells & Bradfield, 1998) found that telling eyewitnesses "good, you identified the suspect" distorted further report. These biases need not be explicit, however. If a witness makes an identification but is asked to "look again," the implied message (i. e., the demand characteristics) is that the first identification was wrong (Wells & Bradfield, 1999).

## 5. Encoding Failures

Some memory errors can be overcome. Sometimes retrieval of information is temporarily blocked, as in so-called "Tip of the Tongue" states. When retrieval blocks are removed (either experimentally, or by the passage of time), the correct answer can often be retrieved.

Encoding failures, however, are "fatal" memory errors. Information that was never encoded in the first place is impossible to retrieve. Poorly encoded information, on the other hand, is more likely to suffer suggestibility effects (Hyman & Loftus, 2002).

Encoding failures are the cause of Schacter's "absent-mindedness."

## 6. Post-Event Information

Because memories are not static snapshots in time, they can be influenced by events or information learned after the event in question. That is, our memories for the past are influenced not only by the events itself, but by what we have learned since the event happened. Post-event information has its greatest effect when there is a relatively long delay between the event and post-event information and a short delay between the information and the test (Loftus, Miller, & Burns, 1978). Furthermore, it is difficult or impossible for witnesses to distinguish post-event information from real event information, a phenomenon known as the "knew-it-all-along effect" (Metcalfe, 2000).

Mazzoni and her colleagues (Mazzoni, Loftus, & Kirsch, 2001) have proposed that the creation of false memories can be understood as a 3-phase process. First, individuals have to see the event as plausible, something that *could* have happened to them. Second, individuals come to believe that the event *did* happen to them, and begin imagining or generating elaborations concerning the fictitious event. Finally, individuals begin to mistake these internally generated events and details for external, real events (a problem of *source confusion*).

**Subject:**    RE: Creating memories

**From:**     Terrell, Dr. Trent (TTerrell@umhb.edu)

**To:**        tiger_russell@att.net;

**Date:**     Monday, August 25, 2014 8:40 AM

Tuesday is a really full day on my end, I have class from 9:30-2:30 with only a short break, so probably the earliest I could realistically get up there is 3:30-4:00. Wednesday the only class I have is cancelled for a university assembly, so that would be a perfect day for me to be there at any time.

Thanks…

**Trent Terrell, Ph.D.**

Associate Professor and Chair, Psychology

University of Mary Hardin-Baylor

900 College Street, Box 8014

Belton, TX 76513

254-295-4630

tterrell@umhb.edu

**From:** Terence Russell [mailto:tiger_russell@att.net]
**Sent:** Sunday, August 24, 2014 9:11 PM
**To:** Terrell, Dr. Trent
**Subject:** Re: Creating memories

I am hopeful. I should know tomorrow if it will be Tuesday or Wednesday.

Terence A. "Tiger" Russell

Attorney & Counselor at Law

PO Box 306

Hillsboro, Texas 76645

         *Exhibit 'C'*



DEFENDANT'S EXHIBIT 5

**Subject:**   Re: Creating memories

**From:**     Tiger Russell (tiger_russell@att.net)

**To:**        TTerrell@umhb.edu;

**Date:**     Tuesday, August 26, 2014 8:57 AM

From discussions with the State and Judge yesterday, it was confirmed that you would not be called before Wednesday.

Terence A. "Tiger" Russell
Attorney at Law
PO Box 306
Hillsboro, Texas 76645

254-396-3219
254-582-5593 (fax)

Sent from my awesome new iPad!

On Aug 25, 2014, at 8:40 AM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:

Tuesday is a really full day on my end, I have class from 9:30-2:30 with only a short break, so probably the earliest I could realistically get up there is 3:30-4:00. Wednesday the only class I have is cancelled for a university assembly, so that would be a perfect day for me to be there at any time.

Thanks…

**Trent Terrell, Ph.D.**

Associate Professor and Chair, Psychology

University of Mary Hardin-Baylor

900 College Street, Box 8014

Belton, TX 76513

254-295-4630

tterrell@umhb.edu

**From:** Terence Russell [mailto:tiger_russell@att.net]

exhibit 'D'


DEFENDANT'S EXHIBIT
PENGAD 800-631-6989

**Subject:** Re: Creating memories

**From:** Tiger Russell (tiger_russell@att.net)

**To:** TTerrell@umhb.edu;

**Date:** Tuesday, August 26, 2014 4:04 PM

Location is correct. Just talked with Court and judge said it would be safe to be here by 12:30 p.m. State has 3 witnesses for the morning, so we should reach you after lunch. If State finishes before lunch, Court say we will take early lunch and start earlier following lunch.

Terence A. "Tiger" Russell
Attorney at Law
PO Box 306
Hillsboro, Texas 76645

254-396-3219
254-582-5593 (fax)

Sent from my awesome new iPad!

On Aug 26, 2014, at 9:17 AM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:

Good deal. If you can just let me know sometime tonight what time you think you'll need me, anytime tomorrow should work. I would be great with getting there at 9 AM and being first up, if that's when court starts.

Is this where I'm headed?: **Hill County Courthouse, 1 North Waco Street, Hillsboro, Texas 76645**

I updated the direct a little bit (see attached). I really didn't change the content, but I just incorporated some more questions for you to ask me so as to keep me on point.

Thanks,

Trent

**Trent Terrell, Ph.D.**

Associate Professor and Chair, Psychology

University of Mary Hardin-Baylor

900 College Street, Box 8014


DEFENDANT'S EXHIBIT

**Subject:** Re: Creating memories

**From:** Terrell, Dr. Trent (TTerrell@umhb.edu)

**To:** tiger_russell@att.net;

**Date:** Wednesday, August 27, 2014 7:02 AM

Terence,

I still haven't received any info from you about when I should appear in court. I'm persisting in emailing you because you said this was the best way to contact you.

Lacking any further information, I'm heading into the office this morning. I have obligations there that I can work around with notice, but without a concrete time to plan around I have to give my full-time job priority. As I said, I have a night class this evening and a 9:30-2:30 teaching schedule Tuesday/Thursday.  I also have meetings scheduled today that I could've missed, but I'll move forward with my regular schedule unless I hear from you very soon.

Thanks,
Trent

Sent from my iPhone

> On Aug 26, 2014, at 7:40 PM, "Tiger Russell" <tiger_russell@att.net> wrote:
>
> Did you receive my earlier message about the time?
>
> Terence A. "Tiger" Russell
> Attorney at Law
> PO Box 306
> Hillsboro, Texas 76645
>
> 254-396-3219
> 254-582-5593 (fax)
>
> Sent from my awesome new iPad!
>
>> On Aug 26, 2014, at 6:22 PM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:
>>
>> Please advise as soon as possible this evening when you'll need me tomorrow, so I can plan out my day. It's at least an hour drive, depending on 35.  I do have an evening class starting at 6, so need to be done before the end of the day in order to get back in time.
>>
>> Thanks..
>>
>> Sent from my iPhone
>>
>> On Aug 26, 2014, at 8:57 AM, "Tiger Russell" <tiger_russell@att.net<mailto:tiger_russell@att.net>> wrote:

*Exhibit F'*



DEFENDANT'S EXHIBIT
8
PENGAD 800-631-6989
11-6-14 cmc

**Subject:** Re: Creating memories

**From:** Terence Russell (tiger_russell@att.net)

**To:** TTerrell@umhb.edu;

**Date:** Tuesday, August 26, 2014 10:23 PM

Judge said it would be safe to be here by 12:30 p.m. State has 3 witnesses for the morning, so we should reach you after lunch. If State finishes before lunch, Court say we will take early lunch and start earlier following lunch.

Terence A. "Tiger" Russell
Attorney & Counselor at Law
PO Box 306
Hillsboro, Texas 76645
254-580-9282
254-582-5593 (fax)

On Aug 26, 2014, at 7:41 PM, "Terrell, Dr. Trent" <TTerrell@umhb.edu> wrote:

> No, all I got this morning was that you wouldn't need me before Wednesday. So, what time will you need me?
>
> Sent from my iPhone
>
>> On Aug 26, 2014, at 7:40 PM, "Tiger Russell" <tiger_russell@att.net> wrote:
>>
>> Did you receive my earlier message about the time?
>>
>> Terence A. "Tiger" Russell
>>
>> Attorney at Law
>>
>> PO Box 306
>>
>> Hillsboro, Texas 76645
>>
>> 254-396-3219
>>
>> 254-582-5593 (fax)



DEFENDANT'S
EXHIBIT
9

038732

10/06/2014

** TERENCE A. RUSSELL **                                          *****2,633.00

---- TWO THOUSAND SIX HUNDRED THIRTY THREE & 00/100 DOLLARS ----


** TERENCE A. RUSSELL **
P. O. BOX 306
HILLSBORO, TX 76645-0306


01-6260      ** TERENCE A. RUSSELL **                          038732 (10/06/2014

   DATE      I.D.              PO #           DESCRIPTION                    AMOUNT
   -------------------------- G/L DISTRIBUTION ---------------------
   8/29/2014  201409157394                 DC-F:RYDER, JAMES DUVAL          2,633.00
       37228  IN/CT: (7/14/14, 8/20/14,8/29/14 @$70)
       (8/25-28/14 @ $300)  O/O/CT: 6/28/12-8/29/14


                                                      CHECK TOTAL      2,633.00

01-6260      ** TERENCE A. RUSSELL **                          038732 10/06/2014

   DATE      I.D.              PO #           DESCRIPTION                    AMOUNT
   8/29/2014  201409157394      --          STDC-F:RYDER, JAMES DUVAL        2,633.00
       37228  IN/CT: (7/14/14, 8/20/14,8/29/14 @$70)
       (8/25-28/14 @ $300)  O/O/CT: 6/28/12-8/29/14


** TERENCE A. RUSSELL **
P. O. BOX 306
HILLSBORO, TX 76645-0306                       CHECK TOTAL      2,633.00

HILL COUNTY AUDITOR

# HILL COUNTY, TEXAS ATTORNEY FEE VOUCHER

| 1. Jurisdiction <br> ☒ District ☐ County <br><br> ☐ County Court at Law <br><br> Court # __66th__ | 2. County <br><br> Hill | 3. Cause Number     Offense <br><br> _37,228_    Agg Sexual Assault - Child   (Count 1) <br><br> _____ Indecency w/Child - Contact   (Count 2) <br><br> _____ Indecency w/Child - Exposure   (Count 3) | 4. Proceedings <br> ☒Trial-Jury ☐Trial-Court <br><br> ☐Plea-Open ☐Plea- Bargain <br><br> ☐Other _____ |
|---|---|---|---|

**5. In the case of:**
State of Texas v James Duval Ryder

**6. Case Level**
☒ Felony ☐ Misdemeanor ☐ Juvenile ☐ Appeal ☐ Capital Case

☐ Revocation – Felony ☐ Revocation – Misdemeanor ☐No Charges Filed ☐ Other _____

| 7. Attorney (Full Name) <br> Terence A. (Tiger) Russell, Attorney at Law <br><br> 8. State Bar Number    8a. Tax ID Number <br> 17437070         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 | 9. Attorney Address (Include Law Firm Name if Applicable) <br> Terence A. (Tiger) Russell, Attorney at Law <br> P. O. Box 306 <br> Hillsboro, TX 76645-0306 | 10. Telephone <br> (254) 580-9282 <br><br> 11. Fax <br> (254) 582-3593 |
|---|---|---|

| 12. Flat Fee – Court Appointed Services | | | | 12a. Total Flat Fee <br> $ |
|---|---|---|---|---|

| 13. | In Court Services | Hours | Dates | 13a. Total In Court Compensation. |
|---|---|---|---|---|
| | (Non-Jury) Hearing | 1 | 7/14/14 | |
| | (Non-Jury) Hearing | 1 | 8/20/14 | |
| | Jury Selection & begin Jury Trial | 7 | 8/25/14 | |
| | Jury Trial | 7 | 8/26/14 | |
| | Jury Trial | 7 | 8/27/14 | |
| | Jury Trial | 7 | 8/28/14 | |
| | (Non-Jury) Hearing | 1 | 8/29/14 | |
| | **Rate per Day =$70.00 (NON-JURY), $300/per half day (JURY) <br> Hours: 3 NJ = $ 300 <br> 28 J = $2400 | 31 | | $ 2700.00 |

| 14. | Out of Court Services | Hours | Dates | 14a. Total Out of Court Compensation. |
|---|---|---|---|---|
| | Consultation/Communications with Defendant | 3.5 | 06/28/2012 | |
| | Investigation & Research, Prep of Motions, etc. (past & future) | 3.0 | through 08/29/2014 | |
| | Watching Videos, Listening to Interviews | 1.5 | | |
| | Interviewing witnesses, correspondence/phone w/Expert | 3.5 | | |
| | Preparation of opening/closing, trial strategy, questions | 4.0 | | |
| | Discussions with DA | 1.5 | | $ 2000.00 |
| | **Rate per Hour = $70.00    Total Hours 20 | 20.0 | | |

| 15. | Investigator | | Amount | 15a. Total Investigator Expenses <br> $ |
|---|---|---|---|---|

| 16. | Expert Witness | | Amount | 16a. Total Expert Witness Expenses <br> $ |
|---|---|---|---|---|

| 17. | Other Litigation Expenses <br> Purchase of Certified Copy of Pleading from Hill Co. | | Amount | 17a. Total Other Litigation Expenses <br> $ 33.00 |
|---|---|---|---|---|

**18. Time Period of service Rendered:** From __06/28/2012__ (Date) to __08/29/2014__ (Date)

| 19. Additional Comments | 20. Total Compensation and Expenses Claimed <br> $4733.00 |
|---|---|

**21. Attorney Certification:** I, the undersigned attorney, certify that the above information is true and correct and in accordance with the laws of the State of Texas. The compensation and expenses claimed were reasonable and necessary to provide effective assistance of counsel.

☒ Final Payment ☐Partial _____Terence J. Russell_____      __08/29/2014__
                 Signature                                 Date

**22. SIGNATURE OF PRESIDING JUDGE:** _F. B. McGregor_      Amount Approved: __2633.00__

Reason(s) for Denial or Variation
_Paid per Hill County Indigent Fee Schedule_

Receipt# 44595                          Charges:
Cause #                                 COPY                                    33.00
                                                                        ----------
                                        Total Paid:                      $33.00

Total Paid:        $33.00   by Cash

PAYEE:
       Terence Russell


Date Received:   08/20/2014
Issued by: JFDYER


Angelia Orr, District Clerk
P. O. Box 634
Hillsboro, Tx 76645
(254) 582-4042

Make online payments 24 hours a day at
http://www.gov-pay.com/hillcountydccivil/

HILL COUNTY AUDITOR

CAUSE NO. 37,228

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 66TH JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| JAMES DUVAL RYDER | § | HILL COUNTY, TEXAS |

## ORDER ON MOTION TO WITHDRAW

After considering Stephanie W. Johnson's Motion to Withdraw as Attorney of Record, the

Court GRANTS the Motion and orders Stephanie W. Johnson withdrawn as attorney of record for

Defendant, James Duval Ryder.

ORDERS ___Terence Russell___ be substituted as attorney

in charge for Defendant.

SIGNED on 27 day of April, 2012.

_____
Judge Presiding

HILL COUNTY AUDITOR

2012 APR 27 A 10: 16

FILED
ANGELIA ORR DISTRICT
CLERK HILL COUNTY, TX

# EXHIBIT F



REPORTER'S RECORD

TRIAL COURT CAUSE NO. 37,695-A

VOLUME 1 OF 1 VOLUMES

STATE OF TEXAS )( IN THE DISTRICT COURT
)(
)(
V. )( HILL COUNTY, TEXAS
)(
THOMAS ERIC LEE )(
)(
)( 66TH JUDICIAL DISTRICT

-------------------------------------------------------

HEARING ON FINDINGS OF FACT

WRIT OF HABEAS CORPUS

-------------------------------------------------------

On the 25th of November, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Alan M. Mayfield, Senior District Judge, held in Hillsboro, Hill County, Texas:

Proceedings reported by machine shorthand.

# A P P E A R A N C E S

PRESIDING JUDGE:
    Alan M. Mayfield
    Senior District Judge
    15826 Wortham Bend Road
    China Spring, TX   76633
    254-723-6360

FOR THE STATE:
    Mark Frederick Pratt
    SBOT NO. 16240550
    District Attorney, Hill County
    Hill County Courthouse
    PO Box 400
    Hillsboro, TX 76645
    254-582-4070

FOR THE DEFENDANT:
    Edward Alan Bennett
    SBOT NO. 02140700
    SHEEHY, LOVELACE & MAYFIELD, P.C.
    510 North Valley Mills Drive, Suite 500
    Waco, Texas   76710
    254-772-8022

INDEX

HEARING - FINDINGS OF FACT
WRIT OF HABEAS CORPUS

NOVEMBER 25, 2014

                                                    PAGE

Caption.......................................    1
Appearances...................................    2

**Thomas Eric Lee**

Examination by Mr. Bennett....................    6
Examination by Mr. Pratt......................   15
Further Examination by Mr. Bennett............   25
Further Examination by Mr. Bennett............   41
Further Examination by Mr. Pratt..............   44

**Terence Russell**

Examination by Judge Mayfield.................   31
Examination by Mr. Bennett....................   33
Examination by Mr. Pratt......................   35
Further Examination by Mr. Bennett............   37
Further Examination by Mr. Pratt..............   38

Court Reporter's Certificate..................   48

STATE'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
| --- | --- | --- | --- |
| 1 | Final Pretrial conference summary | 28 | 28 |

PROCEEDINGS

(Open court, Defendant present)

THE COURT: We are here in Cause No. 37,695-A in regard to a Writ of Habeas Corpus that's been filed by Thomas Eric Lee with the Court of Criminal Appeals. The Court of Criminal Appeals has directed that the originating court hold a hearing to establish and enter findings of fact to be sent to the Court of Criminal Appeals for their consideration.

Judge A. Lee Harris has appointed me, Alan Mayfield, by order to hold the hearing. And so that's what we're here for.

Present in the court today is the District Attorney, Mr. Alan Bennett and Mr. Thomas Eric Lee.

And also subpoenaed as a witness and present is Mr. Terence Russell.

So I'm ready to proceed.

Are you ready to proceed, Mr. Bennett?

MR. BENNETT: Yes, Your Honor.

THE COURT: Is the State ready?

MR. PRATT: Ready, Your Honor.

THE COURT: Thank you very much.

You may call your first witness.

MR. BENNETT: Your Honor, I will call Mr. Thomas Lee.

THE COURT: Okay. Mr. Lee, if you would -- I tell you what I'm going to do, if you can hear him from where he's at, I'm going to let you testify from where you're at, because getting up and down to this witness stand is going to be awkward.

MR. BENNETT: Your Honor, we'd also invoke the Rule.

THE COURT: Okay.

Mr. Russell, if you will wait out in the -- the foyer, outside the hearing and the presence of the witness.

Just go ahead and close the door if you would.

(Mr. Russell excused from the hearing)

THE COURT: Mr. Lee, raise your hand.

(Defendant was sworn)

THE DEFENDANT: Yes, sir.

THE COURT: Thank you very much.

I'm going to ask that if the witness -- or if the court reporter can't hear you, that we'll move your chair over closer to her --

THE DEFENDANT: Yes, sir.

THE COURT: -- if she has any difficulty.

But do keep your voice reasonably up. But we don't want it real loud because we don't want it

overheard out in the foyer.

MR. BENNETT: Thank you, Your Honor.

THOMAS ERIC LEE,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BENNETT:

Q. Mr. Lee, will you please state your name for the record.

A. Thomas Eric Lee.

Q. And you are currently serving a sentence for unauthorized use of a motor vehicle; is that right?

A. Yes, sir.

Q. Was that enhanced with prior convictions?

A. Yes, sir.

Q. And what is your sentence for that?

A. Eight years.

Q. Okay. And that was in this cause number that we're here in court on today, 37,695; is that right?

A. Yes, sir.

Q. And you were sentenced on August the 9th of 2013; is that right?

A. Yes, sir.

Q. Okay. Now, I believe you pleaded no contest or nolo contendere; is that right?

A. Yes, sir.

Q. All right. So let's talk a little bit about the hearing when you did that. Okay?

A. Okay.

Q. Now, at that time you were charged with two felonies; is that correct?

A. Yes, sir.

Q. You were charged with unauthorized use of a motor vehicle and you were charged with being a felon in possession of a weapon?

A. Yes, sir.

Q. Okay. Were there two separate indictments or were they both in this case?

A. I'm not sure.

Q. Okay. But there were two charges?

A. Yes, sir.

Q. And had the State made a plea offer in your case?

A. Yes, sir.

Q. And what was the offer?

A. It was four years for the un-- unlawful use of a motor vehicle and a felon with a firearm. Four years altogether.

Q. Four years on both charges?

A. Yes, sir. Not -- not separate, but altogether --

Q. To run together?

A. Yes, sir.

Q. Okay. And Mr. Terence Russell was your attorney; is that right?

A. Yes.

Q. Was he court appointed?

A. Yes, sir.

Q. Okay. And did you convey to Mr. Russell that you felt like you were not guilty for the weapons charge?

A. What's "convey" mean?

Q. Did you tell him that you didn't feel like you were guilty of the weapons charge?

A. Right. Yes, sir.

Q. And so you were trying to get just a plea bargain on the unauthorized use charge, but the deal that was given to you involved both?

A. Right.

Q. All right. And you instructed Mr. Russell that you wanted to contest the weapons charge; is that right?

A. Yes. Yes.

Q. And did you go to court for the purpose of accepting a plea offer or were you just in the context of a normal setting?

A. Well, I was -- I -- I -- I wanted to go to

trial.

Q. Okay. You wanted to fight the charges?

A. Yes.

Q. Okay. And did Mr. Russell do or say anything to you to persuade you that you ought to consider pleading guilty or no contest?

A. He just told me to hurry up because when he makes the bench, he's going to throw -- he's going to make sure I get the book thrown at me.

Q. Okay. So let's stop right there.

Make the bench, was he running for election for district judge?

A. That's what he told me.

Q. Okay. And your case was pending in the district court; is that right?

A. Yes.

Q. Okay.

A. And -- can I speak on -- can I say something? Oh, go ahead.

Q. Okay. So he told you he was going to be the judge?

A. Yes, sir.

Q. And that he was going to throw the book at you if your case was not resolved before --

A. Yes, sir.

Q. -- before that time?

A. Right.

Q. Okay.

A. And he told me that several times.

Q. All in that one -- the same day or at different times?

A. He told me -- he told me that before, too. He told me that a couple of other times before I even came -- because I think I came down here a couple of times for hearings and stuff like that and he told me that a couple of times, even told it right in front of my wife.

Q. Okay. And so did that make you reconsider what you were going to do with your case?

A. I was just -- I was scared. You know, I didn't -- I didn't know what was going to happen. I -- you know, I take my lawyer's advice. You know.

Q. So you trusted him and followed his advice?

A. Yes, sir.

Q. And because of what he told you repeatedly about him taking the bench and then throwing the book at you, that was what made you ultimately decide to plead no contest?

A. Yes, sir.

Q. To the unauthorized use charge?

A. Yes.

Q. And you did that without any kind of plea bargain or plea offer?

A. Right.

Q. But you were concerned that if you didn't do that, that Mr. Russell would be elected the judge and throw the book at you?

A. Yes, sir.

Q. If he had not made those statements to you, would you have insisted on having a trial in your case?

A. A trial or -- I'd have to go from there. Because I know for, one, I wasn't guilty of the pistol charge. And I was told -- Mr. -- Mr. Russell came and told me that if you drop -- they're going to -- that Mark Pratt would drop the pistol charge -- if you went in front of the trial by judge right now for sentencing, he would drop the pistol charge.

Q. And that's what ultimately happened was you -- you pleaded no contest before the Judge?

A. Right. Right.

Q. And there was kind of a mini trial --

A. (Witness indicates.)

Q. -- just in front of the judge, no jury?

A. Yes.

Q. And so your result -- you ended up waiving your

right to a jury trial?

A. Yes.

Q. And just basically throwing yourself on the mercy of the Court?

A. Yes, sir.

Q. And you wouldn't have done that if Mr. Russell had told you differently?

A. No, sir. No, sir.

Q. Okay. And what ultimately happened was you were sentenced to eight years?

A. Yes. And I -- I never did get a plea offer for just the one, which I know I don't have to have a plea offer on, right?

Q. Right. Okay. So Judge Harris was the one that sentenced you; is that right?

A. Yes, sir.

Q. And he sentenced you to eight years?

A. Yes, sir.

Q. That same afternoon?

A. So -- and I have one question, too. If he's a misdemeanor judge -- and I know Mark Pratt just took office the same time, why did we go in front of Mark Pratt's judge, which it probably doesn't matter --

Q. Okay. Well, I can -- I can help you with that.

A. Okay.

Q. Just -- the record will reflect that Judge Harris is authorized to appear on behalf of Judge McGregor.

A. Yes, sir. Yes. Yes, sir.

Q. Okay.

A. Yes.

Q. And so that's why you were in front of Judge Harris.

A. Okay.

Q. Does that help you?

A. Yes, sir.

THE COURT: In this county.

MR. BENNETT: In this county.

THE COURT: The County Court at Law has concurrent jurisdiction in most cases with the district court.

THE DEFENDANT: Okay.

THE COURT: And can by assignment be -- from the district court take cases. The Judge from that court can then handle some of the district court --

THE DEFENDANT: Right.

THE COURT: -- cases.

THE DEFENDANT: Okay.

THE COURT: And -- and that's done occasionally. Doesn't handle capital cases, but he

could handle this type of case.

THE DEFENDANT: Yes, sir.

THE COURT: So that's how Judge Harris handles both misdemeanor and felony cases --

THE DEFENDANT: Okay.

THE COURT: -- in his court, because of the -- the special jurisdiction that -- that the County Court at Law has been given in this county.

THE DEFENDANT: Yes, sir.

MR. BENNETT: And every county is different.

THE DEFENDANT: Right.

Q. (By Mr. Bennett) Okay. So basically you have the two charges. Mr. Russell told you on more than one occasion that you better hurry up and take a deal because he was about to be elected judge and he would throw the book at you if --

A. Right.

Q. -- he was the judge?

A. Right.

Q. Did you know that if Mr. Russell had, in fact, been elected judge, that he would not be allowed to preside on your case?

A. I -- I did not know that.

Q. You had no reason to know that?

A.    (Witness indicates.)

Q.    And so as a result of these comments and statements that he made to you, you ended up pleading no contest to the unauthorized use charge?

A.    Yes, sir.

Q.    Because that's what he told you to do?

A.    Uh-huh.

Q.    And you were concerned about what would happen if he ended up being elected judge?

A.    Yes, sir.  He was always so fast in talking with me, you know, that -- yeah.  I mean, yes, sir, that's what happened.

MR. BENNETT:  I'll pass the witness, Judge.

THE COURT:  Do you have any questions?

MR. PRATT:  Yes, Your Honor, I do.

EXAMINATION

BY MR. PRATT:

Q.    So, Mr. Lee, as you understand it, the indictment to which you plead is the one that's file marked February 28, 2013, in which you were charged with unauthorized use of a motor vehicle, two prior state jail final felony convictions, and then it also alleged an aggravated assault with a deadly weapon final felony conviction.  Although, that didn't actually enhance your punishment range in this particular case; is that right?

A.    I don't know.

Q.    You don't know what you plead to?

A.    No, I mean I'm talking about the -- you said that it didn't enhance me and I didn't know what you meant.

Q.    Okay.  Well, I believe that Judge Mayfield already stated that your state jail felony punishment range for unauthorized use of a motor vehicle was enhanced to a third-degree felony punishment range --

A.    Yes, sir.  But you said something about the state jail.  The other I didn't know what you meant on that.  I'm sorry.

Q.    Due to your two prior third degree -- I mean your two prior state jail felony convictions; is that correct?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes, it was enhanced because of my last two state jail felonies.  I thought it was enhanced, too, because of that other one, too.  But you're saying it's not, so...

Q.    Okay.  And so you're saying you haven't had a chance to visit with Mr. Bennett, your current attorney, about any of that?

A.    About what?

Q. What I -- what you just spoke about, sir. What you just stated, that you didn't understand that about your indictment and what your range of punishment was.

A. I know it was enhanced to a -- a third-degree felony, which carries two to ten on -- on state jail felonies.

Q. All right.

A. And I thought I was aware -- and I thought also my second-degree felony was part of that enhancement, too, and I even took that as part of my enhancement, too.

Q. Well, it certainly could be considered by a jury in assessing your punishment --

A. Right.

Q. -- or a judge, for that matter, in deciding what to do.

A. Okay.

Q. And you did agree that you were offered four years in both this case and your other pending felony case, the weapons case, correct?

A. I knew I was offered four years for both charges, yes.

Q. All right. And when you actually went to court in this case, after having rejected that plea bargain offer, that was on July 29th, 2013, with a jury sitting

in the courtroom ready to try that case at that moment, correct?

A. Well, I didn't know -- I wasn't aware of no trial, jury being there.

Q. There was a jury sitting in the courtroom with you, wasn't there?

A. I don't remember, sir.

Q. You don't remember that?

A. No, sir.

Q. Okay. And while that jury was sitting there -- well, let me ask you this way, because you're saying that what you were afraid of was somehow your attorney becoming judge and sentencing you to something more, right?

A. I was just going by what he's saying, he's going to throw the book at me. That's all I know.

Q. But you knew you could avoid that with the jury that was sitting right there, because it was your jury trial day and we all appeared in court to try your case, when you decided to change your plea to no contest, correct?

A. I didn't know I was there for a trial day. I did not know that.

Q. So you didn't receive from Judge Harris a notice that that was your jury trial day?

A.   Not that I remember, no, sir.

Q.   And you never discussed with your attorney that you had a -- a jury trial sitting?

A.   No, sir.  Not that I remember.

Q.   So you think it's possible you maybe forgot about that?

A.   No, sir.  Not -- not -- not my trial, no, sir.

Q.   All right.  So you don't believe that there'll be a record from our final pretrial conference setting where you rejected the final pretrial offer and the jury trial date was set July 29th, 2013, at 9:00 a.m., and that was signed by Judge Harris, signed by your attorney, and it appears signed by yourself as well?

A.   I don't know, sir.

Q.   So you believe if we look at that transcript that just -- that hearing won't have existed?

A.   I'm sure you could look at it and I may have signed it.  But I -- Mr. -- Mr. Russell was always going so fast with signing stuff with my -- my deal, you know what I mean, at my desk.

Q.   Well, didn't the Court go over that with you, Judge McGregor or Judge Harris in court, in open court, on what your trial date was and that you're rejecting that offer and that was your jury trial date?  And, in fact, when you came in, there was a jury sitting

there --

A. Well --

Q. -- as we all handled --

A. Well, if there was --

Q. -- and then y'all came up and told me that you changed your mind, you didn't want to have the jury trial, you wanted to plead to the case?

A. If there -- if there was a -- if that, in fact, did happen --

Q. Right.

A. -- I was told to hurry up and get it over with now.

Q. Well, it wouldn't have been because you were afraid of the judge being on the bench because he obviously wasn't sitting on the bench. He was your defense attorney and there was a jury that was about to decide your fate, right?

A. I really wasn't aware of what was going on because I just was told what Mr. Tiger -- Mr. Russell told me.

Q. And then, in fact, after pleading before -- pleading there in the courtroom, then you had a choice of going to the jury for punishment or to the Judge for punishment and you elected that you wanted to go before Judge Harris for punishment, rather than a jury, didn't

you?

A.    Because I was told that my plea bargain -- I was told that my pistol charge would be dropped if I went to a trial with sentencing by a judge.  I was told that my pistol charge would be dropped.

Q.    And that's the way you wanted to proceed to have your pistol charge dropped and proceed with sentencing before the judge on the -- on the UUMV charge?

A.    It happened so fast, I really didn't know what was going on.  I mean I didn't have time to think or any -- nobody explained anything to me.  All I know is I was in a hurry -- to hurry up and get done so I didn't get, you know, a harsher -- a harsher punishment.  That's all I know.  That's all I know.

Q.    So you believe that if --

A.    I don't know what I believe.  All I know is that -- this is what I'm telling you.  That Mr. Russell told me if I don't hurry up, that I'm going to -- he's going to throw the book at me when he takes the stand.  That's all I know.  That's why things went so fast and this, that and the other.

THE REPORTER:  Sir, I need you to slow down just a little bit, please.

THE DEFENDANT:  I'm sorry, ma'am.

Q. (By Mr. Pratt) Now, you say when your attorney takes the stand, do -- do you believe that your attorney now is going to take the witness stand?

A. Take the stand, judge, whatever. That's what I meant. Take the judge...

Because he was running for judge. He told me that several times. Several times that I came down.

Q. Well, if -- if -- really what you're trying to do was to get this matter over --

A. I --

Q. -- with either by trial or by plea prior to what you're saying is your belief that perhaps your attorney was going to become judge. I still don't understand why that would have caused you to choose not --

A. Just the way --

Q. Can you please. --

A. -- he --

Q. -- let me finish asking my questions.

A. Yes, sir.

Q. Thank you.

Why that would have caused you to have chosen to not have gone before a jury right then, when you had one. Either you had to -- if you were going to try the matter, it was either going to have to be before

a jury or a judge, wasn't it, one of the two?

A. I don't -- you're the DA. I don't know. I -- everything happened so fast. He -- he was just like you better hurry up and get this over with be-- before I become judge or I'm going to throw the book at you and that -- that's all I did was just listen to my court -- my court-appointed lawyer, my representation.

Q. And, in fact, that day, July 29, 2013, you had both a jury and/or a judge to have your case tried in front of and then you selected, signed and stated on the record that you didn't want the jury and you wanted the judge to do it. Which is exactly what you got, right?

A. I have no idea. I don't -- I did not -- I was not aware I was there for a jury trial.

Q. Well, the truth is is that you just aren't happy that ultimately Judge Harris gave you eight years and you feel he treated you unfairly, correct?

A. No, sir. That's not correct.

Q. Isn't that why you are alleging in your various letters and your statement here on the record earlier today that you believe that somehow --

A. I'm here --

Q. -- he was --

Can you, again, please let me finish my question. Because she can't --

THE COURT: Wait. Let him finish.

Q. (By Mr. Pratt) I'm not trying to bully you. It's just she can't take both of us talking at the same time and type.

A. Yes, sir.

Q. All right. So that -- because really what you thought was that Judge Harris was somehow my judge and that he treated you unfairly and that's why you got eight years, right?

A. No, I'm just asking. I -- I -- I just -- I don't know. I'm just asking. I don't -- I just -- the only thing I feel is that the way Mr. Terence Russell approached me, that I was -- I was afraid that he was going to -- it was going to be a harsher punishment. Even though now that I found out he cannot be the judge over me if he was elected.

Now, all that other stuff, I -- I don't know because I'm -- I don't know the system. Yes, every time I -- I've been -- this is my third time to TDC prison and I -- I am aware, you know, I do do -- go do my time, you know, but I don't know the system. I don't know how it's supposed to work, you know, the court and all that. I'm -- I'm green at that. But I do -- if there is one thing I do know is that Mr. Terence Russell told me if I do not hurry up and do this and get it over

with, he's going to throw the book at me when he takes the stand or becomes the judge. Whatever that means. Stand, judge, whatever.

Q. Well, ultimately since you were going to be tried one way or another on July 29th, either before that jury or judge, I guess that ultimately doesn't matter, but what I guess my question is, is that had Mr. Russell not made those statements, which you allege that he made, what would you have done differently that day on July 29, 2013, on your trial date?

A. I haven't thought about it. But talk to my lawyer. Go to trial.

Q. Which would have been right there that day, correct?

A. I don't know. I --

Q. Well, let's say that it was.

A. I don't have no idea. I don't know because I can't...

MR. PRATT: I don't have any further questions, Your Honor.

THE COURT: Thank you.

Mr. Bennett.

MR. BENNETT: Just briefly.

FURTHER EXAMINATION

BY MR. BENNETT:

Q. So apparently you went to court last year at the end of July and you ended up being sentenced in early August. And I think we've already discussed that. Is that correct?

A. Yes, sir.

Q. Okay. Now, are you telling the Court you did not understand that on that day, July 29th, or whatever date it was, you did not understand at that point that you were either going to have a jury trial on that day or you were going to plead something in front of the judge?

A. Yeah. I mean...

Q. Did you understand that?

A. No, sir.

Q. Okay. Did Mr. Russell not explain that to you?

A. I really can't remember, but I don't -- as today, no, I don't -- no. No, sir.

Q. And what you wanted was either, like we've talked about, a plea offer on an unauthorized use charge, you wanted to contest the weapons charge? You wanted -- you wanted -- you wanted a trial on the weapons charge?

A. A trial, yes.

Q. And you're saying to Judge Mayfield, to the Court, you would not have pleaded no contest on this --

A. Right.

Q. -- charge except for the fact that Mr. Russell told you he was going to be the judge and he'd throw the book at you?

A. Yes, sir.

Q. And that's a paraphrase. I don't know exactly what he told you, but something to that effect.

A. That's what it was.

Q. Okay. And you understand that if you had not pleaded no contest to the Judge, then the other option would have been a trial?

A. Yes, sir.

Q. Okay. And what you're telling the Court is you're not aware, you don't recall that the trial would have actually happened that day?

A. I was not aware of that, no, sir.

Q. Okay. Do you feel like your plea was involuntarily because of that advice he gave you?

A. Yes, sir.

MR. BENNETT: That's all I have, Judge.

THE COURT: Thank you.

Anything further?

MR. PRATT: Your Honor, I'd like to ask the Court to take judicial of the Court's file in this matter.

THE COURT: All right.

MR. PRATT: Additionally, I do not see a file mark on the particular document, so I'd like to show it to the witness and ask him if that's his signature on that document.

THE DEFENDANT: Yes, it is my signature.

MR. PRATT: All right. I would like to mark this as State's Exhibit 1.

(State's Exhibit No. 1 was marked)

THE DEFENDANT: Is there any way I can use the restroom?

THE COURT: Sure. We'll take a short break.

(A break was taken)

THE COURT: All right. We're back on the record.

And you had had the exhibit marked as State's 1?

MR. PRATT: Yes, Your Honor. The State offers State Exhibit 1.

(State's Exhibit No. 1 offered)

MR. BENNETT: No objection, Your Honor.

THE COURT: State's 1 is admitted.

(State's Exhibit No. 1 admitted)

MR. PRATT: The State has no further

questions, Your Honor.

THE COURT: Thank you.

Any other witnesses?

MR. BENNETT: Your Honor, I have no further witnesses.

THE COURT: Okay. Did you wish to call Mr. Russell, or question Mr. Russell?

MR. BENNETT: Well, Judge, I think the only evidence before the Court is what my client heard ) Mr. Russell say and so I don't think there's any evidence to contradict what Mr. Russell told him under this current record.

THE COURT: And that's why you don't want to call any other witness. That's fine.

Does the State wish to call any witnesses?

MR. PRATT: No, Your Honor.

THE COURT: That's very interesting. I think at this opportunity I'm acting more as a hearing examiner than a judge and I think I have the right to .call Mr. Russell and ask him so that I can enter findings of fact. If I haven't the authority, then that can be discussed with the Court of Appeals.

Ask Mr. Russell to step in.

(Mr. Russell enters the proceedings)

THE COURT: Mr. Russell, if you'd take the

witness stand.

(Witness was sworn)

THE WITNESS: I do.

THE COURT: Thank you. Please be seated.

Neither side has elected to call you, but as the hearing officer in this particular case I've asked -- or I've had you subpoenaed and placed you on the stand.

You remember this particular case with Mr. Lee?

THE WITNESS: I do recall the majority of it. I recall the actual incident for which he was arrested and almost all of my negotiations with the DA and then what we eventually did in this case.

THE COURT: Okay. And what do you remember of the -- the plea bargain that was made at the final hearing on July the 29th, 2013, when he entered a plea of no contest, or was there a plea bargain?

THE WITNESS: Well, if I -- if I may begin from the beginning, Your Honor, and kind of let you know how this case came to the point that it did.

I recall that at arraignment when Mr. Lee and I showed up, Mr. Pratt looked into the case that was a felon in possession and said I don't believe we can prove that he did this. We can't prove this case

because I can't -- I -- I can't -- I don't think I can prove that he knew it was there.

THE COURT: The firearm?

THE WITNESS: Right. So he plead not guilty to both of those cases.

The next thing that we had was we -- we went to -- the case got assigned to Nicole Crain. And I went in to Nicole Crain and Nicole said, Well, I'll offer him four on the UUMV case and we'll 12.45 the other case. I told her -- I say, Well, we can't 12.45 it because that's not a dismissal. That -- that is like a -- a -- a -- basically a -- a plea and avoidance thing. I said -- I said you got to dismiss that case.

I talked that over with Mr. Lee and Mr. Lee understood exactly what we were saying. I went back and told her the same thing. So we agreed that since she wouldn't do that that we were going to have to do something else. So we went before the Court with the plea recommendation -- should be at the top of the thing -- and told the Court that we were not accepting that plea bargain. Now --

THE COURT: And that was on the pretrial conference?

THE WITNESS: Right. The final pretrial conference date.

THE COURT: Okay.

THE WITNESS: And Mr. Lee and I both went in the Court and advised the Court that that was our decision.

Now, it seems to me -- and I don't really remember why, but this case was really expedited very fast to court. And where we'd been in front of Judge McGregor and gave our decision that we were going to proceed to -- not proceed to a guilty plea or a no contest plea at that point and we were going to do something else. We were in front of Judge McGregor and then it got really expedited and the next time -- I remember this -- we were somehow set in front of Judge Harris and Mark Pratt was going to -- going to be handling the case.

Now, between that date and the date we actually had the hearing, I remember Mr. Lee called me back up and he said, Look, I'll take the four years. And I contacted Mark and I said Mr. Lee said that he's agreeable to take the four years and Mark told me -- he said, Well, we're past the final pretrial date so there is no more plea bargains available.

THE COURT: So the plea bargain had been withdrawn.

THE WITNESS: So the plea bargain had been

withdrawn at that point. So we go into the hearing and we actually had the hearing. And I think that what we did we decided to plead no con-- no contest to the -- to the UUMV charge and go to the Court for the punishment, if I -- if I -- to the best of my recollection, I believe that's what we did.

And Mr. Pratt announced to the Court at that time that he was going to dismiss the felon in possession case. So we only proceeded on the UUMV charge. And -- and at the result of the hearing, the -- the Judge sentenced him to eight years, which -- which was twice the amount that was actually offered in the original plea bargain. I pointed to the Court in -- in my closing argument that that final pretrial conference sheet was in the file and exactly why we had set the case for this hearing was because that we -- that they would -- would not dismiss the felon in possession case if we plead to the UUMV in that -- in that material. And that was exactly why we had the hearing and I was just hoping that the Court would understand that and would give him the four years that he had agreed to take once the -- the felon in possession case had been dismissed.

THE COURT: Any questions?

EXAMINATION

BY MR. BENNETT:

Q. Mr. Russell, do you remember telling Mr. Lee that you were running for judge at that time?

A. I don't recollect when this was. I don't think that I had announced at that point. I may have discussed to him that I was contemplating that, yes.

Q. Do you recall telling him anything about if you were elected judge, that you would throw the book at him if you were the judge?

A. I never would have told him that at all.

Q. Did Mr. Lee understand on July 29th, or whatever the date was, that y'all were actually set for a jury trial?

A. I believe -- yes, I believe that was what was reflected in the trial readiness certificate we had that -- that we were set for a jury trial, but at the time we did not go forth with the jury trial.

Q. Yeah. I understand what the paperwork says. I'm just asking you if you fully explained that to him, if he understood that it was actually set for a jury trial on that day?

A. Well, I explained to him what we were doing, yes, that -- that -- I mean he sign-- he signed off on the paperwork and I showed him down there where the date was at and -- and, you know, what -- that -- that it was

set for a jury trial, yes.

Q. So you explained it to him, what he was signing?

A. Yes.

Q. And you felt like he understood what was going on?

A. Yes.

MR. BENNETT: I'll pass the witness, Judge.

THE COURT: Mr. Pratt.

EXAMINATION

BY MR. PRATT:

Q. July 29, 2013, actually was the jury trial date for this case. Is that not right?

A. Yes, I believe that's right. To the best of my recollection.

Q. What your client, Mr. Lee, did not want to do is take a conviction in both cases with four year concurrent sentences, which was his final offer in this case; is that right?

A. My understanding was the offer was basically that he would plead to the UUMV case and that the felon in possession was to be 12.45'd, which means it was going to be taken into consideration on the sentencing of the other case. Which like I say, is a plea and avoidance type of plea.

Q. That was something you said that you discussed with my assistant Ms. Crain, and y'all ultimately rejected handling something like that?

A. Right. When we couldn't get the dismissal, we -- we didn't know what to do at that point. Because that was -- that was Mr. Lee's contention that he wouldn't accept anything but a dismissal of the felon in possession case.

Q. Mr. Lee ultimately decided that he did not want to have a jury determine his guilt or innocence in the UUMV case; is that correct?

A. Yes.

Q. And, in fact, he entered a plea because he didn't contest whether or not he was guilty of that particular charge; is that right?

A. I believe that's correct, to the best of my recollection. I do remember that we stipulated all the -- all the police reports that we didn't have any actual witnesses.

Q. And then, although, he had a jury there for July 29th to have had this matter -- his sentence determined by a jury, he -- he decided he wanted that to be done by a judge and waived his right to a jury for sentencing and decided to proceed before a judge; isn't that correct?

A.    That's correct.

MR. PRATT:  I'll pass the witness.

THE COURT:  He's passed the witness.

MR. BENNETT:  I'm sorry, Your Honor.

THE COURT:  That's all right.

### FURTHER EXAMINATION

BY MR. BENNETT:

Q.    Mr. Russell, did you advise Mr. Lee that it would be in his best interest not to have a jury trial in this case?

A.    I don't recall.  Given the circumstances that -- that existed at the time, I would -- I would suspect that I told him that it probably was not his best option, yes.  But I don't recall whether I actually told him that or not at this time.

Q.    Well, he acted on someone's advice or -- to -- to decide to waive the jury and just have a -- a bench trial, did he not or --

MR. PRATT:  Objection; calls for speculation.  We don't know whether or not he -- he did that on his own volition or based on someone's advice.  It would be purely speculation.

THE COURT:  The witness can answer the question if he knows.

Q.    (By Mr. Bennett)  What do you think?

A.   Yeah.   I'm pretty sure that I'd -- I would have advised him of that.   Like I say, that's what I believe today and I don't think I would have believed anything other at -- at that time.

Q.   So you -- you thought it was in his best to plead no contest to the Court.   Is that a fair statement?

A.   Yes.

Q.   And you advised him of that?

A.   Like I say, the best of my recollection, I don't recall.   But I -- I -- I do believe that I -- I would have done so, yes.

Q.   Okay.   But -- but you're still telling the Court you never told him that -- that you were about to be elected judge and that you would throw the book at him if you were on the bench in this trial?

A.   I don't recall that.   Because, like I say, I -- I wouldn't have made that determination.   I may have told him that -- that I felt like the jury might do that because of his prior record.

MR. BENNETT:   That's all I have, Judge.

FURTHER EXAMINATION

BY MR. PRATT:

Q.   So were your recommendations then taking into account the strength of the case in this matter, which

involved a videotape of the Defendant actually committing this particular offense, as well as his criminal record showing at least three prior final felony convictions, including a couple of trips to state jail and one to the penitentiary for aggravated assault with a deadly weapon?

A.  I took that -- all that into consideration. The fact that the -- that -- that there was a videotape and there was also a LoJack in the vehicle.  So it was -- he was found easily, yes.  And found behind the wheel.

Q.  Yeah.  He was actually observed and caught while driving the stolen vehicle en route from the place from which he stole it heading down the interstate, correct?

A.  That's correct.

Q.  And, in fact, in there there were a number of items taken out of the center console of that vehicle, which contained the weapon --

MR. BENNETT:  Judge, I don't think --

Q.  (By Mr. Pratt)  -- in which he was charged with, correct?

A.  I don't --

MR. BENNETT:  I don't see the --

A.  -- recall that --

MR. BENNETT: -- relevance of going into the facts of the underlying offense here.

MR. PRATT: Well, I believe if we're -- what we're going in to is whether or not his recommendations regarding how to proceed with the matter were reasonable or not, then what else would you look at except for the facts in this particular case.

THE COURT: Well, I don't know that we were going in to whether or not his recommendations were -- was reasonable under the facts. But I think is -- the question was whether he had made certain representations or -- or recommendations. Whether or not they're reasonable recommendations is -- is another matter. But as you say, it would necessitate knowing what the basis of those recommendations were.

I'll overrule the objection, but there's no need to go in any great depth on the underlying case.

MR. PRATT: I'll withdraw my question then, Your Honor.

THE COURT: Thank you.

All right. Anything further?

MR. BENNETT: No, Your Honor.

THE COURT: All right. Thank you very much.

THE WITNESS: May I be excused, Your Honor?

THE COURT: Any objection to this witness being excused?

MR. PRATT: No objection.

MR. BENNETT: No, Your Honor.

(Witness was excused)

THE COURT: All right.

Any further witnesses or any further evidence to be submitted to the Court?

MR. BENNETT: Your Honor, could I recall Mr. Lee just briefly?

THE COURT: Certainly.

Mr. Lee, I'll let you testify from where you're seated.

THE DEFENDANT: Yes, sir.

THE COURT: And you may proceed.

You're still under oath, Mr. Lee.

FURTHER EXAMINATION

BY MR. BENNETT:

Q. All right. Mr. Lee, now after thinking a little bit further about it, do you -- you understood when you guys went back to court on July 29th --

MR. PRATT: Objection; leading.

THE COURT: Sustained.

Q. (By Mr. Bennett) Could you state whether or not when you went to court on July 29th that you

understood that that was for jury selection?  Yes or no?

A.  I think I did know that it was for jury selection.

Q.  Could you state whether or not you understood jury selection was the same thing as the actual jury trial beginning on that day?

A.  No, I did not.  I did not know that.

THE COURT:  Have you ever been to a jury trial, Mr. Lee?

THE DEFENDANT:  No, sir.

THE COURT:  Okay.

Q.  (By Mr. Bennett)  The -- the indictment refers to three prior felony convictions.  So are you telling the Court that you pleaded guilty in all those cases?

A.  Yes.

MR. BENNETT:  That --

A.  Or no contest.

MR. BENNETT:  -- that's all I have, Judge. I just wanted to clarify his understanding of --

THE COURT:  What the process was.

MR. BENNETT:  -- what that process was, at least from his perspective.

THE COURT:  So you understood that a jury was going to be selected that day.

THE DEFENDANT:  I know a jury was going to

be selected. I -- I don't know -- if going to be held that day or not, I did not know.

THE COURT: Okay. But you didn't know it wasn't going to be, you just didn't know exactly.

THE WITNESS: Right.

THE COURT: But you knew that it would -- that you were going to enter a plea of some sort, either not guilty or --

THE DEFENDANT: I --

THE COURT: -- no contest or something?

THE DEFENDANT: -- I didn't know if I was going to enter a plea or not. I wasn't...

THE COURT: Okay. You had previously entered a plea of not guilty and -- and requested a jury trial, according to the documents I have here. Did you understand that that was going to be happening?

THE DEFENDANT: That I was going to go to trial?

THE COURT: Yeah.

THE DEFENDANT: I could -- yes, sir.

THE COURT: Okay. And you knew that was the day the jury was going to be selected?

THE DEFENDANT: I knew it was, yes, sir.

THE COURT: You became aware of that when you got there?

THE DEFENDANT: It's --

THE COURT: Yeah. Okay.

THE DEFENDANT: I just didn't know that there was going to be a court date then.

THE COURT: That's fine. That's fine.

MR. PRATT: Was that your last question?

MR. BENNETT: Yeah.

MR. PRATT: Pass the witness?

MR. BENNETT: I pass the witness, Your Honor.

THE COURT: You pass and I pass.

## FURTHER EXAMINATION

BY MR. PRATT:

Q. And so, Mr. Lee, despite your testimony under oath here earlier that you had no knowledge or -- or memory that there was going to be a jury that day, you're saying that -- that now your memory is starting to come back and you remember that, right? You're not saying that you were lying earlier, but you're just saying that now --

A. I knew that there wasn't going to be -- I was not aware there was going to be a trial right then and there. I that knew that there -- there was a bunch of people coming in in street clothes, going in there and just sitting down waiting for whoever's in there to get

done with -- that's what -- how I took it. And -- that's how I took it. I didn't know that there was going to be a trial date. I thought there was like a jury selection. I didn't know how that -- I don't know how that process works at all. Just a jury selection. Like they were going to pick -- like the -- the courthouse had 50 people in it. 40 -- 40 or 50 people in there. I didn't --

THE COURT: In the courtroom?

THE DEFENDANT: Yes, sir.

THE COURT: Okay.

THE DEFENDANT: I -- I didn't -- how much does the jury trial take? Six or 12? So I didn't that they were going to have all -- you know...

THE COURT: Okay.

THE DEFENDANT: Do you understand what I I'm saying at all?

THE COURT: I -- I think I do. I understand your answer.

Do you have any further questions, Mr. Pratt?

Q. (By Mr. Pratt) Are you making any claim today that you're incompetent to proceed with this particular hearing or have any type of mental issues that -- that --

A. No, I'm not.

Q. -- would cloud your testimony today?

A. No, sir.

MR. PRATT: I'll pass the witness.

THE COURT: Okay. Mr. Bennett, do you have any further questions?

MR. BENNETT: No further questions.

THE COURT: Okay. The Court has no further questions -- or I have no further questions. I keep calling myself the Court because I'm kind of used to doing that in other context. This is a hearing to make certain findings of fact.

THE DEFENDANT: Yes, sir.

THE COURT: And I guess technically I'd be called a Hearing Officer. But I'm not exactly sure. The -- the statute I'm appointed under is 11.07 (c) of the Code of Criminal Procedure. I think (c) (e) or something. Anyway...

I've heard everything y'all wanted to put forward. I've asked the questions that I needed to have answered. I'll prepare findings of fact in regard to this matter and submit those back to Judge -- Judge Harris and he will submit them on or determine what he's going to do with them. Submit them on, I think to the Court of Criminal Appeals, who will take them into

consideration in regard to your writ.

And then we'll proceed forward on your writ. Okay?

THE DEFENDANT: Do I -- do I go back to TDC or do I stay here -- stay here in town?

THE COURT: You'll be going back to TDC. You'll get more time credit that way.

THE DEFENDANT: It don't matter. I'm in seg anyway. I don't get good time.

THE COURT: Well, you need to get out of there.

Okay.

THE DEFENDANT: All right.

THE COURT: All right. You can visit with your attorney if you need to any more. If you have some questions before you go back, you can.

(Proceedings concluded)

STATE OF TEXAS        )

COUNTY OF HILL        )

       I, Sherry Folchert, Court Reporter, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

      I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

      I further certify that the total cost for the preparation of this Reporter's Record is $216.00 and was paid by Hill County.

      WITNESS MY OFFICIAL HAND this 2nd day of December, 2014.

/s/ Sherry Folchert

_____
Sherry Folchert, CSR 6259
11001 Deer Trail
Fort Worth, Texas 76140
817-946-5399

# EXHIBIT G

State of Texas
V.S.
Curtis Lynn Fields

Cause No. 37617

FILED
2013 MAY -8 AM 9:46
ANGELIA ORR DISTRICT CLERK HILL COUNTY, TX

Motion to dismiss attorney and request an alternative court appointed attorney.

It is further requested that council in the person of Terrence Russell is hereby relieved of any future professional obligation, responsibility or duty to the defendant (Curtis Fields) other than providing access to any and all materials which are necessary to represent the defendant (Fields) in this case and which are within his/her possession to substituted council.

Signed and entered _Curtis Field_ Curtis Fields

Signed and entered Judge Presiding
66th District Court
Judge McGreggor

_____

date 5-6-13

Curtis Fields _Curtis Field_

Page 1

Cause No 37617

Terrence Russell is currently my (Curtis L. Fields) court appointed public defender. However, I do not believe that I am being represented adequately or defended justly. I pray that the Court will Consider and grant this request for the appointment of alternate Council. The following is a synopsis of arguements I submit to the Court:

* It is my belief that if Russell would have presented the four alibi statements on my behalf in a timely manner to the prosecution, I would have not even been indicted.

* Russell falsely assured me that he would help me pursue the aquisition of material facts that would clearly prove my innocense. His procrastination has cost me months of needless time in jail, and senseless costs to the county.

* I believe Russell has deliberately withheld information that I have repeatedly requested. I believe Russell purposefully seeks to prevent a dismissal so that he can take the    Page 2

Curtis Fields Curtis Fields 5-6-13

Cause No. 37611 ₵ₚ

Case to trial and win. After over five months of sitting in jail, I am just now viewing documents that caused my arrest that are 100% fabricated. Today, line by line, the plaintiff can be proven to have perjured himself in his (Johnny½ Johnson) statement to police at least on seven counts.

* Russell seems to be a block to my defense rather than a means to reveal my innocense. Russell is deceptive when I ask questions or make simple requests.

* Russell refuses to file a Motion of Discovery and downplays the importance of the procedure.

* Russell told me he would attempt to represent me simultaneously in Hill and McLennan Counties, but has not made one step in order to do so. This has cost me valuable time for my defense. Other inmates have this opportunity.

* Russell refuses to cooperate with outside support. [Page 3

Curtis Fields, Curtis Fields 5-6-13

Cause #37617

* Russell emphasizes that he is utilizing political strategies to win votes for the up-coming judge's position. I believe this is in conflict with my representation. I believe politics interfere with his professional judgement in my case.

* Russell has participated in negative court-house gossip which could negatively affect the credability of my witnesses.

* During the hearing for my Bond Reduction, I was stunned that Russell did not make an opening statement or offer any of the evidence in my behalf, to warrant a dismissal. Russell was too pre-occupied with the deal transpiring with the assistant D.A. to encourage me to sign a plea bargain.

* I do not believe Russell is prepared or is attempting to prepare for the Pre-trial hearing. Russell is new to Hill County and is too timid or too over-loaded to represent me properly.

I declare that this is a true and correct document.

Curtis Fields Curtis Fields.     5-6-13

Page 4

# HILL COUNTY AFFIDAVIT OF INDIGENCE

**This section to be filled out by Court Personnel**

No. _____

The State of Texas        In the _____ Court

vs.

_____        _____ County

Offense _____        Level of Offense _____

---

All information must be completed by the defendant and must be current, accurate, and true. Intentionally or knowingly giving false information may result in your prosecution for the offense of aggravated perjury, a felony. The punishment for aggravated perjury includes imprisonment not to exceed ten (10) years and a fine not to exceed ten thousand dollars ($10,000). Please fill in all blanks. If you do not know the information being asked, enter DO NOT KNOW in the blank. If the information being asked does not apply to you, enter N/A in the blank.

## Defendant's Personal Information

34231

Name *Curtis L. Fields*

Phone Number *N/A*

Street Address *406 Hall Street*

City, State, Zip *Hillsboro, Tx. 76645*

Social Security # *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*

Driver's License # *138 158 44*

Date of Birth *12-26-68*

Name of Spouse *N/A*

Dependents: *N/A*
Name(s) (list below):      Age      Relation      Income

*None*

*Cause # 3 376 17*

Are you currently in jail or in a correctional institution?

___ No

_✓_ Yes    If yes, provide name of institution:

*Hill County Jail*

Are you currently residing in a mental health facility?

_✓_ No

___ Yes    If yes, provide name of facility:

Do you have an application pending at a mental health facility?

_✓_ No

___ Yes    If yes, provide name of facility

Hill County Indigent Defense

Employer Information
Employer
Phone Number
Supervisor's Name       *None*
Street Address:
City, State, Zip
Hours worked       ___ per week   or   ___ per month
Pay rate
Spouse's Employer
Street Address:       *None*
City, State Zip
Hours worked       ___ per week   or   ___ per month
Pay rate

If unemployed, list:
Length of time unemployed
Name of previous employer       *Herb Horn*
Street Address of previous employer:   *3905 Prescott Ave*
City, State, Zip       *Dallas, Tx 75219*

## Defendant's Financial Information

Public Assistance
Are you currently receiving (check all that apply)
*None*
___ Food Stamps
___ Medicaid
___ Public housing
___ Temporary Assistance to Needy Families (TANF)
___ Supplemental Security Income (SSI)

| Expenses (Monthly) | Monthly Payment |
|---|---|
| Rent or Mortgage Payment | |
| Car Payment | |
| Insurance (Life, Health, Car, Homeowners, etc.) | |
| Child Care | |
| Child Support | |
| Water | *5 plus months* |
| Gas | |
| Telephone | *incarcerated* |
| Electricity | |
| Food | |
| Clothes | |
| Medical | |
| Cable TV or Satellite TV | |
| Pager | |
| Cell Phone | |
| Loan and Debt Payments | |
| Outstanding Loans (list type of Loans) | |

Credit Card Debt (list name of cards)
$ *None*       Balance:
$ *None*       Balance:
Other Monthly Expenditures (Describe)

| Income (Monthly) | Monthly Amount |
|---|---|
| Take Home Pay | |
| Spouse's Take Home Pay | |
| Investment Income | |
| Stock Dividend | |
| Bond Dividend | |
| Rental Income | |
| Pension Payments | |
| Unemployment | |
| Social Security Benefits | |
| Child Support | |
| Public Assistance | |
| TANF | |
| SSI | |
| Medicaid | |
| Other | |
| Cash Gifts | |
| Other (Describe) | |

**TOTAL GROSS MONTHLY INCOME**       *0*

**TOTAL MONTHLY EXPENSES**       *0*

**Assets**

| Asset | Value |
|---|---|
| **A. Place of Residence** ___ Rent ___ Own<br>Describe if house, condominium, apartment, other: | $ *None* |
| **B. Real Property Owned**; Description/Location: | $ |
| **C. Automobile(s)**<br>Make        Model        Year | $ *None* |
| Make        Model        Year *None* | $ |
| Make        Model        Year | $ |
| **D. Stock and Bonds** (provide description) | $ |
| *None* | $ *None* |
| | $ |
| **E. Other Property** (list all jewelry, equipment, watercrafts, etc.) | $ |
| *None* | $ *None* |
| | $ |

**F. Bank Accounts**

| Bank Name | Type of Account | Balance |
|---|---|---|
| | | $ |
| *None* | *None* | $ *None* |
| | | $ |
| | | $ |

| G. Other Assets (Identify)<br>*Carpentry tools* | VALUE<br>$ *~100.00* |
|---|---|
| **ASSETS TOTAL VALUE** | $ *~100.00* |

I have / have not (circle one) attempted to hire an attorney. The names of the attorneys I have contacted are as follows: *Current Court appointed attorney     Terrence A. Russell*

*Pray to a Change Council*

On this ___6___ day of ___May___, 20 _13_, I have been advised by the (name of the court) Court of my right to representation by counsel in the trial of the charge pending against me. I am without means to employ counsel of my own choosing and I hereby request the court to appoint counsel for me. By signing my name below, I swear, that all of the above information about my financial condition is current, accurate, and true. By signing below, I understand that a court official can verify any of the information for accuracy as required to determine my eligibility.

_____
Defendant's Signature

SUBSCRIBED and SWORN to before me, the undersigned authority, this ___ day of _____, 20___

_____
Clerk's Signature, Notary, Magistrate, or Peace Officer

This court finds the defendant        **is / is not**        indigent.

_____
Signature of Judge

Hill County Indigent Defense